**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **LUKE PATTERSON,** | § | |
| | § | |
| **JACOB PATTERSON, and** | § | |
| | § | |
| **GARY HEITZ,** | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.: 1:18-cv-998** |
| **V.** | § | |
| | § | |
| **BUDBO, INC.,** | § | |
| | § | |
| **LANEAXIS, INC.,** | § | |
| | § | |
| **LANEAXIS GPSCT, INC., and** | § | |
| | § | |
| **RICK LYNN BURNETT, a/k/a RICK** | § | |
| | § | |
| **BURNETT,** | § | |
| **Defendants** | § | |

**DEFENDANTS LANEAXIS, INC., LANEAXIS GPSCT, INC., AND RICK LYNN**
**BURNETT, a/k/a RICK BURNETT'S MOTION TO DISMISS FOR FAILURE TO**
**PROSECUTE AND REPLY TO PLAINTIFFS' RESPONSE TO ORDER TO SHOW**
**CAUSE**

Defendants LaneAxis, Inc., LaneAxis GPSCT, Inc., and Rick Burnett ("Burnett"), specially appear[1] to file this Motion to Dismiss under Fed.R.Civ.P. Rule 4(m) and Reply to Plaintiffs' Response to this Court's Order to Show Cause:

1. The Plaintiffs filed the Complaint on November 26, 2018.

2. Fed.R.Civ.P. Rule 4(m) provides: "If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.

3. Service has not been made upon Burnett and the 90-day deadline has passed.

4. Plaintiffs served the corporate defendants only after this Court issued its Order to Show Cause (Docket No. 4) and after the 90-day deadline had passed without seeking an extension from this Court.

5. In exercising its discretion under Fed. R. Civ. P. 4(m), this Court should dismiss the Complaint. The Plaintiffs have brought suit alleging, in part, Defendants' violations of the Budbo, Inc. Shareholders Agreement (the "Shareholders Agreement"). That same Shareholders Agreement requires mediation before a suit may be filed. Mediation did not occur prior to the filing of the suit (nor has it occurred since). Further, if mediation were unsuccessful, the Shareholders Agreement requires that the lawsuit be brought in California. The shareholders agreed not to bring any action or proceeding arising out of

---

[1] This Court does not have personal jurisdiction over LaneAxis, Inc., LaneAxis GPSCT, Inc., Budbo, Inc., and Rick Burnett. Accordingly, a special appearance is made exclusively for this Rule 4(m) motion. Defendants reserve the right to seek dismissal based upon the lack of personal jurisdiction.

or relating to the Shareholders Agreement in any other court including the United States
District Court for the Western District of Texas.


I.      **PROCEDURAL BACKGROUND**

On November 26, 2018, Plaintiff filed suit in the United Sates District Court for the
Western District of Texas.   Plaintiffs made no attempts to serve the Complaint on Defendants.

On April 3, 2019, this Court Ordered Plaintiffs to Show Cause for their failure to serve
the Complaint despite the passage of 128 days.

Plaintiffs scrambled and mailed the Complaint to the corporate defendants' agents for
service of process on April 4, 2019.   As of this date, Plaintiffs have not served Rick Burnett with
the Complaint.


II.     **FACTUAL BACKGROUND**

1.      <u>**The Introduction of LaneAxis and Bubo Technologies**</u>

In 2017, the Plaintiff herein operated Bubo Technologies, LLC (the "LLC" or "Bubo"), a
Delaware limited liability - a company which had developed a "Tinder-like" basic mobile app
focused on helping consumers find desired cannabis products in their area[2].   The members of the
LLC were:  Luke Patterson ("Luke"), Jacob Patterson ("Jake"), Gary Heitz ("Gary") and Nick
Heldreth ("Nick"). Through their business, the Bubo members developed a relationship with
Michael Colton, who at the time was seeking to expand his rapidly growing business venture

---

[2] Bubo'a cell phone application matches cannabis clients with coveted strains and items in their general
vicinity. Regularly alluded to as "The Tinder of cannabis," the app enables clients to "puff" or "go" on a
virtual pile of pot blossom strains, oils, edibles – all accessible at close-by dispensaries or for nearby
conveyance. Clients list wanted impacts or side effects, for example, tension or a sleeping disorder.  The
app provides a rundown of best strain matches. Each swipe right (a "puff") is recorded as a favored strain
or item.

involving cultivating, processing, and distributing cannabis and cannabis-related products to dispensaries.

Although the Bubo app appeared to provide potentially useful consumer services, its overall business and revenue model appeared lacking. The company claimed to have relationships with over 2,000 cannabis dispensaries and an active user base of 75,000 people, and as such there was a desire to accelerate this perceived momentum. Both figures were proven to be a hoax perpetuated by the Bubo members.

In the Spring of 2017, Colton introduced LaneAxis CEO Rick Burnett to the Pattersons. In March 2017, Burnett flew to Colorado with another LaneAxis shareholder to meet the Pattersons and Colton.  (Declaration of Rick Burnett, dated May 28, 2019 ("Burnett Decl.") at ¶¶ 2-3.)

As a veteran of GPS and logistics tracking software design, Burnett (whose proprietary GPS logistics software system was granted a full U.S. patent in March 2018), suggested integrating the LaneAxis back-end tracking software into the Bubo consumer interfacing system, and further pushing the functionality onto a blockchain-based platform. This could potentially provide cannabis dispensaries with a wealth of critical business analytics to maximize profits and services. In short, it was all about the data. The LaneAxis tracking feature, later dubbed "Budbo Trax," would provide all players in the cannabis supply chain real-time tracking visibility (crucial for such a security-sensitive product), unfiltered and immutable data, and most critically, give dispensaries invaluable insights into which products would sell best in their stores. Additionally, the LaneAxis platform would secure all critical documents and drastically simplify compliance and auditing for regulatory agencies. (Burnett Decl., at ¶ 4.)

In essence, Burnett was giving a nascent, essentially unfunded and inexperienced start-up Bubo team, access to not only his expertise in logistics and freight tracking achieved over 25 years in the trucking industry, but also to a patent-pending (at the time, but ultimately fully patented) software solution to grow the business.

2. __The Corporate Creation of Budbo – the Marriage of Bubo and LaneAxis__

In order to execute the "partnership" venture, the parties did NOT simply enter into a license agreement in which Bubo would license and access the LaneAxis patent-pending tracking system. Instead, (with each party being represented by their own counsel), the parties unfurled the following series of transactions that represented a partnership and an alliance:

1. Budbo, Inc. was incorporated on March 21, 2017.
2. On April 18, 2017, the following concerted steps were taken:
   a. Budbo issued shares to Luke, Jake, Gary, Nick, and LaneAxis GPSCT, Inc. (a subsidiary of LaneAxis) (collectively "Budbo Shareholders").
   b. Burnett was made CEO of Budbo.  Luke Patterson was appointed Budbo's President.  Jacob was appointed the company's Chief Technical Officer.  Gary has and continues to serve as Budbo's Chief Operating Officer. Nick served in an official capacity for Budbo until being terminated by Budbo's board.
   c. Two directors were appointed to Budbo's board:  Burnett and Luke.
   d. Budbo acquired 100% ownership of Bubo, including its intellectual property – the "Tinder-like" app, with Bubo becoming a wholly owned subsidiary of Budbo.
   e. Jake and Luke were each issued 700,000 shares of common stock of LaneAxis— representing 10% interest in LaneAxis.
   f. The Budbo Shareholders entered in a Shareholders Agreement (described, in relevant part, below) that would govern the corporate conduct of Budbo.
   g. A wholly-owned subsidiary of Budbo entered into a Software License and Services Agreement with LaneAxis for the use of the LaneAxis' Software System Technology and LaneAxis' ancillary technical support.  Because of the "partnership," the agreement provided that no royalty payment would be made to LaneAxis for use of its platform.  However, Budbo's subsidiary agreed for it or Budbo to cover LaneAxis' cost and expenses to deliver, maintain and service the Software System Technology.  Luke executed the license on behalf of the Budbo subsidiary.  (Burnett Decl., at ¶ 5; and Exhibit A-D & K-L.)

A press release issued by Budbo in May 2017 ("*Budbo Consumer Cannabis App Merges with LaneAxis Freight Tracking Platform to form Budbo, Inc.*"), extolled the relationship among the entities and demonstrated Plaintiffs' understanding of that relationship:

> "***LaneAxis will serve as the engine behind 'Budbo Trax,' the real-time, GPS-based tracking of cannabis movements from seed to processing to dispensary to delivery.***
> LaneAxis is an emerging player in the freight transportation industry, utilizing patent-pending design wrapped around GPS and internet technology to deliver real-time visibility over freight shipments. A driver mobile app serves as the backbone of the platform, which sends shipment data to a secure cloud vault providing immediate digital access to critical documents for auditing or compliance.
>
> "'Budbo now emerges as the dominant source of cannabis tracking and business intelligence,' says Luke Patterson, Budbo President. 'The Budbo app already gives consumers the most complete experience on the market when it comes to finding their favorite cannabis products. Dispensaries rely on our data to strategically stock their shelves. ***Our partnership with LaneAxis will launch our visibility and data offerings to the next level***.'" (Burnett Decl., at ¶ 6 and Exhibit E.)

On January 9, 2018, Budbo responded to an on-line inquiry on the Bitcoin Forum:

"Bubo Technologies was our original company that we built the Budbo app under. In March ***we merged with a company LaneAxis*** to add another suite of services, and formed Budbo, Inc. As we began implementing this technology within ours, we saw the need for blockchain within the cannabis industry as a whole, and formed another company Budbo Token International, LTD." (Burnett Decl., at ¶ 7 and Exhibit F.)

On January 27, 2018, the Bitcoinist cite described Budbo as follows:

"Budbo was originally founded by Luke and Jacob Patterson, Budbo set out to better educate customers about the cannabis industry.  With very little marketing, they were able to grow their network to three thousand dispensaries and over 75,000 users.

"As blockchain continued to revolutionize the way businesses operate, *Budbo pivoted to bring it into their business model, **merging** with Rick Burnett's LaneAxis.* LaneAxis, a virtual freight management network, allows shippers and carriers to more effectively and efficiently transact all the intricate business details in moving freight.

"Budbo positioned itself to become an enterprise solution for the cannabis industry, enabling everything from supply-chain management to compliance and regulation. In deploying BUBO tokens that serve as API keys to aggregate valuable data, Budbo can now provide actionable insights to growers, dispensaries, and consumers." (Burnett Decl., at ¶ 8 and Exhibit G.)

After the Plainitffs' initiated Burnett's dismissal, the Plaintiffs described the relationship as follows on the Telegram:

> "When LaneAxis was looking to potentially track cannabis shipments, they reached out to us at Budbo. Since LaneAxis is in the logistics industry it was not in their best interest to engage in the cannabis industry directly. In a deal struck in between the two companies, Budbo would be able to use their tracking technology and have an indenite [*sic*] license to use such technology under their patent without any costs." (Burnett Decl., at ¶ 9 and Exhibit H.)

In summary, the business plan contemplated the creation and marketing of the Budbo mobile app (a marriage of Bubo and LaneAxis technologies), which would store industry data in the blockchain to provide retailers with real-time analytics on consumer preferences. Deliveries would be tracked in real-time via GPS, with all true data and compliant documentation instantly stored in the blockchain's immutable ledger. This would provide an unprecedented solution for the secure storage of all historical records.

Consistent with the "merger," a number of pre-merger LaneAxis employees jumped on the Budbo enterprise to provide valuable work. These LaneAxis-associated contributors included: Andrew Rivera, Mason Burnett, Richard Levy, David Levy, Alex Williams, Charlie Sellers, Matt Guinn and, significantly, Rick Burnett who dedicated the majority of his workday to the development of Budbo. (Burnett Decl., at ¶ 10.)

### 3. The Creation and Purpose of Budbo Token International LTD.

On November 13, 2017, Budbo Token International LTD. ("BTI") was incorporated in the British Virgin Islands. Its owners are: Luke (50%) and Burnett (50%). (Plaintiffs claim that BTI is a Budbo subsidiary. This is inaccurate.) (Burnett Decl., at ¶ 11; Exhibit I and J.)

The BTI corporate structure was entirely separate from Budbo and LaneAxis. However, the purpose of BTI was to:

    a.   issue Ethereum-based tokens (the "Tokens") that would be the digital utilities that would power the mobile phone app (the Bubo component) and the cloud-based back-end business intelligence platform (the LaneAxis component) (collectively, the "Platform");

    b.   oversee the implementation of the Tokens on the Platform; and

    c.   oversee the distribution of proceeds of the anticipated Token sale in the best interests of the Platform and its users. (Burnett Decl., at ¶ 12.)

BTI's utility Tokens would enable the integration of the Budbo blockchain to all third parties via an Application Programming Interface (API), allowing for a single point, data-driven cannabis environment to quickly flourish. (Burnett Decl., at ¶ 13.)

BTI launched a Token sale in December of 2017 ("Token Sale"). To support the Token Sale, Plaintiffs and Burnett traveled to a number of blockchain conferences touting the mobile app with its integration of the LaneAxis technology. The picture below depicts Jake at a Los Angeles blockchain conference addressing the utility brought to the app by the LaneAxis technology. (Burnett Decl., at ¶ 14.)



By most measures, the Token Sale was a moderate success, although only the Plaintiffs know how successful it was. The sale concluded in March 2018. The official number of tokens sold, and the total amount of funding raised from the Token Sale remains unknown to Burnett, as Budbo CTO Jacob Patterson – the sole controller of the BTI crypto wallet --- has refused to disclose the official amount or give access to Burnett to such crypto wallet, despite numerous requests and demands to do so. All of the funds raised from the Token Sale were deposited into such BTI crypto wallet. (Burnett Decl., at ¶ 15.)

Budbo does not own or have any rights in BTI other than the Services Agreement entered into between BTI and Budbo on January 7, 2018 and promises made to the holders of the Tokens in the white paper that BTI and Budbo jointly published that BTI is there to support the buildout of the Budbo/LaneAxis Platform, to manage the token community and to oversee the funds

raised in the Token Sale for the benefits of the Platform and the Token holders.  (Burnett Decl., at ¶ 16.)

Part of the technology that BTI was intended to support was Budbo Trax, which is owned by LaneAxis, and discussed in detail in the BTI white paper issued to potential Token purchasers.  (Burnett Decl., at ¶ 17 and Exhibit M.)  The Budbo Token Sale was also intended to fund the buildout of version 2 of the Budbo mobile app, as well as launch the development of the LaneAxis blockchain platform, and finally, help fuel the launch of the LaneAxis token sale.

**4.  Transition to LaneAxis Token Sale**

Following the Budbo Token Sale, work began on the critical step to adapt the LaneAxis system to support the mobile app, including building the blockchain to be integrated with the app.  Due to its familiarity with the LaneAxis platform, Seamgen, an industry-leading digital agency specializing in mobile and web app design and development, was tapped to facilitate the build-out.  In addition, LaneAxis began its process of raising additional capital to support the build-out and its expansion.  (Burnett Decl., at ¶ 18.)

A necessary component of the Token Sale process involved bringing LaneAxis to various international blockchain conferences so it could continue to attract attention.  This was crucial to LaneAxis' development of the Platform.  Accordingly, Jake – the only individual with access to the BTI cryptocurrency wallet – processed distributions to finance these trips.  (Burnett Decl., at ¶ 19.)

It has been alleged that $100,000 was misappropriated by Burnett to finance at trip to London for "LaneAxis personnel."  This is a gross distortion of the truth designed to malign Burnett and LaneAxis.  These conferences were a vital step in the development of the Platform. Accordingly, it was not only "LaneAxis personnel" who attended.  Indeed, the Plaintiffs

themselves were not only in attendance, but were deeply involved in the planning (including all booth setup and ordering), promotional strategy, and budgeting of this trip. (Burnett Decl., at ¶ 20.)

The pictures incorporated herein depict Jake and Gary in front of the LaneAxis booth, actively participating in the London conference.  (Id.) Luke was photographed in front of the LaneAxis booth at the Shanghai conference.  (Burnett Decl., at ¶ 21.)

The LaneAxis Token Sale tour included stops in Shanghai, Bangkok, and London. Rick and several other team members then returned to the United States to prepare for another upcoming conference, while Gary, Luke and Jacob flew on from London – utilizing the "disputed" funds – to Singapore and Sydney, to represent LaneAxis at two more conferences.



Jake Patterson in London – April 2018



Gary Heitz in London – April 2018



Luke Patterson in Shanghai – April 2018

**5.   Burnett Did Not Transfer Crypto Currency from BTI to LaneAxis**

Plaintiffs have made claims in their demand letter that Burnett transferred $1.76 million from Budbo to LaneAxis and/or to himself, personally.  Plaintiffs know that this claim is insupportable.  The fund raised through the Token Sale were held *solely* in the BTI wallet. One person, and only one person, had the private key to the BTI crypto wallet and was in complete control of it – Jake Patterson. Burnett was never provided with the key to the wallet and thus he could not distribute BTI's digital currency nor monitor the wallet's balance.  (Burnett Decl., at ¶ 22.)

**6.  The Plaintiffs Plot to Disregard Agreements and Corporate Structure to Extricate from Their Relationship with Burnett and LaneAxis**

After 53-year old Burnett dedicated a year to the development of Budbo, his thirty-year old counterparts (Plaintiffs Luke, Jake, and Gary) schemed to extricate Burnett and LaneAxis from the Budbo venture.

The foundational meeting with Seamgen was scheduled for May 22, 2018, in San Diego. Luke and Jake failed to attend.  As Budbo's CTO, Jake's engagement in this meeting was vital. (Burnett Decl., at ¶ 23.)

Unbeknownst to Burnett, the Plaintiffs were moving Budbo in a completely different direction despite the inter-company agreements and despite the representations the parties had made at a number of the blockchain conferences.  (Burnett Decl., at ¶ 24.)As Gary wrote on the Telegram Budbo chat page, on December 4, 2018:

> "Rick Burnett is the chairman of the board for Budbo, INC and LaneAxis is a shareholder of Budbo that we formed a partnership to use their IP with the app. [The Plaintiffs] decided to no longer use the LaneAxis IP for the app and have decided to go a different direction."  (Burnett Decl., at ¶ 25 and Exhibit N.)

In May 2018, the Plaintiffs independently and without the knowledge of Mr. Burnett announced a partnership with Low Spark Capital to integrate delivery, tracking and shipping. LaneAxis was being supplanted without the knowledge or approval of its C.E.O. Burnett. (Burnett Decl., at ¶ 26.)

To add insult to injury, Jake shut off Burnett's Budbo email account and his access to the server.  Burnett's requests for reactivation of his email account were ignored and *remain so to this day*.  His appeals for financial information from BTI that lay in the hands of Jake were disregarded despite Burnett's position as BTI's treasurer, CEO, Secretary and director and *remain so to this day*. Furthermore, Charles Sellers is the third director of BTI and has been equally prevented by Plaintiffs from getting any financial information or access to BTI's records, cryptocurrency wallet and any other financial information. Plaintiffs have ignored all corporate rules, including The BVI Business Companies Act 2004, and BTI corporate formation documents and resolutions in place in absconding with the BTI funds and using them for their own purposes (the purposes of which are to this day unknown to the Defendants). (Burnett Decl., at ¶ 27.)

Meanwhile, Seamgen was progressing with the integration.  The preliminary work product of Seamgen's efforts are included in Declaration of Rick Burnett. However, progression came to a halt with Plaintiff's attempted *coup de grâce*.  (Burnett Decl., at ¶ 28 and Exhibit O.)

Jake, Luke and Gary faced a legal logistical problem.  Their deciding to abandon the LaneAxis technology for Spark was not simply a contractual matter.  LaneAxis and Plaintiffs were more than contracting parties.  They were co-owners in Budbo.  Further, because LaneAxis was the majority shareholder in Budbo and possessed a super majority of the voting stock, Plaintiffs' forcing Burnett's disengagement could not be achieved through appropriate corporate

protocol.  Accordingly, Plaintiffs' hatched a scheme to falsely accuse Burnett of impropriety

(misappropriating corporate funds for the benefit of LaneAxis and breaching his fiduciary

duties), and to continue to develop the Budbo business with Burnett constructively terminated.

Burnett's counsel has made numerous demands to Plaintiff's three successive attorneys

(identified below) asking that he and Burnett be provided access to Burnett's Budbo email, BTI's

crypto wallet and BTI's financial records showing how the funds from the Token Sale were

spent.  Indeed, it is anticipated that those emails and records would bear evidence to the propriety

of the BTI disbursements and Plaintiffs' endorsement of the distributions and the impropriety of

Plaintiff's spending the remaining BTI funds to support their scheme to oust Burnett from his

positions at Budbo and BTI.  However, for ten months, each of Plaintiffs and each of their

attorneys has refused to provide the sitting C.E.O. with access to his own business emails.

(Declaration of Jeffrey Katz, dated May 28, 2019 ("Katz Decl."), at ¶¶ 3, 8, & 10.)


   7.   **The Shareholders Agreement**

Article XVII of the Shareholders Agreement requires that any controversy arising under, out

of, in connection with, or relating to, the Agreement or the breach thereof, shall be submitted to

mediation, and, if not resolved by such mediation, shall then be determined and settled in a

California court of law.  (Burnett Dec., at Exhibit C, p. 13.)

Section F of Article XIX provides:

"This Agreement shall be governed by and construed in accordance with the internal laws of
the State of California without giving effect to any choice or conflict of law provision or rule
(whether of the State of California or any other jurisdiction) that would cause the application
of laws of any jurisdictions other than those of the State of California. Each of the parties (a)
submits to the jurisdiction of any state or federal court sitting in Orange County in the State
of California in any action or proceeding arising out of or relating to this Agreement, (b)
agrees that all claims in respect of such action or proceeding may be heard and determined in

any such court, and (c) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court."  (Id., at p. 15.)

8.  **Plaintiffs' Succession of Attorney Representation**

    a.  **Plaintiffs' New York Attorney Appears and Disappears.**

Untangling themselves from the Budbo's corporate structure would prove a challenge. Thus, the Austin-based Plaintiffs retained a big law firm New York counsel, Robert Schwinger, who drafted a letter to Burnett falsely accusing him of misappropriating funds from Budbo for the benefit of LaneAxis.  (See Exhibit B to the Complaint.)  This, despite BTI's mandate to use capital raised in the Token Sale for the benefit of the Platform which included LaneAxis as its backbone.  This, despite the fact that Jake was the sole officer with access to the BTI wallet and only he could appropriate funds from the wallet.  Schwinger's demands were clear: "[Luke, Jake and Gary] require that LaneAxis GPSCT, Inc. (i.e., [Burnett] as its designee tender of all of its shares of common stock and preferred stock in [Budbo], and that [Burnett] tender of your stock in Budbo Token International Ltd.  Additional you would need to resign as director and offer of the [Budbo] and as a director of [BTI]."  (Id.)

Clearly, the relationship among the parties had disintegrated and a separation needed to be negotiated.

Burnett's counsel, Orange County attorney Jeffrey Katz, attempted to negotiate with Schwinger, however the New York attorney disengaged in the process.  (Katz Decl., at ¶ 6.)

    b.  **Plaintiffs' San Francisco Attorney Appears, Demand Mediation and Disappears.**

One month later, a new attorney for Plaintiff's appeared – San Francisco attorney Matthew Didaleusky.  In his opening letter to Burnett's counsel, dated September 19, 2018, Didaleusky wrote: "[B]y this letter, Luke Patterson, Jacob Patterson and Gary Heitz hereby formally request that this matter sent [*sic*] to mediation pursuant to Article XVII of the Budbo, Inc. Shareholders Agreement. [¶] We are amenable to conducting mediation in Southern California. To that end, we are proposing that the parties engage either of the two following [Los Angeles-based] persons as the mediator ….  [O]ur clients are amenable to considering a different mediator that is proposed by Mr. Burnett." (Katz Decl., at ¶ 7 and Exhibit A attached thereto.)

In a letter dated October 1, 2018, Katz reiterated to Didaleusky that Burnett would participate in the mediation.  However, as the Shareholder's Agreement designated Orange County as the venue for resolution of disputes, Katz asked that an Orange County mediator be selected.  (Katz Decl., at ¶ 8 and Exhibit B attached thereto.)

On October 16, 2018, Katz provided Didaleusky with the name of a respected Orange County mediator and the phone number of his case worker so that the mediation could be calendared.  (Katz Decl., at ¶ 10 and Exhibit D attached thereto.)

Katz never heard from Didaleusky again.  (Katz Decl., at ¶ 11.)

### 9.  **Plaintiffs' Report Budbo's Insolvency.**

On October 1, 2018, prior to Didaleusky's disappearance, Burnett, pursuant to the Budbo by-laws and Delaware Code § 145(e), submitted an undertaking and asked Budbo to advance him the payments to defend Plaintiffs' claims.  (Katz Decl., at ¶ 8 and Exhibit B attached thereto.)

On October 5, 2018, Didaleusky replied to Katz's submission the undertaking stating that Budbo "lacks funds to meet such a request.  Unfortunately, the Company is insolvent, as its outstanding debts exceed its very limited available funds." (Katz Decl., at ¶ 9 and Exhibit C attached thereto.)

This report of Budbo's financial position was the first report Burnett had received regarding Budbo's financial condition since the Plaintiffs isolated Burnett from the company in which he was the C.E.O. and one of two directors on the board.

Burnett exercised the last vestige of authority that he had as an attempt to retrieve control of Budbo and properly guide it out of insolvency.  On October 15, 2018, LaneAxis GPCST exercised its majority voting shareholder right and removed Luke as director of Budbo.  Burnett, then the sole director of Budbo, removed Luke and Jake as officers of Budbo.

Katz informed Didaleusky of the terminations in an October 16, 2018 letter.  Katz also demanded the Pattersons provide detailed reports regarding worked performed since May 2018 and schedule of financial transactions. (Katz Decl., at ¶ 10 and Exhibit D attached thereto.)

Luke and Jake, to date, have ignored the request for such reports.  (Burnett Decl., at ¶ 29.)


10. **Luke and Jake's Claims of Wrongful Termination Are Disingenuous.**

Plaintiffs have reported that Burnett's decision to terminate Luke (who continued to serve as President following Burnett's being isolated from Budbo and shepherded Budbo into insolvency) and Jake (who continued to serve as CTO following Burnett's being isolated from Budbo and shepherded Budbo into insolvency, as the CTO, cut off the C.E.O.'s email access) was wrongful.  This report is insincere.

No C.E.O. would tolerate his direct reports' insubordination such as turning off the C.E.O.'s email, isolating the C.E.O., disregarding meetings with crucial vendors, etc. Furthermore, Luke and Jacob breached their fiduciary duties under Delaware corporate law and prevented Burnett from exercising his duties as a director of Budbo. Yet, Burnett's decisions regarding Luke and Jake were inconsequential.  Luke and Jake have ignored the terminations, vote of controlling stockholder and all essence of Delaware corporate law.  Instead, they have continued to run Budbo and move forward with the development of the platform.  Proof of this appears in the Telegram Budbo chat room where Plaintiffs kept the token holders and the public apprised of Budbo's developments.  For example, on December 4, 2018, Gary posted the following:

> "[I]t's only been 7 months and if you look at the roadmap you will see that we hired 3 tier 1 design and dev firms to work on design, development, and audience data building for the app and another firm for the blockchain solution. That is an update that we put on the site."  (Burnett Decl., at ¶ 30 and Exhibit N.)

And, on January 5, 2019, Gary posted the following:

> "[W]e are still in development. Everything about the app is changing. User journey and it's [sic] simplification, content experience, design and color, and there are several features we are adding to the app that we believe will be 'game-changers' and will set us apart from anything else on the market at this time. [¶] [W]e are an existing company and application that this is not our first rodeo.  We have a strategy in place, and it is in the best interest of our company as well as our token holders. [¶] Rest assured that we are progressing forward and very excited or what we have built it this far and what our plan

is for media and marketing strategy when we released the app."  (Burnett Decl., at ¶ 31 and Exhibit P.)

**11. <u>A Third Attorney for Plaintiffs Surfaces.</u>**

After Didaleusky's disappearance, there was silence from the Plaintiffs until the end of November 2018, when Justin Welch, an Austin attorney, surfaced and filed the Complaint herein.  Welch and Plaintiffs have now completely disregarded the Budbo Shareholders' obligation to mediate their dispute.  Further, Plaintiffs, although suing on violations of the Shareholder Agreement, have ignored that agreement's provision that requires lawsuits to be brought in California state court and in accordance with California law.

**III.    LEGAL ARGUMENT**

Fed.R.Civ.P. Rule 4(m) provides: "If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  Rule4(m) permits a district court to dismiss a case without prejudice if the plaintiff fails to serve the defendant within 90 days of filing the complaint. *Thompson v. Brown*, 91 F.3d 20, 21(5th Cir.1996).

In deciding whether to extend a plaintiff's deadline to serve the defendant pursuant to Fed. R. Civ. P. 4(m), courts must engage in a two-part inquiry. First, a court must determine whether there is good cause for the failure of proper service; if so, the court must extend the time for service and the inquiry is complete. *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1305 (3d Cir. 1995). Second, if no good cause is found, the court may, at its discretion, either grant an extension for service or dismiss the case without prejudice. Id.

In evaluating whether good cause exists for the failure of proper service, courts generally

consider three factors: "(1) whether the plaintiff has reasonably attempted to effect service; (2) whether the defendant is prejudiced by the absence of timely service; and (3) whether the plaintiff moved for an extension of time for effecting service." *Thompson*, 501 F. Supp. 2d at 604. Courts evaluating good cause primarily focus on the plaintiff's reasons for failure to obtain good service within the time limits of Rule 4. *Id*.[3]

1.   **The Plaintiffs Have *Not* Engaged in Continuous Settlement Discussions with Defendants.**

Plaintiffs have responded to this Court's Order to Show for their failure to serve timely the Complaint arguing, "[Plaintiffs' attorney] has since [the filing of the Complaint] been in *continuous* contact with [Defendants'] attorney *negotiating* settlement." (Plaintiffs' Response to Order to Show Cause, Docket #7, at 2.)

Contact has neither been "continuous" nor can the exchange between counsel be considered "negotiations."

On January 30, 2019, after an extended absence, Welch wrote to Katz, "Sorry to go dark." (Katz Decl., at ¶ 15 and Exhibit E.)

Thereafter, there was another long period of inactivity. Katz made a number of efforts to engage in conversation with Welch, however, he received no response. Alas, six days after this Court issued its Order to Show Cause, Welch reappeared with the following email:

"I want to apologize for ***my radio silence***. It is not how I like to interact with opposing counsel." (Katz Decl., at Exhibit G; emphasis added.)

---

[3] The fact that a defendant has not been prejudiced may, on its own, be viewed as insufficient to establish the "good cause" required to justify an extension of time to effectuate service. *Gonzalez v. E.I. DuPont Nemours & Co*., Civil Action No. 06-643JJF, 2007 WL 1034943, at *1 (D. Del. Apr. 4, 2007).

Welch's emails undermine Plaintiffs' contention that Welch has been engaged in negotiations.  In the April 9, 2019 email to Katz, Welch concedes:

> "[F]or reasons I cannot discuss, ***I have been unable to continue negotiations or discuss the case until now***."  (Id.; emphasis added.)

When he resurfaced, Welch did tender a settlement offer.  However, this gesture could hardly be deemed "negotiations."  That term "negotiation" contemplates "**an interactive process between two or more parties seeking to find common ground on an issue or issues of mutual interest or dispute, where the involved parties seek to make or find a mutually acceptable agreement that will be honored by all the parties concerned.**" (https://www.negotiations.com/definition/**.**)

The final sentence of Welch's email reflects that his clients were not interested in seeking common ground: "I want to emphasize that, although there may be room to refine language, my clients' are relatively firm on the major points."  (Katz Decl., at Exhibit G.)

On April 30, 2019, Katz telephoned Welch to follow up on his non-negotiable demand dated April 18, 2019.  Mr. Welch was unavailable. Accordingly, Katz left a voice-mail message for Mr. Welch to return his call.  Katz has not heard from Mr. Welch as of May 28, 2019.  (Katz Decl., at ¶ 18.)


2. **LaneAxis and Burnett Have Been Prejudiced by the Delay.**

After more than 90 days had passed since Plaintiffs' filing their Complaint, an on-line article was published on The Block, a website dedicated to blockchain news.  The article featured the allegations in Plaintiffs' Complaint which, of course, presented only the version manufactured by Plaintiffs' designed to arrest control of Budbo and expel Burnett.  Without

interviewing Defendants or their counsel, the author editorializes: "I'm not sure how Burnett is supposed to respond to all of this."  (Burnett Decl., at ¶ 31 and Exhibit Q.)

The author subsequently "updated" the article to minimize slightly the prejudice to the unserved parties.  He wrote that the Defendant "has not filed an answer because the lawsuit has never been served and that attempt to settle the case are outstanding."  (Id.) The author indicated a willingness to incorporate the Defendants' answer in the article, however, as the Complaint remains unserved on Burnett, there were few avenues to generate a responsive pleading.

Wrongfully extricated from Budbo – a company to which he dedicated 16 months of work --- Burnett has had to pick up the pieces and focus on LaneAxis.  However, the presence of this article, has prejudiced Burnett's ability to move forward from Budbo.

Throughout this period, Katz has made multiple requests to Welch to direct Jake to reactivate Burnett's Budbo email account and provide financial records of Budbo and BIT.  Jake has refused to accommodate the C.E.O.'s and director's request.

### 3.   <u>The Delay Must Be Presumed to Have Been Prompted by Bad Faith.</u>

Following an extremely long period of "radio silence" in which Defense counsel's pleas for conversation were ignored, Plaintiffs' counsel wrote to Katz: "**_[F]or reasons I cannot discuss_**, I have been unable to continue negotiations or discuss the case until now."  Katz subsequently asked Welch to explain the reason for why he forsook engagement with Katz, and Welch reluctantly told Katz that he was unable to divulge the reason.  (Katz Decl., at ¶ 17 and Exhibit G.)

What is clear is that there was "radio silence" for an extended period.  What is clear is that Welch was prevented by Plaintiffs from engaging.  What is clear is that was intentional. What is clear is that Welch was barred from sharing the reason for this tactic.

However, the aim behind Plaintiffs' device remains shrouded in mystery but reflects ill intent to orchestrate a corporate heist.  One must assume, based upon the lack of transparency, that this ruse was designed in bad faith calculated solely to benefit Plaintiffs at the expense of Defendants' interests.

**4.  <u>Plaintiffs Have Prejudiced Defendants by Continuously Prohibiting Burnett from Accessing His Budbo Emails and Financial Records.</u>**

Plaintiffs argue that their failure to serve Defendants will cause no prejudice because "there is no risk that Defendant[s] will lose or destroy evidence by which they can challenge the accusations…."  (Plaintiffs' Response to OSC, at 3.)

This argument ignores the fact that by dint of completely excising Burnett from Budbo for the last 12 months, Plaintiffs have prohibited Defendants' access to evidence to challenge the accusations.  Significantly, Jake, the Chief Technical Officer of Budbo, cut off Burnett's access to his Budbo emails and Plaintiffs have refused to provide Burnett with financial records of Budbo and BTI.  Despite the fact that Katz has made requests of each the three attorneys who have represented Plaintiffs that Burnett's access to his emails be restored and records be provided, Plaintiffs have and continue to refuse to comply with the request.  This, despite the fact that Burnett remains C.E.O. and one of 2 directors of Budbo and LaneAxis' wholly owned subsidiary remains a majority controlling stockholder of Budbo – although it is clear that Plaintiffs have rendered this titular only (as they have, by their conduct, constructively terminated Burnett from the C.E.O. position). Plaintiffs have continuously, intentionally and recklessly ignored, sidestepped and/or plainly violated all corporate rules, governance and agreements in place between Plaintiffs and Defendants.

5.  **Katz Did Not Agree to Suspend Service of the Complaint.**

Contrary to Welch's statement in his declaration, the attorneys never discussed suspending service of the Complaint.  That is because Katz immediately communicated with Welch and advised him that Burnett reconsidered his previous position and agreed to accede to Plaintiffs' demand.  (Katz Decl., at ¶ 14.)

In his July 10, 2018 letter to Burnett, Plaintiffs' first attorney, Robert Schwinger made the following demand:  "[O]ur clients also require that LaneAxis GPSCT, Inc. (i.e., you as its designee) tender all of its shares of common stock and preferred stock in the Company, and that you tender all of your stock in Budbo Token International Ltd. Additionally, you would need to resign as a director and officer of the Company and as a director of Budbo Token International Ltd."  (Complaint, at Exhibit B.)  Subsequently, the second of Plaintiffs' attorney, Matthew Didaleusky, reiterated the same demand.  (Katz Decl., at ¶ 8.)

In late November, Katz told Welch that Burnett agreed to submit to Plaintiffs' demand and tender his shares in Budbo and BTI and resign his positions, thus obviating the need for litigation.  However, postponing service of the Complaint was not discussed because Burnett agreed to Plaintiffs' demands. The Plaintiffs' that has delayed the process pulling in the reigns on their attorney and ceasing all talks.  This conduct does not justify an extension of time to serve Defendants. (Katz Decl., at ¶ 14.)

6.  **This Court Should Dismiss the Complaint and Not Permit Late Service on the Defendants.**

Upon a defendant's Fed. Rule Civ. P. 4(m) motion, this Court has two options.  It may either permit late service of the Complaint or it can dismiss the Complaint without prejudice. Defendants urge this Court to dismiss the Complaint.

The Shareholders' Agreement, upon which the Complaint is premised – indeed, the same agreement which supported counsel for Plaintiffs September 19, 2018 demand for mediation – requires (1) mediation before commencing suit; and (2) if unsuccessful, suit to be brought in California.  (Burnett Decl., at Exhibit C.)

Welch's emails reflect that there have been negotiations but there have been periods of "radio silence" and complex issues with which to deal.  A mediation before a professional mediator is designed to keep the parties at the table so that workable, common ground can be identified. If it the mediation is unsuccessful, the Plaintiffs can bring their lawsuit, anew, in California.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendants Burnett, LaneAxis and LaneAxis GPSCT, through their special appearances, pray that this Court dismiss this case for want of prosecution.

Respectfully submitted,

/s/ Seth P. Crosland
_____
Seth Crosland
Texas State Bar No.: 24069551
Attorney for Defendants LaneAxis, Inc., LaneAxis GPSCT, and Rick Burnett

Managing Attorney for:

Crossland Law Firm, PLLC
1848 Norwood Plaza, Suite 205B

Hurst, Texas 76054
P: 972-591-6919
f: 972-408-0713

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of May 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and electronic notice was issued to:

All parties in interest.

By:    /s/ Seth P. Crosland

Seth P. Crosland