Seth Crosland
Attorney for Defendants LaneAxis, Inc.,
LaneAxis GPSCT, and Rick Burnett

Managing Attorney for:

Crosland Law Firm, PLLC
1848 Norwood Plaza, Suite 205B
Hurst, Texas 76054
P: 972-591-6919
F: 972-408-0713

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **LUKE PATTERSON,** | § | |
| | § | |
| **JACOB PATTERSON, and** | § | |
| | § | |
| **GARY HEITZ,** | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. 1:18-cv-998** |
| **V.** | § | |
| | § | |
| **BUDBO, INC.,** | § | |
| | § | |
| **LANEAXIS, INC.,** | § | |
| | § | |
| **LANEAXIS GPSCT, INC., and** | § | |
| | § | |
| **RICK LYNN BURNETT, a/k/a** | § | |
| | § | |
| **RICK BURNETT,** | § | |
| **Defendants.** | § | |

# DECLARATION OF RICK BURNETT

1. My name is Rick Burnett. I declare under penalty of perjury under the laws of the United States of American that the following is true and correct, and within my personal knowledge.

2. I am, and at all relevant times herein, the Chief Executive Officer of LaneAxis, Inc.

3. In the Spring of 2017, Michael Colton introduced me to the Luke and Jake Patterson. In March 2017, I flew to Colorado with another LaneAxis shareholder to meet the Pattersons and Colton.

4. As a veteran of GPS and logistics tracking software design, I suggested integrating the LaneAxis back-end tracking software into the Bubo consumer interfacing system, and further pushing the functionality onto a blockchain-based platform. I was my opinion that this integration could potentially provide cannabis dispensaries with a wealth of critical business analytics to maximize profits and services.

5. In order to execute the "partnership" venture, the parties did NOT simply enter into a license agreement in which Bubo would license and access the LaneAxis patent-pending tracking system. Instead, (with each party being represented by their own counsel), the parties unfurled the following series of transactions that represented a partnership and an alliance:

   a. Budbo, Inc. was incorporated on March 21, 2017. (Exhibit A, attached hereto.)

   b. On April 18, 2017, the following concerted steps were taken:

      i. Budbo issued shares to Luke, Jake, Gary, Nick, and LaneAxis GPSCT, Inc. (a subsidiary of LaneAxis) (collectively "Budbo Shareholders").

ii. Burnett was made CEO of Budbo. Luke Patterson was appointed Budbo's President. Jacob was appointed the company's Chief Technical Officer. Gary has and continues to serve as Budbo's Chief Operating Officer. Nick served in an official capacity for Budbo until being terminated by Budbo's board.

iii. Two directors were appointed to Budbo's board: Burnett and Luke.

iv. Budbo acquired 100% ownership of Bubo, including its intellectual property – the "Tinder-like" app, with Bubo becoming a wholly owned subsidiary of Budbo. (Exhibit B.)

b. Jake and Luke were each issued 700,000 shares of common stock of LaneAxis—representing 10% interest in LaneAxis. (Exhibits K & L.)

c. The Budbo Shareholders entered in a Shareholders Agreement (described, in relevant part, below) that would govern the corporate conduct of Budbo. (Exhibit C.)

d. A wholly owned subsidiary of Budbo entered into a Software License and Services Agreement with LaneAxis for the use of the LaneAxis' Software System Technology and LaneAxis' ancillary technical support. Because of the "partnership," the agreement provided that no royalty payment would be made to LaneAxis for use of its platform. However, Budbo's subsidiary agreed for it or Budbo to cover LaneAxis' cost and expenses to deliver, maintain and service the Software System Technology. Luke executed the license on behalf of the Budbo subsidiary. (Exhibit D.)

6. Attached hereto as Exhibit E is a true and correct copy of the Budbo press release issued on May 24, 2017.

7. Attached hereto as Exhibit F is a true and correct representation of posts on Bitcoin Forum.

8. Attached hereto as Exhibit G is a true and correct representation of Plaintiffs' posts on Bitcoinist.

9. Attached hereto as Exhibit H is a true and correct representation of Plaintiffs' posts on the Telegram.

10. Consistent with the "merger," a number of pre-merger LaneAxis employees jumped on the Budbo enterprise to provide valuable work. These LaneAxis-associated contributors included: Andrew Rivera, Mason Burnett, Richard Levy, David Levy, Alex Williams, Charlie Sellers, and Matt Guinn. I dedicated the majority of my workday to the development of Budbo.

11. On November 13, 2017, Budbo Token International LTD. ("BTI") was incorporated in the British Virgin Islands. (See Exhibit I.) Its owners are: Luke (50%) and me (50%). (See Exhibit J.)

12. The BTI corporate structure was entirely separate from Budbo and LaneAxis. However, the purpose of BTI was to:

    a. issue Ethereum-based tokens (the "Tokens") that would be the digital utilities that would power the mobile phone app (the Bubo component) and the cloud-based back-end business intelligence platform (the LaneAxis component) (collectively, the "Platform");

    b. oversee the implementation of the Tokens on the Platform; and

c. oversee the distribution of proceeds of the anticipated Token sale in the best interests of the Platform and its users. (See Exhibit R.)

13. BTI's utility Tokens would enable the integration of the Budbo blockchain to all third parties via an Application Programming Interface (API), allowing for a single point, data-driven cannabis environment to quickly flourish.

14. BTI launched a Token sale in December of 2017 ("Token Sale"). To support the Token Sale, Plaintiffs and Burnett traveled to a number of blockchain conferences touting the mobile app with its integration of the LaneAxis technology. The picture in Section II, part 3 of the concurrently filed brief depicts Jake at a Los Angeles blockchain conference addressing the utility brought to the app by the LaneAxis technology.

15. By most measures, the Token Sale was a moderate success, although only the Plaintiffs know how successful it was. The sale concluded in March 2018. The official number of tokens sold, and the total amount of funding raised from the Token Sale remains unknown to me, as Budbo CTO Jacob Patterson – the sole controller of the BTI crypto wallet --- has refused to disclose the official amount or give access to me to such crypto wallet, despite numerous requests and demands to do so. I was advised by Jake that all of the funds raised from the Token Sale were deposited into such BTI crypto wallet.

16. Budbo does not own or have any rights in BTI other than the Services Agreement entered into between BTI and Budbo on January 7, 2018 (Exhibit R) and promises made to the holders of the Tokens in the white paper (Exhibit M) that BTI and Budbo jointly published that BTI is there to support the buildout of the Budbo/LaneAxis Platform, to manage the token community and to oversee the funds raised in the Token Sale for the benefits of the Platform and the Token holders.

17. Part of the technology that BTI was intended to support was Budbo Trax, which is owned by LaneAxis, and discussed in detail in the BTI white paper issued to potential Token purchasers. (See Exhibit M, at 31.) The Budbo Token Sale was also intended to fund the buildout of version 2 of the Budbo mobile app, as well as launch the development of the LaneAxis blockchain platform, and finally, help fuel the launch of the LaneAxis token sale.

18. Following the Budbo Token Sale, work began on the critical step to adapt the LaneAxis system to support the mobile app, including building the blockchain to be integrated with the app. Due to its familiarity with the LaneAxis platform, Seamgen, an industry-leading digital agency specializing in mobile and web app design and development, was tapped to facilitate the build-out. In addition, LaneAxis began its process of raising additional capital to support the build-out and its expansion.

19. A necessary component of the Token Sale process involved bringing LaneAxis to various international blockchain conferences so it could continue to attract attention. This was crucial component to LaneAxis' development of the Platform. Accordingly, Jake – the only individual with access to the BTI cryptocurrency wallet – processed distributions to finance these trips.

20. It was not only "LaneAxis personnel" who attended. Indeed, the Plaintiffs themselves were not only in attendance, but were deeply involved in the planning (including all booth setup and ordering), promotional strategy, and budgeting of this trip. The pictures incorporated in Section II, part 4 of the concurrently filed brief depict Jake and Gary in front of the LaneAxis booth, actively participating in the London conference. Luke was photographed in front of the LaneAxis booth at the Shanghai conference.

21. The LaneAxis Token Sale tour included stops in Shanghai, Bangkok, and London. Rick and several other team members then returned to the United States to prepare for another upcoming conference, while Gary, Luke and Jacob flew on from London – utilizing the "disputed" funds – to Singapore and Sydney, to represent LaneAxis at two more conferences.

22. The fund raised through the Token Sale were held *solely* in the BTI wallet. One person, and only one person, had the private key to the BTI crypto wallet and was in complete control of it – Jake Patterson. I was never provided with the key to the wallet and thus I could not distribute BTI's digital currency nor monitor the wallet's balance.

23. The foundational meeting with Seamgen was scheduled for May 22, 2018, in San Diego. Luke and Jake failed to attend. As Budbo's CTO, Jake's engagement in this meeting was vital.

24. I was unaware that Plaintiffs were moving Budbo in a completely different direction despite the inter-company agreements and despite the representations the parties had made at a number of the blockchain conferences.

25. Gary wrote on the Telegram Budbo chat page, on December 4, 2018:

"Rick Burnett is the chairman of the board for Budbo, INC and LaneAxis is a shareholder of Budbo that we formed a partnership to use their IP with the app. [The Plaintiffs] decided to no longer use the LaneAxis IP for the app and have decided to go a different direction."

A true and correct copy of Gary's post is attached hereto as Exhibit N.

26. I have been informed and believe that in May 2018, the Plaintiffs independently and without my knowledge announced a partnership with Low Spark Capital to integrate

delivery, tracking and shipping. LaneAxis was being supplanted without the knowledge or approval of its C.E.O. Burnett.

27. In or about May 2018, Jake shut off my Budbo email account and my access to the server. My requests for reactivation of his email account were ignored and *remain so to this day*. My appeals for financial information from BTI that lay in the hands of Jake were disregarded despite my positions as BTI's treasurer, CEO, Secretary and director and *remain so to this day*. Furthermore, Charles Sellers is the third director of BTI and has been equally prevented by Plaintiffs from getting any financial information or access to BTI's records, cryptocurrency wallet and any other financial information. Plaintiffs have ignored all corporate rules, including The BVI Business Companies Act 2004, and BTI corporate formation documents and resolutions in place in absconding with the BTI funds and using them for their own purposes (the purposes of which are to this day unknown to the Defendants).

28. Meanwhile, Seamgen was progressing with the integration. A portion of preliminary work product of Seamgen's efforts are included herein as Exhibit O.) However, progression came to a halt with Plaintiff's attempted *coup de grâce.*

29. On October 5, 2018, Katz relayed to me the contents of Mr. Didaleusky's letter claiming that Budbo was insolvent. This was the first time that Budbo's insolvency had ever been communicated to me. Five months had elapsed since Plaintiffs had begun their campaign to constructively terminate me and run the company without my participation. I attempted to exercise my fiduciary duties by removing Luke and Jake and reinserting myself into Budbo's operations so I could address the financial issues. I requested

reports from Luke and Jake on what had transpired in the prior five months. To date, I have not received any reports.

30. Plaintiffs have continued to run Budbo and move forward with the development of the platform. Proof of this appears in the Telegram Budbo chat room where Plaintiffs kept the token holders and the public apprised of Budbo's developments. Attached as Exhibit N is Gary Heitz December 4, 2018 post on the Telegram Budbo chat room.

31. Attached as Exhibit P is Gary Heitz January 5, 2019 post on the Telegram Budbo chat room.

32. After more than 90 days had passed since Plaintiffs' filing their Complaint, an on-line article was published on The Block, a website dedicated to blockchain news. The article featured the allegations in Plaintiffs' Complaint which, of course, presented only the version manufactured by Plaintiffs' designed to arrest control of Budbo and expel Burnett. Without interviewing Defendants or their counsel, the author editorializes: "I'm not sure how Burnett is supposed to respond to all of this." (See Exhibit Q.)

33. The author subsequently "updated" the article to minimize slightly the prejudice to the unserved parties. He wrote that the Defendant "has not filed an answer because the lawsuit has never been served and that attempt to settle the case are outstanding." The author indicated a willingness to incorporate the Defendants' answer in the article, however, as the Complaint remains unserved on Burnett, there were few avenues to generate a responsive pleading.

Dated this 28th day of May, 2019

_/s/_  Rick Burnett
Rick Burnett

# EXHIBIT A

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:34 PM 03/21/2017
FILED 07:34 PM 03/21/2017
SR 20171908543 - File Number 6355933

# CERTIFICATE OF INCORPORATION

## OF

## BUDBO, INC.

The undersigned, for the purpose of organizing a corporation for conducting the business and promoting the purposes hereinafter stated, under the provisions and subject to the requirements of the laws of the State of Delaware (particularly the General Corporation Law of the State of Delaware, as such may be amended, supplemented or modified, and referred to herein as the "DGCL"), hereby certifies that:

FIRST: The name of the corporation (hereinafter called the "Corporation") is Budbo, Inc.

SECOND: The address, including street, number, city, and county, of the registered office of the Corporation in the State of Delaware is 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805 in the County of New Castle; and the name of the registered agent of the Corporation in the State of Delaware at such address is Vcorp Services, LLC.

THIRD: The nature of the business and the purposes to be conducted and promoted by the Corporation are as follows:

To conduct any lawful business, to promote any lawful purpose, and to engage in any lawful act or activity for which corporations may be organized under the DGCL.

FOURTH: The total number of shares of stock which the Corporation shall have authority to issue is Thirty-One Million (31,000,000) shares, all of such shares shall be $0.0001 par value per share, of which Thirty Million (30,000,000) shall be designated Common Stock and One Million (1,000,000) shares shall be Preferred Stock. The Corporation's Board of Directors (the "Board of Directors") is expressly authorized at any time, and from time to time, to provide for the issuance of shares of Preferred Stock in one or more series, with such voting powers, full or limited, or without voting powers and with such designations, preferences and relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions providing for the issue thereof adopted by the Board of Directors and as are not stated and expressed in this Certificate of Incorporation, or any amendment thereto, including (but without limiting the generality of the foregoing) the following:

        (i)      the designation of such series;

        (ii)      the dividend rate of such series, the conditions and dates upon which such dividends shall be payable, the preference or relation which such dividends shall bear to the dividends payable on any other class or classes or of any other series of capital stock, whether such dividends shall be cumulative or noncumulative, and whether such dividends may

be paid in shares of any class or series of capital stock or other securities of the Corporation;

        (iii)   whether the shares of such series shall be subject to redemption by the Corporation, and, if made subject to such redemption, the times, prices and other terms and conditions of such redemption;

        (iv)   whether or not the shares of such series shall be convertible into or exchangeable for shares of any other class or classes or series of capital stock or other securities of the Corporation, and, if provision be made for conversion or exchange, the times, prices, rates, adjustment and other terms and conditions of such conversion or exchange;

        (v)   the extent, if any, to which the holders of the shares of such series shall be entitled to vote, as a class or otherwise, with respect to the election of the directors or otherwise, and the number of votes to which the holder of each share of such series shall be entitled;

        (vi)   the restrictions, if any, on the issue or reissue of any additional shares or series of Preferred Stock; and

        (vii)   the rights of the holders of the shares of such series upon the dissolution of, or upon the distribution of assets of, the Corporation.

FIFTH:  The name and the mailing address of the incorporator are as follows:

| Name | Mailing Address |
|------|-----------------|
| Sasha Ablovatskiy | Foley Shechter LLP<br>211 East 43rd Street, 6th Floor<br>New York, NY 10017 |

SIXTH:  The Corporation is to have perpetual existence.

SEVENTH:  The bylaws of the Corporation (the "Bylaws") may be made, altered, amended, changed, added to, or repealed by the board of directors of the Corporation without the consent or vote of the stockholders.

EIGHTH:  The Corporation shall, to the fullest extent permitted by the provisions of Section 145 of the DGCL, as the same may be amended and supplemented, indemnify any and all persons whom it shall have power to indemnify under said section from and against any and all of the expenses, liabilities, or other matters referred to in or covered by said section, and the indemnification provided for herein shall not be deemed exclusive of any other rights to which those indemnified may be entitled under the Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a

director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, and administrators of such person.

NINTH: A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director of the Corporation, except (i) for any breach of the duty of loyalty of such director to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL and (iv) for any transaction from which such director derives an improper personal benefit. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. No repeal or modification of this Article NINTH shall adversely affect any right of or protection afforded to a Director prior to such repeal or modification.

TENTH: From time to time any of the provisions of this Certificate of Incorporation may be amended, modified, altered, or repealed, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted in the manner and at the time prescribed by said laws, and all rights at any time conferred upon the stockholders of the Corporation by this Certificate of Incorporation are granted subject to the provisions of this Article TENTH.

Dated: March 21, 2017

_____
Sasha Ablovatskiy
Incorporator

# EXHIBIT B

# SHARE-LLC INTEREST EXCHANGE AGREEMENT

This Share-LLC Interest Exchange Agreement, dated as of April 18, 2017 (this "<u>Agreement</u>"), is entered into by and among Bubo Technologies, LLC, a Delaware limited liability company ("<u>Bubo</u>"), each of the members of Bubo listed on <u>Schedule I</u> attached hereto (each a "<u>Member</u>" and collectively, the "<u>Members</u>"), and Budbo, Inc., a Delaware corporation (the "<u>Company</u>").

**WHEREAS**, the Members are the sole members of Bubo and collectively own 100% of the outstanding membership interests of Bubo (the "<u>Membership Interests</u>");

**WHEREAS**, each of the Members is a managing member (each a "Bubo Managing Member" and collectively, the "<u>Bubo Managing Members</u>") and a member of the board of directors of Bubo (the "<u>Bubo Board</u>");

**WHEREAS**, (i) the Members and Bubo believe it is in Bubo's and their best interests to exchange 100% of the Membership Interests for (a) two million five hundred fifty thousand (2,550,000) newly-issued shares (the "<u>Company Shares</u>") of the Company's common stock, $0.0001 par value per share (the "<u>Company Common Stock</u>"), as set forth on <u>Schedule I</u> hereto, and (ii) the Company believes it is in its and its stockholders' best interests to acquire the Membership Interests in exchange for the Company Shares, all upon the terms and subject to the conditions set forth in this Agreement (the "<u>Share-LLC Interest Exchange</u>");

**WHEREAS,** it is the intention of the parties that the Share-LLC Interest Exchange shall qualify as a tax-free reorganization under Section 354 of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"); and

**WHEREAS,** the Share-LLC Interest Exchange shall qualify as a transaction in securities exempt from registration or qualification under Section 4(2) of the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and/or Regulation D promulgated thereunder.

**NOW, THEREFORE,** in consideration of the mutual terms, conditions and other agreements set forth herein, the parties hereto agree as follows:

## ARTICLE I

### SHARE-LLC INTEREST EXCHANGE; CLOSING AND ACTIONS AT CLOSING

**Section 1.1** <u>Agreement to Exchange Membership Interests for the Company Shares</u>. <u>Purchase Price</u>. On the Closing Date (as hereinafter defined) and upon the terms and subject to the conditions set forth in this Agreement, each of the Members shall assign, transfer, convey, and deliver all of his Membership Interests to the Company. In consideration and exchange for the Membership Interests, the Company shall issue and deliver the Company Shares to the Members (in an amount opposite each Member's name as set forth on <u>Schedule I</u> hereto).

**Section 1.2** <u>Closing</u>. The closing of the Share-LLC Interest Exchange (the "<u>Closing</u>") shall take place remotely via the exchange of documents and signatures simultaneously with the execution and delivery of this Agreement (the "<u>Closing Date</u>").

**Section 1.3** <u>Resignation of Bubo Managing Members and Board of Directors' Members and Appointment of New Officer and Sole Managing Member of Bubo at Closing</u>. On the Closing Date:

(i)      Rick Burnett, the Company's CEO and Chairman, shall be appointed as the President of Bubo (the "<u>Bubo Officer Appointment</u>"); thereafter, Luke Patterson, Jacob Patterson and Rick Burnett shall be the only executive officers of Bubo unless otherwise approved by the Company;

(ii)     Each of the Bubo Managing Members shall resign as a Managing Member of Bubo and as a member of the Bubo Board (collectively, the "<u>Bubo Managing Members and Board Members Resignation</u>");

(iii)     the Company shall be admitted as the sole member and sole managing member of Bubo (the "<u>Bubo Managing Members and Board Members Resignation New Sole Member and Sole Managing Member Bubo Appointment</u>"); and

(iv)     Bubo shall adopt a simple standard operating agreement, in the form acceptable to the Company, evidencing the Company as the sole member and sole managing member of Bubo after the Closing (the "<u>New Bubo Operating Agreement</u>").

**Section 1.4** <u>Appointment of Officers of the Company at Closing</u>. On the Closing Date, (i) Luke Patterson, Bubo's CEO and Chairman, shall be appointed as the President of the Company and Jacob Patterson, Bubo's CTO, shall be appointed as the Chief Technical Officer of the Company (collectively, the "<u>Company Officers Appointments</u>").

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

The Company represents and warrants to Bubo and the Members that the statements contained in this Article II are true and correct on the date hereof.  For purposes of this Article II, the phrase "to the knowledge of the Company" or any phrase of similar import shall be deemed to refer to the actual knowledge of any officer of the Company as well as any other knowledge which such person would have possessed had such person made reasonable inquiry of appropriate officers, directors, key employees, accountants and attorneys of the Company.

**Section 2.1** <u>Corporate Organization</u>. (a) The Company is a corporation duly organized, validly existing and in good standing under the laws of Delaware, and has all requisite corporate power and authority to own its assets and governmental licenses, authorizations, consents and approvals to conduct its business as now conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the nature of its activities makes such qualification and being in good standing necessary, except where the failure to be so qualified and in good standing will not have a Material Adverse Effect on the Company. "Material Adverse Effect" means any event, occurrence, fact, condition, change or effect, which, individually or in the aggregate, would reasonably be expected to be materially adverse to the activities, business, operations, properties, assets, condition (financial or otherwise) or results of operation of such entity and its subsidiaries (taken as a whole), or materially impair the ability of such entity to perform its obligations under this Agreement, excluding any change, effect or circumstance resulting from (i) the announcement, pendency or consummation of the transactions contemplated by this Agreement, or (ii) changes in the United States securities markets generally.

(b) Copies of the Certificate of Incorporation, Certificate of Designation and By-Laws of the Company with all amendments thereto, as of the date hereof (the "<u>Company Charter Documents</u>"), have been delivered to Bubo and such copies are accurate and complete as of the date hereof.  The minute books

of the Company are current as required by law, contain the minutes of all meetings of the Company Board of Directors (the "Company Board") and stockholders of the Company since March 21, 2017 to the date of this Agreement, and adequately reflect all material actions taken by the Company Board and the Company's stockholders since that date. The Company is not in violation of any of the provisions of the Company Charter Documents.

**Section 2.2** Capitalization of the Company. (a) The authorized capital stock of the Company consists of thirty million (30,000,000) shares of Company Common Stock and one million (1,000,000) shares of the Company's preferred stock, $0.0001 par value per share (the "Company Preferred Stock"). The Company's current capitalization is as set forth on Schedule 2.2 hereof.

(b) All of the issued and outstanding shares of the Company Common Stock and all shares of the Company Common Stock when issued in accordance with the terms hereof will be, duly authorized, validly issued, fully paid and non-assessable. Except with respect to securities to be issued to the Members pursuant to the terms hereof or has been discussed with Bubo or as contemplated by the Stockholders Agreement, as of the date of this Agreement there are no outstanding or authorized options, warrants, agreements, commitments, conversion rights, preemptive rights or other rights to subscribe for, purchase or otherwise acquire or receive any shares of the Company's capital stock, nor are there or will there be any outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights, pre-emptive rights or rights of first refusal with respect to the Company or any Company Common Stock, or any voting trusts, proxies or other agreements, understandings or restrictions with respect to the voting of the Company's capital stock. Except for the shares of Preferred Stock and rights associated therewith as set forth in the Certificate of Designation issued to Laneaxis, Inc., a Delaware corporation and the Company's sole current stockholder ("LaneAxis"), there are no registration or anti-dilution rights, and there is no voting trust, proxy, rights plan, anti-takeover plan or other agreement or understanding to which the Company is a party or by which it is bound with respect to any equity security of any class of the Company. The Company is not a party to, and it has no knowledge of, any agreement restricting the transfer of any shares of the capital stock of the Company. The issuance of the Company Shares pursuant to this Agreement has been, or will be, as applicable, in compliance with U.S. federal and state securities laws and state corporate laws.

(c) There are no outstanding contractual obligations (contingent or otherwise) of the Company to retire, repurchase, redeem or otherwise acquire any outstanding shares of capital stock of, or other ownership interests in, the Company or to provide funds to or make any investment (in the form of a loan, capital contribution or otherwise) in any other person.

**Section 2.3** Subsidiaries and Equity Investments. Except as set forth herein, the Company does not directly or indirectly own any capital stock or other securities of, or any beneficial ownership interest in, or hold any equity or similar interest, or have any investment in any corporation, limited liability company, partnership, limited partnership, joint venture or other company, person or other entity. As of the date of this Agreement, the Company owns 100% of the equity securities of GPS Cannabis Tracker, Inc., a Delaware corporation ("GPSCT"), formed to hold technology to be licensed from LaneAxis pursuant to the License and Services Agreement (as defined below).

**Section 2.4** Authorization, Validity and Enforceability of Agreements. The Company has all corporate power and authority to execute and deliver this Agreement and all agreements, instruments and other documents to be executed and delivered in connection with the transactions contemplated by this Agreement to perform its obligations hereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate action of the Company, and no other corporate proceedings on the part of the Company are

necessary to authorize this Agreement or to consummate the transactions contemplated hereby and thereby. This Agreement constitutes the valid and legally binding obligation of the Company and upon the execution of this Agreement by Bubo and the Members, shall be enforceable in accordance with its terms, except as such enforcement may be limited by general equitable principles, or by bankruptcy, insolvency and other similar laws affecting the enforcement of creditors' rights generally. The Company does not need to give any notice to, make any filings with, or obtain any authorization, consent or approval of any government or governmental agency or other person in order for it to consummate the transactions contemplated by this Agreement, other than filings that may be required or permitted under the U.S. federal and state securities laws.

**Section 2.5** <u>No Conflict or Violation</u>. Neither the execution and delivery of this Agreement by the Company, nor the consummation by the Company of the transactions contemplated hereby will: (i) contravene, conflict with, or violate any provision of the Company Charter Documents; (ii) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, court, administrative panel or other tribunal to which the Company is subject, (iii) conflict with, result in a breach of, constitute a default (or an event or condition which, with notice or lapse of time or both, would constitute a default) under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any agreement, contract, lease, license, instrument or other arrangement to which the Company is a party or by which it is bound, or to which any of its assets or properties are subject; or (iv) result in or require the creation or imposition of any encumbrance of any nature upon or with respect to any of the Company's assets, including without limitation the Company Shares.

**Section 2.6** <u>Litigation</u>. There is no action, suit, proceeding or investigation ("<u>Action</u>") pending or, to the knowledge of the Company, currently threatened against the Company or any of its affiliates, that may affect the validity of this Agreement or the right of the Company to enter into this Agreement or to consummate the transactions contemplated hereby or thereby. There is no Action pending or, to the knowledge of the Company, currently threatened against the Company or any of its affiliates, before any court or by or before any governmental body or any arbitration board or tribunal, nor is there any judgment, decree, injunction or order of any court, governmental department, commission, agency, instrumentality or arbitrator against the Company or any of its affiliates. Neither the Company nor any of its affiliates is a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

**Section 2.7** <u>Compliance with Laws.</u> The Company has been and is in compliance with, and has not received any notice of any violation of any, applicable law, order, ordinance, regulation or rule of any kind whatsoever, including without limitation the securities laws and rules and regulations of any state.

**Section 2.8** <u>Books and Financial Records</u>. All the accounts, books, registers, ledgers, the Company Board minutes and financial and other records of whatsoever kind of the Company have been fully, properly and accurately kept and completed; there are no material inaccuracies or discrepancies of any kind contained or reflected therein; and they give and reflect a true and fair view of the financial, contractual and legal position of the Company.

**Section 2.9** <u>No Broker Fees</u>. No brokers, finders or financial advisory fees or commissions will be payable by or to the Company or any of their affiliates with respect to the transactions contemplated by this Agreement.

**Section 2.10** <u>Disclosure</u>. No representation or warranty by the Company contained in this Agreement, and no statement contained in any other document, certificate or other instrument delivered or to be delivered by or on behalf of the Company pursuant to this Agreement, contains or will contain any

untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF BUBO AND THE MEMBERS

Bubo and each of the Members represents and warrants to the Company that the statements contained in this Article III are true and correct on the date hereof, except as set forth in the disclosure schedule provided by Bubo to the Company (the "Bubo Disclosure Schedule"). The Bubo Disclosure Schedule shall be arranged in paragraphs corresponding to the numbered and lettered paragraphs contained in this Article III; and to the extent that it is clear from the context thereof that such disclosure also applies to any other numbered paragraph contained in this Article III, the disclosures in any numbered paragraph of the Disclosure Schedule shall qualify such other corresponding numbered paragraph in this Article III. For purposes of this Article III, the phrase "to the knowledge of Bubo" or any phrase of similar import shall be deemed to refer to the actual knowledge of any officer, managing member and Member of Bubo as well as any other knowledge which such person would have possessed had such person made reasonable inquiry of appropriate officers, directors, managing members, key employees, accountants and attorneys of Bubo.

**Section 3.1** Organization. Bubo is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware and has the power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its Business in all material respects as it is now being conducted. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Operating Agreement, dated as of January 10, 2015, entered into by and among Bubo L.L.C. and the Members, as amended in December 2016 (as amended, the "Operating Agreement"). Bubo and the Members specifically represent and warrant that (i) they intended and continue to intend for the Operating Agreement to apply, and that the Operating Agreement applied and continues to apply, to Bubo and (ii) the Operating Agreement governs the rights and obligations among the Members and Bubo despite the Operating Agreement erroneously stating that the name of the limited liability company is Bubo L.L.C. Bubo has taken all actions required by law, its Certificate of Formation, dated as of December 21, 2016 (the "Certificate of Formation"), or Operating Agreement, or otherwise to authorize the execution and delivery of this Agreement and the transactions contemplated herein. Bubo has full power, authority, and legal capacity and has taken all action required by law, its Certificate of Formation or Operating Agreement, and otherwise to enter into this Agreement and consummate the transactions contemplated herein.

**Section 3.2** Membership Interests. (a) The Membership Interests represent 100% of the outstanding membership interests and total ownership of Bubo. The Membership Interests were duly authorized, validly issued, fully paid and non-assessable. Except for the Membership Interests to be acquired by the Company pursuant to this Agreement, as of the date of this Agreement there are no outstanding or authorized options, warrants, agreements, commitments, conversion rights, preemptive rights or other rights to subscribe for, purchase or otherwise acquire or receive any Membership Interests (or any securities or other instruments evidencing ownership of Bubo), nor are there or will there be any outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights, pre-emptive rights or rights of first refusal with respect to Bubo or any Membership Interests (or any equivalent securities or other instruments evidencing ownership of Bubo), or any voting trusts, proxies or other agreements, understandings or restrictions with respect to the voting of the Membership Interests (or any securities or other instruments evidencing ownership of Bubo). Except as set forth in the Operating Agreement, there are no anti-dilution rights, and there is no voting trust, proxy, rights plan, anti-takeover plan or other agreement or understanding to which Bubo is a party or by which it is bound with respect to

any security or other equity or ownership instrument of Bubo. Except as set forth in the Operating Agreement, Bubo is not a party to, and it has no knowledge of, any agreement restricting the transfer of any Membership Interests (or any securities or other instruments evidencing ownership of Bubo). The transfer of the Membership Interests pursuant to this Agreement has been, or will be, as applicable, in compliance with U.S. federal and state securities laws and state corporate laws.

(b) There are no outstanding contractual obligations (contingent or otherwise) of Bubo to retire, repurchase, redeem or otherwise acquire any outstanding Membership Interests (or any securities or other instruments evidencing ownership of Bubo) or to provide funds to or make any investment (in the form of a loan, capital contribution or otherwise) in any other person.

**Section 3.3** Subsidiaries and Predecessor Corporations. Bubo does not own, beneficially or of record, any shares of any entity.

**Section 3.4** Financial Statements; Tax Matters. (a) To the knowledge of Bubo, Bubo has kept all books and records since inception and Bubo's financial statements have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved. To the knowledge of Bubo, the balance sheets are true and accurate and present fairly as of their respective dates the financial condition of Bubo. To the knowledge of Bubo, as of the date of such balance sheets, Bubo had no liabilities or obligations (absolute or contingent) which should be reflected in the balance sheets or the notes thereto prepared in accordance with generally accepted accounting principles, and all assets reflected therein are properly reported and present fairly the value of the assets of Bubo, in accordance with generally accepted accounting principles consistently applied throughout the periods involved. To the knowledge of Bubo, the statements of operations, stockholders' equity and cash flows reflect fairly the information required to be set forth therein by generally accepted accounting principles.

(b) Bubo has duly and punctually paid all governmental fees and taxation which it has become liable to pay and has duly allowed for all taxation reasonably foreseeable and is under no liability to pay any penalty or interest in connection with any claim for governmental fees or taxation and Bubo has made any and all proper declarations and returns for taxation purposes and all information contained in such declarations and returns is true and complete and full provision or reserves have been made in its financial statements for all governmental fees and taxation.

(c) The books and records, financial and otherwise, of Bubo are, in all material aspects, complete and correct and have been maintained in accordance with good business and accounting practices. The minute books and other similar records of Bubo contain, in all material respects, complete and accurate records in all material respects of all actions taken at any meetings of the Members, Bubo Board or its Managing Members or any committees thereof and of all written consents executed in lieu of the holding of any such meetings.

**Section 3.5** Information. To the knowledge of Bubo, the information concerning Bubo set forth in this Agreement is complete and accurate in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact required to make the statements made, in light of the circumstances under which they were made, not misleading.

**Section 3.6** Absence of Certain Changes or Events. Since its inception, (a) there has not been any material adverse change in the Business, operations, properties, assets, or condition (financial or otherwise) of Bubo; and (b) Bubo has not (i) made any material change in its method of management, operation or accounting, (ii) entered into any other material transaction other than sales in the ordinary course of its business; (iii) made any increase in or adoption of any profit sharing, bonus, deferred compensation, insurance, pension, retirement, or other employee benefit plan, payment, or arrangement made to, for, or

with its members, managers, or employees or; and (iv) to the knowledge of Bubo, no event or development has occurred which, individually or in the aggregate, has had, or could reasonably be expected to have in the future, a Material Adverse Effect on or with respect to Bubo.

**Section 3.7** <u>Litigation and Proceedings</u>. To the knowledge of Bubo, there are no Actions, suits, proceedings, or investigations pending or, to the knowledge of Bubo, threatened by or against Bubo or affecting Bubo or its assets or rights, at law or in equity, before any court or other governmental agency or instrumentality, domestic or foreign, or before any arbitrator of any kind. Bubo does not have any knowledge of any material default on its part with respect to any judgment, order, injunction, decree, award, rule, or regulation of any court, arbitrator, or governmental agency or instrumentality or of any circumstances

**Section 3.8** <u>No Conflict With Other Instruments</u>. To the knowledge of Bubo, the execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of any indenture, mortgage, deed of trust, or other material agreement, or instrument to which Bubo is a party or to which any Membership Interests or its assets, properties or operations are subject.

**Section 3.9** <u>Compliance With Laws and Regulations</u>. To the knowledge of Bubo, Bubo has complied with all applicable statutes and regulations of any federal, state, or other governmental entity or agency thereof, except to the extent that noncompliance would not have a Material Adverse Effect on or with respect to Bubo or its current or future business plans or operations as presented by, and contemplated by, Bubo and Laneaxis, including without limitation in connection with the development of a mobile application that allows a user to quickly discover new local marijuana strains, concentrates, and edibles and further modification of such mobile application with the use of the technology licensed from Laneaxis pursuant to the License and Services Agreement (collectively, the "<u>Business</u>"). This compliance includes, but is not limited to, the filing of all reports to date and being in full compliance, with federal and state securities authorities and applicable state marijuana laws in those states where Bubo is currently operating or intends to operate in the future.

**Section 3.10** <u>Approval of Agreement</u>. The Members and the Bubo Board has authorized the execution and delivery of this Agreement by Bubo and has approved this Agreement and the transactions contemplated hereby.

**Section 3.11** <u>Valid Obligation</u>. This Agreement and all agreements and other documents executed by Bubo in connection herewith constitute the valid and binding obligation of Bubo, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

**Section 3.12** <u>Contracts</u>. Bubo has delivered or made available to the Company a complete and accurate copy of each material agreement or contract used in Bubo's current business.

**Section 3.13** <u>Intellectual Property</u>. (a) To the knowledge of Bubo, it owns, is licensed to use, or otherwise possesses legally enforceable rights to use, license and exploit all issued patents, copyrights, trademarks, service marks, trade names, trade secrets, and registered domain names and all applications for registration therefor (collectively, the "<u>Intellectual Property Rights</u>") and all computer programs and other computer software, databases, know-how, proprietary technology, formulae, and development tools, together with all goodwill related to any of the foregoing (collectively, the "<u>Intellectual Property</u>"), in each case as is necessary to conduct their respective businesses as presently conducted, the absence of which

would be considered reasonably likely to result in a Material Adverse Effect. To the knowledge of Bubo, it has not received any notice or claim challenging the validity or enforceability of any of the Intellectual Property or indicating an intention on the part of any person to bring a claim that any of the Intellectual Property is invalid or unenforceable, nor to the knowledge of Bubo is there a reasonable basis for any claim that any of the Intellectual Property is either invalid or unenforceable. Bubo's Intellectual Property is set forth in Section 3.13 of the Bubo Disclosure Schedule.

(b) To the knowledge of Bubo, it is not, or will not as a result of the consummation of the Share-LLC Interest Exchange or other transactions contemplated by this Agreement be, in breach in any material respect of any license, sublicense or other agreement relating to the Intellectual Property Rights of Bubo, or any licenses, sublicenses or other agreements as to which Bubo is a party and pursuant to which Bubo uses any patents, copyrights (including software), trademarks or other intellectual property rights of or owned by third parties (the "Third Party Intellectual Property Rights"), the breach of which would be reasonably likely to result in a Material Adverse Effect.

(c) To the knowledge of Bubo, neither Bubo nor any Member has been named as a defendant in any Action which involves a claim of infringement or misappropriation of any Third Party Intellectual Property Right and neither Bubo nor any Member has received any written notice or, to the knowledge of Bubo, other communication of any actual or alleged infringement, misappropriation or unlawful or unauthorized use of any Third Party Intellectual Property Rights. With respect to its products or software in development, after the same are marketed, Bubo will not, to the knowledge of Bubo, infringe any Third Party Intellectual Property Rights in any material manner, except for such infringement as would not be reasonably likely to result in a Material Adverse Effect on or with respect to Bubo.

(d) To the knowledge of Bubo, no other person is infringing, misappropriating or making any unlawful or unauthorized use of any Intellectual Property Rights of Bubo in a manner that has a material impact on the Business, except for such infringement, misappropriation or unlawful or unauthorized use as would not be reasonably expected to have a Material Adverse Effect on or with respect to Bubo.

(e) To the knowledge of Bubo, none of Bubo's software (other than software code currently under development) used or held for use primarily in the operation or conduct of the Business and owned, developed, marketed, distributed, licensed, sold, or otherwise made available to any person by Bubo as used in the Business (collectively, "Software") (i) contains any bug, defect, or error that materially and adversely affects the use, functionality, or performance of such Software or any product or system containing or used in conjunction with such Software or (ii) fails to comply in any material respect with any applicable warranty or other contractual commitment relating to the use, functionality, or performance of such Software, or any product or system containing or used in conjunction with such Software.

(f) To the knowledge of Bubo, no Software contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing or facilitating, any of the following functions: (i) disrupting, disabling, harming, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed or (ii) compromising the privacy or data security of a user or damaging or destroying any data or file without the user's consent (collectively, "Malicious Code"). Bubo implements commercially reasonable measures designed to prevent the introduction of Malicious Code into Software, including firewall protections and regular virus scans.

**Section 3.14** Obligations of Management. Each Luke Patterson and Jacob Patterson (collectively, the "Founders") is currently working full time in the conduct of the Business. To the knowledge of Bubo, no Founder or officer or key employee of Bubo is planning to work less than full time in the future. To the

knowledge of Bubo, (i) neither Founder is currently working or plans to work for a competitive enterprise, whether or not such officer or key employee is or will be compensated by such enterprise, (ii) is planning to leave the employ of, or stop providing services to, Bubo, or (iii) is working for Bubo in violation of any contractual obligation to any other person, or (iv) employment of, or services provided before or to be provided after the Closing Date by, the Founders to Bubo or to be provided to the Company would not be in violation of any of their contractual obligation to any other person.

Section 3.15 <u>Insurance</u>. <u>Section 3.15 of the Bubo Disclosure Schedule</u> sets forth a list of the policies of insurance currently maintained with respect to the products, properties, assets, operations, Business and/or current or former employees of Bubo (collectively, the "<u>Bubo Policies</u>"). Bubo heretofore has made available to the Company copies of all Bubo Policies. All premiums due on the Bubo Policies have been paid, and no notice of cancellation or termination or intent to cancel has been received by Bubo with respect to the Bubo Policies and to the knowledge of Bubo, no grounds exist for such termination or cancellation.

Section 3.16 <u>Banks</u>. <u>Section 3.16 of the Bubo Disclosure Schedule</u> sets forth (a) the name of each bank, trust company or other financial institution with which Seller has an account, credit line or safe deposit box, (b) the names of all persons authorized to draw thereon or to have access to any safe deposit box, and (c) the purpose of each such account, credit line or safe deposit box. From and after Closing, Seller will separately furnish to the Buyer the passwords used to access such accounts, including those required for voice response and internet services.

Section 3.17 <u>Undisclosed Liabilities</u>. To the knowledge of Bubo, Bubo has no liabilities, debt or any other indebtedness (whether known or unknown, whether absolute or contingent, whether liquidated or unliquidated and whether due or to become due), except for (a) liabilities shown on Bubo's financial statements provided to the Company, (b) liabilities not exceeding $1,000 in the aggregate that have arisen since January 10, 2015 in the ordinary course of business and (c) contractual and other liabilities incurred in the ordinary course of business which are not required by U.S. GAAP to be reflected on a balance sheet.

Section 3.18 <u>No Material Adverse Effect</u>. There has not occurred any Material Adverse Effect on or with respect to Bubo, nor any event has occurred which, with the lapse of time or the giving of notice, may cause or create any Material Adverse Effect on or with respect to Bubo.

Section 3.19 <u>No Broker Fees</u>. No brokers, finders or financial advisory fees or commissions will be payable by or to Bubo or any of their affiliates with respect to the transactions contemplated by this Agreement.

Section 3.20 <u>Disclosure</u>. No representation or warranty by Bubo contained in this Agreement, and no statement contained in the Bubo Disclosure Schedule or any other document, certificate or other instrument delivered or to be delivered by or on behalf of Bubo pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

<u>ARTICLE IV</u>

**ADDITIONAL REPRESENTATIONS AND WARRANTIES OF THE MEMBERS**

Each of the Members represents and warrants to the Company that the statements contained in this Article IV are true and correct on the date hereof. For purposes of this Article IV, the phrase "to the knowledge of the Member" or any phrase of similar import shall be deemed to refer to the actual knowledge of such Member as well as any other knowledge which such person would have possessed had such person

made reasonable inquiry of appropriate officers, directors, managing members, key employees, accountants and attorneys of such Member and Bubo with respect to the matter in question.

**Section 4.1** <u>Authority</u>. The Member has the right, power, authority and capacity to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement to which the Member is a party, and to perform the Member's obligations under this Agreement to which the Member is a party. This Agreement has been duly and validly authorized and approved, executed and delivered by the Member. Assuming this Agreement has been duly and validly authorized, executed and delivered by the parties thereto other than the Member, this Agreement is duly authorized, executed and delivered by the Member and constitutes the legal, valid and binding obligation of the Member, enforceable against the Member in accordance with their respective terms, except as such enforcement is limited by general equitable principles, or by bankruptcy, insolvency and other similar laws affecting the enforcement of creditors rights generally.

**Section 4.2** <u>No Conflict</u>. Neither the execution or delivery by the Member of this Agreement nor the consummation or performance by the Member of the transactions contemplated hereby or thereby will, directly or indirectly, (a) contravene, conflict with, constitute a default (or an event or condition which, with notice or lapse of time or both, would constitute a default) under, or result in the termination or acceleration of, any agreement or instrument to which the Member is a party or by which the properties or assets of the Member are bound; or (b) contravene, conflict with, or result in a violation of, any law or order to which the Member, or any of the properties or assets of the Member, may be subject.

**Section 4.3** <u>Litigation</u>. There is no pending Action against the Member that involves the Membership Interests or that challenges, or may have the effect of preventing, delaying or making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement or the Business and, to the knowledge of the Member, no such Action has been threatened, and no event or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any such Action.

**Section 4.4** <u>Acknowledgment</u>. The Member understands and agrees that the Company Shares to be issued pursuant to this Agreement have not been registered under the Securities Act or the securities laws of any state of the U.S. and that the issuance of the Company Shares is being effected in reliance upon an exemption from registration afforded either under Section 4(2) of the Securities Act for transactions by an issuer not involving a public offering or Regulation D promulgated thereunder or Regulation S for offers and sales of securities outside the U.S. The Member hereby certifies that such person is either an "accredited investor" or not a "U.S. Person" as such terms are defined in Regulation D and Regulation S, respectively, under the Securities Act.

**Section 4.5** <u>Stock Legends</u>. The Member hereby agrees with the Company as follows:

(a) <u>Securities Act Legend</u>. The certificates evidencing the Company Shares issued to the Member will bear the following or a similar legend:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR (2) PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, IN WHICH CASE THE HOLDER MUST, PRIOR TO SUCH TRANSFER, FURNISH TO THE COMPANY AN OPINION OF COUNSEL, WHICH

COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED IN THE MANNER CONTEMPLATED PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR (3) IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S PROMULGATED UNDER THE SECURITIES ACT, AND BASED ON AN OPINION OF COUNSEL, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO THE COMPANY, THAT THE PROVISIONS OF REGULATION S HAVE BEEN SATISFIED.

(b) Other Legends. The certificates representing such the Company Shares, and each certificate issued in transfer thereof, will also bear any other legend required under any applicable law, including, without limitation, any U.S. state corporate and state securities law, or contract.

(c) Opinion. The Member shall not transfer any or all of the Company Shares without first obtaining the Company's prior written consent, which the Company may withhold, condition or delay for any reason in its sole and absolute discretion, and with an opinion of counsel (which counsel and opinion are reasonably satisfactory to the Company) to the effect that such transfer will be made in compliance under the Securities Act or will be exempt from the registration and the prospectus delivery requirements of the Securities Act and the registration or qualification requirements of any applicable U.S. state securities laws.

**Section 4.6** Ownership of Membership Interests. The Member is both the record and beneficial owner of the Membership Interests. The Member has and shall transfer at the Closing, good and marketable title to the Membership Interests, free and clear of all liens, claims, charges, encumbrances, pledges, mortgages, security interests, options, rights to acquire, proxies, voting trusts or similar agreements, restrictions on transfer or adverse claims of any nature whatsoever, excepting only restrictions on future transfers imposed by applicable law.

**Section 4.7** Disclosure. No representation or warranty by the Member contained in this Agreement or any other document, certificate or other instrument delivered or to be delivered by or on behalf of the Member pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

## ARTICLE V

## DELIVERIES OF THE COMPANY AT CLOSING

**Section 5.1** Company Share Issuance. In accordance with Section 1.1 of this Agreement, on the Closing Date, the Company shall deliver to Bubo an original share certificate evidencing each Member's respective ownership of the Company Shares as set forth on Schedule I hereto, registered in the name of such Member; provided, that the Seller may deliver such certificates to the Seller within ten (10) business days after the Closing Date.

**Section 5.2** Documents. In addition to delivery of the share certificates as set forth in Section 5.1, on the Closing Date, the Company shall deliver or cause to be delivered to Bubo:

(a) this Agreement duly executed by the Company;

(b) a certificate, dated as of the Closing Date, executed by the Secretary of the Company, certifying in such capacity and on behalf of the Company as to (i) the Company Charter Documents (and any amendments thereto) as being correct, complete and in full force and effect as of the Closing Date; (ii) the

incumbency and signatures of the officers of the Company who executed this Agreement and other documents delivered in connection herewith on behalf of the Company; and (iii) the adoption of resolutions of the board of directors of the Company as being correct, complete and in full force and effect as of the Closing Date, authorizing the execution and delivery of this Agreement and other documents delivered in connection herewith, and the performance of the obligations of the Company hereunder and thereunder;

(c) License and Services Agreement between the Company and GPSCT (the "License and Services Agreement"), in the form reasonably satisfactory to Bubo and the Company, executed by the Company and GPSCT;

(d) such other documents as Bubo may reasonably request for the purpose of (i) evidencing the accuracy of any of the representations and warranties of the Company, (ii) evidencing the performance of, or compliance by the Company with any covenant or obligation required to be performed or complied with by the Company, (iii) evidencing the Company Officers Appointments or (iv) otherwise facilitating the consummation or performance of any of the transactions contemplated by this Agreement.

## ARTICLE VI

## DELIVERIES OF SELLER AND THE MEMBERS AT CLOSING

**Section 6.1** Documents. On the Closing Date, Seller and the Members shall deliver or cause to be delivered to the Company:

(a) this Agreement duly executed by Bubo and each of the Members;

(b) a certificate, dated as of the Closing Date, executed by the Chief Executive Officer of Bubo, certifying in such capacity and on behalf of Bubo as to (i) the Certificate of Formation and the Operating Agreement (and any amendments thereto) of Bubo as being correct, complete and in full force and effect as of the Closing Date; (ii) the incumbency and signatures of the officers of Bubo who executed this Agreement and other documents delivered in connection herewith on behalf of Bubo; and (iii) the adoption of resolutions of the board of directors of Bubo as being correct, complete and in full force and effect as of the Closing Date, authorizing the execution and delivery of this Agreement and other documents delivered in connection herewith, and the performance of the obligations of Bubo hereunder and thereunder;

(c) documentation, reasonably satisfactory to the Company, evidencing the number of Membership Interests, along with such other documents evidencing the transfer of such Membership Interests to the Company;

(d) the IP Assignment Agreement, in the form reasonably satisfactory to Bubo and the Company, executed by each of the Members and the Company;

(f) such other documents as the Company may reasonably request, with such evidence reasonably satisfactory to the Company, for the purpose of (i) evidencing the accuracy of any of the representations and warranties of the Bubo and the Members, (ii) evidencing the performance of, or compliance by Bubo and the Members with, any covenant or obligation required to be performed or complied with by Bubo and the Members, as the case may be, (iii) evidencing the Bubo Officer Appointment, the Bubo Managing Members and Board Members Resignation and the New Sole Member and Sole Managing Member Bubo Appointment, (iv) evidencing that each of the Founders shall continue to be employed and/or provide full time services by Bubo after the Closing Date or (v) otherwise facilitating the consummation or performance of any of the transactions contemplated by this Agreement.

**Section 6.7** Accredited Investor Questionnaire. Concurrently with or prior to the execution and delivery of this Agreement, Bubo shall deliver an Accredited Investor Questionnaire to the Company, substantially in the form attached hereto as Exhibit A, completed and executed by each Member.

**Section 6.10** Books and Records. At the Closing, Bubo shall deliver to the Company, the originals of Bubo's corporate minute books (or their equivalent), books of account, contracts, records, and all other books or documents of Bubo now in the possession or control of Bubo, the Members or their representatives and agents.

# ARTICLE VII

## SPECIAL COVENANTS AND POST-CLOSING AGREEMENTS

**Section 7.1** Waiver of Operating Agreement Restrictions. In connection with the execution of this Agreement, the agreements contemplated hereunder and the consummation of the transactions contemplated hereby (the "Contemplated Transactions"), each Member and Bubo hereby waives any transfer, voting, disposition, consent or any other restriction, limitation or requirement in the Operating Agreement or any other governing document of Bubo prohibiting or in any way restricting (i) the execution, delivery and performance of this Agreement or the agreements contemplated hereunder or (ii) the consummation of the Contemplated Transactions.

**Section 7.2** Additional Documents and Further Assurances. Each party hereto, at the request of one or more of the other parties hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Agreement and the transactions contemplated hereby.

**Section 7.3** Good Faith Conduct After the Closing. Each Founder recognizes and acknowledges that following the Closing, in consideration of the Laneaxis entering into the License and Services Agreement with GPSCT and for such other consideration as Laneaxis has provided to the Founders, each of them, including without limitation as executive officers of the Company, owes to the Company the duties of loyalty, care, fidelity and obedience in all matters pertaining to their involvement with the Company, including without limitation, to (i) continue to provide to the Company the services that they have provided to Bubo prior to the Closing, (ii) fulfill their obligations under this Agreement and (iii) use his best efforts to deliver on the business plan and promises made to LaneAxis as part of negotiations that led to the execution of this Agreement and the transactions contemplated in connection therein. Each of the Founders agrees to serve the Company diligently and faithfully, to perform in good faith all duties to the best of his ability, and to reasonably devote all of their working time, attention and skills to the conduct of the business of the Company and its subsidiaries' business. In furtherance of such purposes, each of the Founders agrees not to engage in a business, venture or other undertaken that would, directly or indirectly, compete with the Business.

# ARTICLE VIII

## INDEMNIFICATION

**Section 8.1** Indemnification. (a) Indemnification Obligations in favor of the Company. Bubo and each Member shall for a period commencing from the Closing Date and ending on the second anniversary of the Closing Date, severally and jointly, indemnify the Company, Laneaxis and each of their respective officers, directors, stockholders, agents, representatives and affiliates (each such person is referred to herein as a "Company Indemnified Party") in respect of, and hold each Company Indemnified Party harmless against, any and all debts, obligations losses, liabilities, deficiencies, damages, fines, fees, penalties, interest

obligations, expenses or costs (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise) (including without limitation amounts paid in settlement, interest, court costs, costs of investigators, fees and expenses of attorneys, accountants, financial advisors and other experts, and other expenses of litigation) (collectively, "Damages") incurred or suffered by any Company Indemnified Party thereof resulting from:

(i) any misrepresentation or breach of warranty by, or failure to perform any covenant or agreement of, Bubo or the Members contained in this Agreement or the Bubo Certificate; and

(ii) any claim for brokers' or finders' fees or agents' commissions arising from or through Bubo or any of its members in connection with the negotiation or consummation of the transactions contemplated by this Agreement.

(b) Indemnification in favor of Bubo and the Bubo Managing Member. The Company shall, for a period commencing from the Closing Date and ending on the second anniversary of the Closing Date, indemnify Bubo, the Members and each of their respective officers, directors, members, agents, representatives and affiliates (each such person is referred to herein as a "Bubo Indemnified Party") in respect of, and hold each Bubo Indemnified Party harmless against, any and all Damages incurred or suffered by any Bubo Indemnified Party thereof resulting from:

(i) any misrepresentation or breach of warranty by, or failure to perform any covenant or agreement of, the Company contained in this Agreement or the Company Certificate; and

(ii) any claim for brokers' or finders' fees or agents' commissions arising from or through the Company in connection with the negotiation or consummation of the transactions contemplated by this Agreement.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

**Section 9.1** Press Releases and Announcements. No party shall issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other parties.

**Section 9.2** No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any person other than the parties and their respective successors and permitted assigns; provided, however, that the provisions in Article VIII concerning indemnification are intended for the benefit of the benefit of the individuals specified therein and their successors and assigns.

**Section 9.3** Entire Agreement. This Agreement (including the documents referred to herein) constitutes the entire agreement among the parties and supersedes any prior or (other than as set forth herein) contemporaneous understandings, agreements or representations by or among the parties, written or oral, with respect to the subject matter hereof.

**Section 9.4** Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns. No party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other parties; provided that the Company may assign its rights, interests and obligations hereunder in the event it consummates a merger, acquisition and/or sale.

**Section 9.5** Counterparts and Electronic Signature. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures delivered by fax and/or e-mail/.pdf transmission shall be sufficient and binding as if they were originals and such delivery shall constitute valid delivery of this Agreement.

**Section 9.6** Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.7** Notices. All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered four business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent for next business day delivery via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

If to the Company:                          Copy to (which shall not constitute notice hereunder):

Budbo, Inc.                                 Foley Shechter LLP
1159 Campanile                              211 East 43rd Street, 6th Floor
Newport Beach, CA 92660                     New York, NY 10017
Attn: Rick Burnett, CEO                     Attn: Jonathan Shechter, Esq.
Facsimile:                                  Facsimile: +1-917-688-4092

If to Bubo or the Members:                  Copy to (which shall not constitute notice hereunder):

Bubo Technologies, LLC                      _____
15400 Sonoma Drive #208                     _____
Fort Myers Beach, FL                        _____
Attn: Luke Patterson                        Attn: _____
Facsimile: _____                Facsimile: _____

Any party may give any notice, request, demand, claim or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the party for whom it is intended. Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties notice in the manner herein set forth.

**Section 9.8** Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdictions other than those of the State of Delaware.

**Section 9.9** Submission to Jurisdiction. Each of the parties (a) submits to the jurisdiction of any state or federal court sitting in Orange County in the State of California in any action or proceeding arising out of or relating to this Agreement, (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, and (c) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the parties waives any defense of inconvenient

forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto. Any arty may make service on another arty by sending or delivering a copy of the process to the arty to be served at the address and in the manner provided for the giving of notices in Section 9.7. Nothing in this Section 9.9, however, shall affect the right of any party to serve legal process in any other manner permitted by law.

**Section 9.10** <u>Amendments and Waivers</u>. The parties may mutually amend any provision of this Agreement at any time prior to the Effective Time. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all of the parties. No waiver of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the Party giving such waiver. No waiver by any Party with respect to any default, misrepresentation or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

**Section 9.11** <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

**Section 9.12** <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

**Section 9.13** <u>Construction</u>. The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any Party. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

**Section 9.14** <u>Fees and Expenses</u>. Except as otherwise expressly provided in this Agreement, all legal and other fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such fees, costs or expenses.

**Section 9.15** <u>Tax Free Reorganization Status</u>. Notwithstanding anything to the contrary contained in this Agreement, the parties acknowledge and agree that no party is making any representation or warranty as to the qualification of the Share-LLC Interest Exchange as a reorganization under Section 354 of the Code or as to the effect, if any, that any transaction consummated prior to the Closing Date has or may have on any such reorganization status. The parties acknowledge and agree that each (i) has had the opportunity to obtain independent legal and tax advice with respect to the transaction contemplated by this Agreement, and (ii) is responsible for paying its own taxes, including without limitation, any adverse tax consequences that may result if the transaction contemplated by this Agreement is not determined to qualify as a reorganization under Section 354 of the Code.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

BUDBO, INC.

By: _____
Name: Rick Burnett
Title: Chief Executive Officer

BUBO TECHNOLOGIES, LLC

By: _____
Name: Luke Patterson
Title: Chief Executive Officer

MEMBERS:

_____
By: Luke Patterson

_____
By: Jacob Patterson

_____
By: Gary Heitz

_____
By: Nick Heldreth

[Signature page to the Share-LLC Exchange Agreement]

17

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**BUDBO, INC.**


By:_____
Name: Rick Burnett
Title:   Chief Executive Officer


**BUBO TECHNOLOGIES, LLC**

*Luke Patterson*

By:_____
           27B23AE265044C5...
Name: Luke Patterson
Title:   Chief Executive Officer


**MEMBERS:**

*Luke Patterson*
           27B23AE265044C5...
_____
By: Luke Patterson


_____
By: Jacob Patterson


_____
By: Gary Heitz


_____
By: Nick Heldreth


[Signature page to the Share-LLC Exchange Agreement]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**BUDBO, INC.**


By:_____
Name: Rick Burnett
Title:   Chief Executive Officer


**BUBO TECHNOLOGIES, LLC**


By:_____
Name: Luke Patterson
Title:   Chief Executive Officer


**MEMBERS:**



_____
By: Luke Patterson


F90BFB41CE954F8...

_____
By: Jacob Patterson



_____
By: Gary Heitz



_____
By: Nick Heldreth

[Signature page to the Share-LLC Exchange Agreement]

By: Gary Heitz


By: Nick Heldreth

## SCHEDULE I

### Bubo Members

| Name | Address | Tax-ID (if applicable) | Percentage of Total Membership Interests Held | Shares of Company Common Stock to Be Issued |
|------|---------|------------------------|-----------------------------------------------|---------------------------------------------|
| Luke Patterson | Luke Patterson 15400 Sonoma Drive #208 Fort Myers Beach, FL 33908 | 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 | 43% | 1,109,863 |
| Jacob Patterson | 503 E. Nifong Blvd #217 Columbia, MO 65201 | 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 | 42% | 260,000 |
| Nick Heldreth | Nicholas Heldreth 728 Devon Ct San Diego CA 92109 | 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 | 10% | 255,000 |
| Gary Heitz | Gary W Heitz 1709 Elmhurst Drive, Unit B Austin, TX 78741 | 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 | 5% | 127,500 |
| | | **TOTALS** | 100% | 2,550,000 |

18

_____

By: Gary Heitz


DocuSigned by:

*Nick Heldreth*

ACA252BA9CF040C
By: Nick Heldreth


[Signature page to the Share-LLC Exchange Agreement]
## SCHEDULE I

### **Bubo Members**

| Name | Address | Tax-ID (if applicable) | Percentage of Total Membership Interests Held | Shares of Company Common Stock to Be Issued |
|------|---------|------------------------|-----------------------------------------------|---------------------------------------------|
| Luke Patterson | Luke Patterson 15400 Sonoma Drive #208 Fort Myers Beach, FL 33908 | 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 | 43% | 1,109,863 |
| Jacob Patterson | 503 E. Nifong Blvd #217 Columbia, MO 65201 | 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 | 42% | 260,000 |
| Nick Heldreth | Nicholas Heldreth 728 Devon Ct San Diego CA 92109 | 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 | 10% | 255,000 |
| Gary Heitz | Gary W Heitz 1709 Elmhurst Drive, Unit B Austin, TX 78741 | 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 | 5% | 127,500 |
| | | **TOTALS** | 100% | 2,550,000 |

**Bubo Members**

| Name | Address | Tax-ID (if applicable) | Percentage of Total Membership Interests Held | Shares of Company Common Stock to Be Issued |
|---|---|---|---|---|
| Luke Patterson | Luke Patterson 15400 Sonoma Drive #208 Fort Myers Beach, FL 33908 | 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 | 43% | 1,109,863 |
| Jacob Patterson | 503 E. Nifong Blvd #217 Columbia, MO 65201 | 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 | 42% | 260,000 |
| Nick Heldreth | Nicholas Heldreth 728 Devon Ct San Diego CA 92109 | 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 | 10% | 255,000 |
| Gary Heitz | Gary W Heitz 1709 Elmhurst Drive, Unit B Austin, TX 78741 | 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 | 5% | 127,500 |
| | | **TOTALS** | 100% | 2,550,000 |

**Schedule 2.2**

**Current Capitalization of the Company**

| Stockholder Name | Preferred Stock (1) | Common Stock | Total | % Ownership |
|---|---|---|---|---|
| Laneaxis, Inc. (directed by Rick Burnett (CEO of LaneAxis, Inc.)) | 1 | 2,450,000 | 2,450,000 | 100% |
| Totals: | 1 | 2,450,000 | 2,450,000 | 100% |

(1) Per Bubo's and the Company's agreement, such one (1) share of Series A Preferred Stock will entitle Laneaxis, Inc. to cast up to 15,000,001 votes together with the holders of the Company Common Stock, voting together as a single class, with respect to any and all matters presented to the holders of the Company Common Stock for their action, subject to the limitations in the Stockholders Agreement.

**BUBO DISCLOSURE SCHEDULE**

**Section 3.13**

**Intellectual Property**

Bubo's mobile application (currently named Budbo), and all of Bubo's and the Members' associated or related Intellectual Property and Intellectual Property Rights, that allows a user to quickly discover new local marijuana strains, concentrates, and edibles (the "Mobile Application") and further modification of the Mobile Application with the use of the tracking technology and Intellectual Property Rights to be licensed from LaneAxis.

**Section 3.15**

**Insurance**

_____

**Section 3.16**

**Bank Accounts**

_____

EXHIBIT C

# SHAREHOLDERS AGREEMENT

THIS SHAREHOLDERS AGREEMENT (this "***Agreement***") is made as of the date last below written by and among Budbo, Inc. a Delaware corporation (the "***Corporation***"), LaneAxis GPSCT, Inc. ("***LaneAxis Shareholder***"), a Delaware corporation and a wholly owned subsidiary of Laneaxis, Inc., a Delaware corporation, Luke Patterson, Jacob Patterson, Nick Heldreth and Gary Heitz (LaneAxis Shareholder collectively with Messrs. Patterson, Patterson, Heldreth and Heitz are collectively referred to herein as the "***Shareholders***" or individually each a "***Shareholder***"). The following recitals form the basis of this Agreement and are made a material part hereof:

A.    The Shareholders own the respective number of shares of the Corporation's common stock, $0.0001 par value per share (the "Common Stock"), as set forth on ***Exhibit A*** to this Agreement, as may be amended from time to time, which shares constitute all of the current equity securities of the Corporation (together with any other equity securities of the Corporation which hereafter may be owned by Shareholders, the "***Shares***"); and

B.    The Shareholders and the Corporation desire to make certain provisions relating to the rights of the Shareholders to purchase, transfer, encumber or otherwise acquire or dispose of the Shares.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, the parties hereto, each intending to be legally bound hereby, agree as follows:

## ARTICLE I.
### General Restriction

No Shareholder shall voluntarily or involuntarily transfer, assign, sell, convey or otherwise dispose any interest in his shares of Common Stock of the Corporation, now owned by such Shareholder or hereafter acquired by him, except in accordance with the provisions of this Agreement. The words "transfer, assign, sell, convey or otherwise dispose" as used in this Agreement shall include the grant of any proxy, the establishment of any voting trust or any sale, hypothecation, pledge, assignment, or other conveyance, with or without consideration, of any incidence of ownership or title as to any share of the Corporation's stock owned of record or beneficially by a Shareholder, regardless of whether or not record or beneficial title to such shares is thereby transferred. Each of the Shareholders agrees that, notwithstanding any provision of this Agreement to the contrary, he will not at any time transfer, assign, sell, convey or otherwise dispose, or agree to transfer, assign, sell, convey or otherwise dispose, any shares to any person or entity (including any stockholder or equity holder of such entity) that to the knowledge of the Shareholder, is engaged in a business or activity competing with the Corporation's business as then conducted, unless unanimously approved by the Board of Directors of the Corporation in writing in advance.

## ARTICLE II.
### Disposition of Shares During Lifetime

A.   Except as otherwise provided in this Agreement, no Shareholder shall transfer, sell, assign, convey or otherwise dispose his or her shares during his lifetime without the express written consent of the Board of Directors of the Corporation and a vote of the majority of the Shares of Common Stock.

B.   If any Shareholder is permitted to transfer, sell, assign, convey or otherwise dispose any interest in his shares to any third party pursuant to Article II(A), such Shareholder shall first submit a written request to the Corporation seeking the Corporation's approval of such transfer. Such request shall set forth the identity of the proposed transferee, the price or consideration to be paid for the transfer or assignment, and all of the material terms of the proposed transaction. For thirty (30) days following the receipt of such notice, the Corporation shall have a first option to purchase all (but not less than all) of the shares of the transferor Shareholder for a price (the "Option Price") equal to the lesser of (1) the price disclosed in such notice or (2) the price set forth in Article IV of this Agreement. The Corporation's option shall be exercisable by duly constituted action of the Board of Directors of the Corporation by majority vote (not including the transferor Shareholder) in accordance with the By-laws of the Corporation.

If the Corporation fails to exercise its first option as provided herein, then for fifteen (15) days following the expiration of the Corporation's first option, the other Shareholders shall have a second option to purchase all (but not less than all)of the shares of the transferor Shareholder for a price equal to Option Price. Each of the other Shareholders who elects to exercise his option shall purchase his pro rata part of the shares of the transferor Shareholder in the same proportion which his shares bear to all the shares of Common Stock owned by all Shareholders electing to purchase hereunder. If any Shareholders do not elect to exercise their options to purchase, then the Shareholders who elect to exercise their options shall have the right to purchase the shares which the Shareholders who elected not to exercise their options in the same proportion which their shares bear to all of the shares owned by all Shareholders electing to purchase hereunder.

Should either the Corporation or the other Shareholders elect to exercise their option to purchase the shares of the transferor Shareholder as provided in this subparagraph B, the payment of the purchase price shall be upon either (1) the terms set forth in such notice or (2) the terms provided in Article IV of this Agreement, at the option of the purchasing Shareholder(s).

Should neither the Corporation nor the other Shareholders elect to exercise the options provided herein within forty-five (45) days following the receipt of the transferor Shareholder's original notice, then the transferor Shareholder shall be free for a period of ninety (90) days to transfer ownership of his shares in strict accordance with the terms of the notice given to the Corporation and the other Shareholders, free of the restrictions imposed by this Agreement (subject to the foregoing clauses); provided however, that the proposed transferee shall be an eligible shareholder such that the Corporation, if elected, maintains its election to be taxed under the provisions of Subchapter S of the Internal Revenue Code, as amended; and

provided further that the proposed transferee of such shares shall take them subject to the terms and restrictions imposed by this Agreement and shall become a party hereto.  If the transferor Shareholder does not transfer his shares as provided herein within ninety (90) days following the expiration of the Corporation's first option and the Shareholders' second option, then (i) such shares shall once again be subject to the restrictions of this Agreement and may not subsequently be transferred, sold, assigned, conveyed or otherwise disposed except in compliance with the terms hereof, and (ii) such shares may not, in any event, be transferred, sold, assigned, conveyed or otherwise disposed by such transferor Shareholder for a period of twelve (12) months from the expiration of the ninety (90) days period within which such transferor Shareholder was free to transfer his ownership under this paragraph.

C.    If the transferor Shareholder is permitted to sell, assign, convey or otherwise dispose his shares which represent at least forty-nine percent (49%) of the outstanding shares, and if neither the Corporation nor the other Shareholders shall elect to exercise the options provided herein, then:

(1)    all (but not less than all) of the other Shareholders shall have the right, upon written notice delivered to the transferor Shareholder prior to the expiration of the forty-five (45) day period described above in Paragraph B, to require that their shares also be sold to the proposed transferee at the same price and upon the same terms as apply to the transferor Shareholder's shares; provided, however, that the price per share at which the other Shareholders may be required to sell, assign, convey or otherwise dispose shall, in no event, be less than the price per share determined according to the provisions of Article IV of this Agreement as of the date of such notice; and

(2)    the transferor Shareholder shall also have the right, upon written notice delivered to the other Shareholders prior to the expiration of the said forty-five (45) day period described above in Paragraph B, to require all (but not less than all) of the other Shareholders to sell all (but not less than all) of their shares to the proposed transferee at the same price and upon the same terms as apply to the transferor Shareholder's shares; provided, however, that the price per share at which the other Shareholders may be required to sell shall, in no event, be less than the price per share determined according to the provisions of Article IV of this Agreement as of the date of such notice.

(3)    If neither (1) nor (2) above of this Paragraph C occur after such proposal, then this Agreement shall remain in full force and effect.

D.    In the event that a Shareholder or his attorney-in-fact who represents such Shareholder provides evidence reasonably satisfactory to the Board of Directors of the Corporation that such Shareholder is experiencing "significant financial hardship" (as defined herein, including as a result of a "Disability" as also defined herein), then such Shareholder (or the attorney-in-fact who represents such Shareholder) may, at his option, elect to sell his shares, which must also include all shares owned by a trust for the benefit of the Shareholder's family under the provisions of Article VI of this Agreement, to the Corporation for the price and upon the terms in accordance with Article IV of this Agreement.  "Significant financial hardship" shall mean an immediate and substantial financial need (not covered by reimbursement or

compensation by insurance or otherwise) of a Shareholder, such as (i) medical care expenses for the Shareholder and his family; (ii) potential loss of the Shareholder's principal residence due to actual or threatened foreclosure proceedings or (iii) an inability to pay ordinary and customary living expenses which can only be averted by sale of the Shareholder's other assets at "sacrifice" or "below market" prices; or (iv) an inability to maintain the Shareholder's normal and customary style of living (which the parties to this Agreement agree may be different for each Shareholder). If the Board of Directors of the Corporation determines that such Shareholder has not provided evidence reasonably satisfactory that such Shareholder is experiencing "significant financial hardship", then such Shareholder or his personal representative and the Corporation may then each appoint a financial specialist to review the decision of the Board of Directors of the Corporation, and if no agreement is reached as a result of such review, then a third financial specialist shall be selected by both parties who shall review the decision of the Board of Directors of the Corporation. After the review by the third financial specialist, such third financial specialist shall render his decision which shall be final and binding on all parties. "Disability" shall mean a mental or physical condition which prevents a Shareholder for working for a period of at least twelve (12) consecutive calendar months in substantially the same capacity as he worked prior to incurring such disability if, in the opinions of physicians selected by the Shareholder and by the Corporation, such incapacity is likely to be of a permanent nature. If either the Shareholder or the Corporation cannot agree upon the other party's physician, then an independent physician, mutually agreeable to the Shareholder and the Corporation, shall be selected, whose decision shall be final and binding on all parties. If the Shareholder elects to sell his shares as a result of such "significant financial hardship", then the Corporation must purchase such Shareholder's shares, which must also include all shares owned by a trust for the benefit of the Shareholder's family under the provisions of Article VI of this Agreement, for the price and upon the terms in accordance with Article IV of this Agreement.

E. If any Shareholder shall, voluntarily or involuntarily, transfer, sell, assign, convey or otherwise dispose any interest in his or her shares during his or her lifetime without having first complied in all respects with the requirements of this Agreement, then any such transfer or assignment shall be null and void.

F. In addition to all other terms and conditions contained in this Agreement, no Transfers shall be completed or effective for any purpose unless the following conditions are satisfied:

(a) prior thereto:

(i) the Transferring Shareholder shall have provided to the Corporation, (x) at least ten (10) days' prior notice of such Transfer, (y) a certificate of the Transferring Shareholder, delivered with such notice, containing a statement that such Transfer is permitted under this Agreement, referencing the Section permitting such Transfer, and (z) such other information and documents as may be reasonably requested by the Corporation in order for it to determine whether such Transfer is permitted under this Agreement;

(ii) the transferee shall have executed and delivered to the Corporation a written undertaking substantially in the form of **_Exhibit B_** attached hereto, pursuant to which such transferee agrees (x) to be bound by the terms and conditions of this Agreement and (y) that the Shares acquired by it shall be subject to the terms of this Agreement, and the transferee shall furnish copies of all share certificates effecting the Transfer and such other certificates, instruments and documents as the Company may request; and

(iii) all necessary third party consents to the Transfer shall have been obtained;

(b) such transferee is not a competitor of the Corporation and its subsidiaries, as determined in the reasonable discretion of the Board; provided that any private equity fund or other financial investor shall not be deemed to be a competitor of the Corporation;

(c) such Transfer would not violate the Act or any State Laws applicable to the Corporation or the Shares to be Transferred;

(d) such Transfer shall not impose liability or reporting obligations on the Corporation or any Shareholder in any jurisdiction, whether domestic or foreign, or result in the Corporation or any Shareholder becoming subject to the jurisdiction of any governmental authority anywhere, other than the governmental authorities to which the Corporation is then subject to such liability, reporting obligation or jurisdiction; and

(e) such Transfer shall not, in the Board's sole discretion, have the effect of requiring the Company to, upon the consummation of such Transfer, register the Shares under Section 12(g) of the Exchange Act; provided, however, that the provisions of (i) this Section F(a) through Section F(e) shall not apply to a Transfer in connection with a company sale, in the IPO or in connection with the liquidation, winding-up or dissolution of the Corporation and (ii) Section 3.3(b) shall not apply to a Transfer subject to, or in accordance with, Article XII (Tag-Along and Drag-Along rights).

## **ARTICLE III.**
### Disposition of Shares Upon Death of a Shareholder

Upon the death of a Shareholder, the Corporation may elect to purchase, in which case the personal representative for the estate of the deceased Shareholder must sell, all the shares of the Corporation owned by such deceased Shareholder, which must also include all shares owned by a trust for the benefit of the Shareholder's family under the provisions of Article VI of this Agreement, at the price and upon the terms set forth in Article IV of this Agreement. Such transaction shall take place within six (6) months of the date of appointment of the personal representative for the deceased Shareholder's estate. If the Corporation makes a determination that it lacks the necessary funds to purchase the shares or that purchasing the shares would cause significant financial hardship to the Corporation, which determination shall be made by the Board of Directors of the Corporation, then the Corporation may assign its right to purchase all or a portion of the shares to the other Shareholders, who, subject to the same terms and conditions of the Corporation's obligation for the payment to the Shareholder's estate

(which must also include all shares owned by a trust for the benefit of the Shareholder's family under the provisions of Article VI of this Agreement), may purchase the shares in a percentage equal to their percentage of the outstanding shares of Common Stock of the Corporation or any other percentage such Shareholders may agree upon among themselves; provided that the foregoing shall not release the Corporation from its obligation hereunder to purchase any unpurchased shares if the Shareholders fail, for any reason, to purchase all shares pursuant to the foregoing assignment by the Corporation.

## ARTICLE IV.
### Price and Terms for Purchase of Shares

A.    The price per share shall be as agreed upon by the Corporation and a vote of the majority of the Shares of Common Stock of the Shareholders.  If the Corporation and Shareholders, by a vote of the majority of the Shares of Common Stock, are unable to reach a unanimous agreement as to the agreed price per share, the Shareholders agree to cooperate in good faith to choose a mutually acceptable independent appraiser to determine the agreed value and that the value determination made by such appraiser shall be conclusive and binding on all Shareholders as the agreed price per share, provided such value determination shall, in no event, be less than the previously agreed value by the Corporation and Shareholders, if any.  If such value determination by the appraiser is less than the previously agreed value, then such previously agreed value shall remain in effect for all purposes of this Agreement until otherwise determined in accordance with the provisions of this Article IV.

B.    Unless otherwise agreed to by the parties, the purchaser may deliver to the selling Shareholder a promissory note equal to the full purchase price or an amount of cash at closing as agreed to by the parties.

C.    The selling Shareholder shall transfer and convey the shares to the purchaser at closing free and clear of all debts, liabilities, obligations, liens or any other encumbrances except those arising out of this Agreement.

## ARTICLE V.
### Vote Requirements

A.    Unless otherwise set forth in the Corporation's Certificate of Designation (as defined below) as filed with the Secretary of State of Delaware, the following actions shall not be taken by or on behalf of the Corporation without the affirmative vote of sixty-six percent (66%) of the shares of Common Stock of the Corporation:

1.    The amendment or restatement of the Certificate of Incorporation or the By-Laws of the Corporation;

2.    The appointment, removal, or replacement of any members of the Board of Directors of the Corporation;

3.     Except as provided for in Article VIII of this Agreement, the issuance of dividends and other distributions of cash or other property on the shares of the Corporation;

4.     The lending of money, the borrowing of money, the granting of guaranties, or the transfer, issuance or the dealing with any debt instruments of the Corporation other than short-term debt arrangements made in the ordinary course of the Corporation's business to finance current inventory requirements;

6.     The purchase, sale, mortgage or disposition of any personal property or real property which has a fair market value of $250,000.00 or more;

7.     The appointment of a receiver for the Corporation or the voluntary filing of any bankruptcy or similar proceeding by the Corporation; or

B.     The Shareholders shall take all actions necessary and vote all of their Shares to ensure that the Certificate of Incorporation and By-Laws of the Corporation are adopted, amended and maintained consistent with the agreements, terms and conditions and intentions of this Agreement, as it may from time to time be amended; provided that in the event of any conflict between the Corporation's Certificate of Designation for its Series A Preferred Stock (the "Certificate of Designation") and this Agreement, the terms and provisions of this Agreement shall control.

C.     Protective Provisions.  Without limiting the foregoing, the Corporation shall not, without first obtaining the approval, by unanimous vote or written consent, of the Board of Directors, voting as a class:

(i)     effect any transaction between the Corporation and any party related to or affiliated with the Corporation or its shareholders;

(ii)     change the lines of business of the Corporation;

(iii)     agree to any material change in any compensation arrangement or agreement with the Corporation's senior executive officers;

(iv)     issue any shares of capital stock of the Corporation below fair market value;

(v)     increase the number of shares of Common Stock authorized under the Corporation's stock option plan;

(vi)     create (by new authorization, amendment, reclassification, recapitalization or otherwise) any class or series of capital stock or any other securities convertible into equity securities of the Corporation having a preference superior to or on a parity with the Series A Preferred Stock with respect to voting, dividends, participation or liquidation preferences;

(vii)     merge with or into or consolidate with any other corporation (other than a wholly-owned subsidiary the Corporation) or effect any material acquisition by the Corporation;

(viii)   file a registration statement for an initial pubic offering of the Corporation's securities;

(ix)   change the size or composition of the Corporation's Board of Directors or replace any of the Directors;

(x)   sell, convey or otherwise dispose of all or substantially all of its property or business or effect any transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Corporation is disposed of;

(xi)   amend, modify, alter or repeal the Corporation's Certificate of Incorporation or By-laws;

(xii)   issue additional capital stock of the Corporation other than upon the exercise of any outstanding warrants or options granted, or that may be granted, under the Corporation's stock option plan, or upon conversion of any outstanding convertible securities of the Corporation;

(xiii)   incur any indebtedness other than under capitalized leases;

(xiv)   redeem or repurchase any outstanding shares of capital stock of the Corporation;

(xv)   declare or pay any dividends on the Common Stock or the Preferred Stock; and

(xvi)   take any action that alters the rights and preferences or increases the number of outstanding shares of Series A Preferred Stock.

## ARTICLE VI.
### Shares Owned by a Trust for the Shareholder's Family

Shares in the Corporation may be owned by a trust (eligible to hold S Corporation stock, if applicable) for the benefit of the Shareholder's family.  In such event, the shares owned by such trust shall, for all purposes of this Agreement, including the required sale of all shares owned by a Shareholder as a result of the Shareholder's death or significant financial hardship, including such Shareholder's disability as defined in Paragraph D of Article II of this Agreement, be included in, deemed part of, and bound by the terms of this Agreement, and any action taken, offer made, or option exercised under this Agreement, with reference to the shares owned by a Shareholder shall be applicable to the shares owned by such trust.  In the event of the death of any member of the Shareholder's family who is a trust beneficiary, the shares in the Corporation held in trust for such deceased family member may remain held in trust for other members of the Shareholder's family.  The Shareholders agree to provide the Corporation with sufficient documentation as well as any other data which the Corporation may reasonably request (i) to establish the legal existence of such trust; (ii) to determine that such trust is eligible to hold S Corporation stock under the Internal Revenue Code, as amended; and (iii) to determine the Trustee's authority to be bound by the terms of this Agreement.

## ARTICLE VII.
Conflicts Transactions

Except as otherwise set forth herein, any contract or other transaction between the Corporation and any Shareholder or any Affiliate (a "Conflict Transaction"), shall be valid, if the material facts of the Conflict Transaction and such Shareholder's or such Affiliate's interest is disclosed to the Board of Directors of the Corporation, and such Conflict Transaction is authorized by unanimous approval of the Board of Directors of the Corporation.

## ARTICLE VIII.
Other Opportunities

Each of the parties hereto acknowledges that the LaneAxis Shareholder and its affiliates may conduct business with any enterprise, including any enterprise which may have products or services which compete directly or indirectly with those of the Corporation or its subsidiaries. Nothing in this Agreement shall preclude or in any way restrict the LaneAxis Shareholder and its affiliates from conducting business with or investing or participating in any particular enterprise, whether or not such enterprise has products or services that compete with those of the Corporation. Notwithstanding anything to the contrary herein, the Company and each Shareholder expressly acknowledge and agree that in the event that any of the LaneAxis Shareholder and its officers, directors, shareholders, partners, affiliates, agents, representatives and any related investees (other than the Corporation and its subsidiaries) acquires knowledge of a potential transaction or matter that may be a corporate opportunity for any of the Corporation or any of its subsidiaries (each a "Corporate Opportunity Party"), then any such Corporate Opportunity Party shall have no duty (contractual or otherwise) to communicate or present such corporate opportunity to the Corporation or any of its subsidiaries, as the case may be, and, notwithstanding any provision of this Agreement to the contrary, any such Corporate Opportunity Party shall not be liable to the Company, any of its affiliates, any of its subsidiaries or any other Shareholder for breach of any duty (contractual or otherwise) by reason of the fact that any such Corporate Opportunity Party, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another person, or does not present such opportunity to the Corporation, its affiliates or any of its subsidiaries. Notwithstanding the foregoing, this Section shall not be deemed in any manner to relieve any director of any fiduciary duties owed by such director to the Company and the Shareholders.

## ARTICLE IX.
Election of Directors

A.      So long as the Shareholders or eligible trusts own shares in the Corporation, they shall vote their shares to elect the following as the only directors of the Corporation:  Rick Burnett or another director appointed by Laneaxis, Inc., a Delaware corporation, and Luke Patterson.

B.      In the unlikely event that there is a disagreement or "deadlock" between Mr. Burnett and Luke Patterson regarding any matter of which the aggregate transaction value is less than one million dollars ($1,000,000), Mr. Burnett and Mr. Patterson shall attempt to resolve

such disagreement or "deadlock" in the manner and in accordance with the following procedures: (i) Mr. Burnett and Mr. Patterson will attempt in good faith to promptly resolve the disagreement or "deadlock" by negotiation, including convening a meeting of their representatives for that purpose. All reasonable requests for relevant information relating to the disagreement made by either party will be honored; and if (ii) Mr. Burnett and Mr. Patterson are unable to promptly resolve the disagreement or "deadlock" through negotiation, Mr. Burnett shall be entitled to cast an additional tie-breaking vote to resolve the disagreement or "deadlock."

C.　　In the unlikely event that there is a disagreement or "deadlock" between Mr. Burnett and Luke Patterson regarding any other matter or any matter for which the aggregate transaction value is greater than one million dollars ($1,000,000), Mr. Burnett and Mr. Patterson shall attempt to resolve such disagreement or "deadlock" in accordance with Section B(i) above. If Mr. Burnett and Mr. Patterson are unable to resolve the disagreement or "deadlock" through negotiation, no action pertaining to such matter shall be taken until such time as Mr. Burnett and Mr. Patterson are able to reach a resolution.

## ARTICLE X.
### Election of Officers

The officers of the Corporation shall be elected and serve in accordance with the By-Laws of the Corporation.  The officers of the Corporation following the effectiveness of this Agreement initially shall be as follows:

| Office | Individual |
| --- | --- |
| Chief Executive Officer, Secretary and Treasurer | Rick Burnett |
| President | Luke Patterson |
| Chief Technology Officer | Jacob Patterson |

## ARTICLE XI.
### Conditions Precedent

The obligation of the Shareholders to enter into this Agreement shall be subject to the following:

A.　The Corporation shall provide each of the Shareholders with certified copies of the Certificate of Incorporation and By-Laws of the Corporation, which shall be in effect upon the date of this Agreement;

B.　A License and Services Agreement, dated on or about the date hereof, shall have been entered into between Laneaxis, Inc. and GPS Cannabis Tracker, Inc., a Delaware corporation and a wholly owned subsidiary of the Corporation; and

C.    The Corporation shall have acquired 100% of the membership interests of Bubo Technologies, L.L.C., a Delaware limited liability company ("Bubo"), pursuant to the Share-LLC Interest Exchange Agreement, dated on or about the date hereof, entered into among the Corporation and the members of Bubo.

## ARTICLE XII.
### Intentionally Reserved

## ARTICLE XIII.
### Specific Performance

The shares of the Corporation cannot be readily purchased or sold on the open market and for that reason, among others, the parties will be irreparably damaged if this Agreement is not specifically enforced.  Should any dispute arise concerning the sale or disposition of shares of the Corporation, an injunction may be issued restraining any sale or disposition pending the determination of such controversy upon application to a court of competent jurisdiction by any party to this Agreement.  If any controversy arises concerning the purchase or sale of any such shares, the same shall be enforceable in a court of equity in Orange County, State of California by decree of specific performance.  Such remedy shall, however, be cumulative and not exclusive, and shall be in addition to any other remedy which the parties may have.

## ARTICLE XIV.
### Termination of Agreement

This Agreement shall terminate upon the first to occur of the following events:

A.    The execution of an agreement to revoke this Agreement signed by all the parties to this Agreement and the personal representative of any deceased party who has not yet been fully paid for the sale of all the shares of such decedent.

B.    The adoption of a plan of sale, dissolution, or liquidation by the Corporation in accordance with the requirements of Article V of this Agreement; or the bankruptcy or receivership of the Corporation (but such termination shall not extinguish the rights or obligations of the parties hereunder arising out of any event occurring prior to such termination).

C.    Upon the shares of the Corporation becoming publicly traded on a publicly recognized stock exchange, such as the New York Stock Exchange or the American Stock Exchange, on over-the-counter trading marketplace such as the OTC Marketplace.

## ARTICLE XV.
### Securities Laws and Endorsement of Stock Certificates

A.    The Shareholders acknowledge that the stock of the Corporation acquired by them has not been registered under the Securities Act of 1933, as amended (the "Act"), or any state securities laws (the "State Acts").  The Shareholders individually represent and warrant that they did not acquire their shares of stock from the Corporation with a view to, offer, offer for sale, or

sell in connection with, the distribution of such shares of stock, and that they will hold such shares of stock indefinitely unless subsequently registered under the Act and the State Acts or unless an exemption from such registration is available and an opinion of counsel for the Corporation, in form and substance satisfactory to the Corporation, is obtained to that effect. The provisions of this Agreement are in all respects subject to the restrictions of the Act and the State Acts and the rules and regulations thereunder. All certificates representing shares of Corporation's stock subject to this Agreement shall bear a conspicuous legend in substantially the following form:

*The Securities represented by this certificate (the "Securities") have been issued and sold in reliance upon an exemption from registration under the Securities Act of 1933, as amended (the "1933 Act"). The Securities may not be offered for sale, sold or transferred without an effective registration statement being filed under or pursuant to said 1933 Act or an opinion of counsel in form and substance satisfactory to the issuer then exemption from registration is available.*

Each Shareholder realizes that the Corporation does not file, and does not in the foreseeable future contemplate filing, periodic reports in accordance with the provisions of Section 13 or 15(d) of the Securities and Exchange Act of 1934, as amended, and also understands that the Corporation has not agreed to register any of its securities for distribution in accordance with the provisions of the Act or to take any actions respecting the obtaining of an exemption from registration for such securities or any transaction with respect thereto. Hence, by virtue of certain rules respecting restricted securities promulgated under the Act, the stock of the Corporation acquired by the Shareholders must be held indefinitely unless and until subsequently registered under the Act or the State Acts or both, as applicable, or unless an exemption from such registration is available, in which case the amount of stock that may be sold may be limited.

B.    Upon the execution of this Agreement, the certificates representing shares of stock subject to this Agreement shall be conspicuously legended as follows:

*The shares represented by this certificate may not be transferred, hypothecated, pledged, or otherwise disposed of except in compliance with that certain Shareholders Agreement, dated April 17, 2017 a copy of which is on file in the office of the Secretary of this Corporation.*

### ARTICLE XVI.
### Future Stock and After-Acquired Stock

A.    Unless waived in writing by all of the parties hereto, before any additional shares of stock of the Corporation are issued in the future to any person, corporation, partnership, association, trust and/or any other entity whatsoever other than a signatory to this Agreement, such person or entity shall be required to become a party to and execute, seal, and deliver a copy of this Agreement prior to the issuance of such shares of stock or any other securities, if any, to him, and the certificates therefore shall be legended as provided in this Agreement; and thereafter, such person or entity shall be deemed to be a "Shareholder" for all purposes under this

Agreement, provided that such shares may only be issued in compliance with the provisions of this Agreement.

B.     Whenever any Shareholder acquires any additional shares of stock of the Corporation or any other securities of the Corporation other than the shares owned at the time of the execution of this Agreement, such shares or such other securities of the Corporation so acquired shall be subject to all of the terms of this Agreement, and the certificates therefor shall be surrendered to the Corporation for legending in accordance with this Agreement, unless already so legended, provided that such shares may only be issued in compliance with the provisions of this Agreement.

## ARTICLE XVII.
### Mediation and Arbitration of Disputes

Any controversy arising under, out of, in connection with, or relating to, this Agreement, and any amendment thereof, or the breach thereof, shall be submitted to mediation, and, if not resolved by such mediation, shall then determined and settled by the California State Courts in San Diego, CA.

## ARTICLE XVIII.
### Notices

All notices, requests, demands and other communications shall be directed to the address or electronic mail set forth below or to such other address or electronic mail as any party hereto may designate to the other parties by like notice and shall be deemed duly given when delivered by hand, transmitted electronically as evidenced by a confirmation of receipt, or three (3) business days after posting in the United States mail by registered or certified mail, with postage pre-paid return receipt requested:

If to the Corporation, to:          Budbo, Inc.
                                    11159 Campanile
                                    Newport Beach, CA 92660
                                    Attn:  Rick Burnett
                                    Email: rick@laneaxis.com

If to LaneAxis Shareholder, to:     Rick Burnett
                                    11159 Campanile
                                    Newport Beach, CA 92660
                                    Email: rick@laneaxis.com

If to Luke Patterson, to:           Luke Patterson
                                    15400 Sonoma Drive #208
                                    Fort Myers Beach, FL 33908
                                    E: luke@budbo.com

If to Jacob Patterson, to:

Jacob Patterson
503 E. Nifong Blvd # 217
Columbia, MO 65201
E: jacob@budbo.com

If Nick Heldreth, to:

Nick Heldreth
728 Devon Ct
San Diego CA 92109
E: nickheldreth@gmail.com

If to Gary Heitz, to:

Gary W. Heitz
1709 Elmhurst Drive Unit B
Austin, TX 78741
E: garyheitz80@gmail.com

## ARTICLE XIX.
### Miscellaneous

A.    This Agreement represents and embodies the entire understanding among the parties and may be altered, amended or revoked only by subsequent written instrument duly executed by all of the parties hereto.

B.    This Agreement shall be binding upon the Corporation, the Shareholders, their heirs, legal representatives, transferees, successors and assigns. Any person or entity to whom any shares are transferred as permitted under the terms of this Agreement shall, by acceptance of such shares, be bound by all the terms, conditions and restrictions of this Agreement.

C.    This Agreement shall inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, assigns and transferees.

D.    Each Shareholder and the Corporation, through its CEO and President or other authorized officer, shall give prompt notice to the other Shareholders and Corporation, as the case may be, of all offers, acceptances, refusals, and exercise of options made pursuant to this Agreement. All notices, writings, offers, acceptances, refusals, payments or agreements given or required to be given under this Agreement shall be made in writing and sent by registered or certified mail, return receipt requested, to the principal business office of the Corporation and to the last known address of each Shareholder appearing on the books of the Corporation as well as via electronic mail. Any such notice or other writing shall be deemed given and received upon the expiration of three days following such mailing with proper postage affixed.

E.     The parties agree to execute and deliver all proxies, stock transfer agent agreements, authorizations, documents and instruments which are necessary to carry out the terms and conditions of this Agreement.

F.     This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of laws of any jurisdictions other than those of the State of California. Each of the parties (a) submits to the jurisdiction of any state or federal court sitting in Orange County in the State of California in any action or proceeding arising out of or relating to this Agreement, (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, and (c) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.  Any party may make service on another party by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in Article XVIII.  Nothing in this Section, however, shall affect the right of any party to serve legal process in any other manner permitted by law.

G.     Any heading preceding the text of the several paragraphs hereof are inserted solely for convenience of reference, and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

H.     This Agreement is intended and does hereby revoke all previous agreements among the parties to the extent they are inconsistent herewith.

I.     Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

J.     Each Shareholder represents and warrants that he is the sole owner of the shares of the Corporation's stock issued to him.

K.     Each Shareholder does hereby appoint the then acting secretary of the Corporation as his Attorney in Fact to transfer, in such Shareholder's name, record ownership of all shares which the Shareholder shall transfer or convey, or be required to transfer or convey, under the terms of this Agreement.  The said appointment is coupled with the interest of the parties in the

shares and the mutual covenants hereunder and may not be revoked except as an amendment to this Agreement.

L.    Unless the context otherwise requires, whenever used in this Agreement, the singular shall include the plural, the plural shall include the singular, and the masculine gender shall include the neuter and feminine gender, and vice versa.

M.    In the event that any dispute among the parties to this Agreement should result in litigation, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

N.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures delivered by fax and/or e-mail/.pdf transmission shall be sufficient and binding as if they were originals and such delivery shall constitute valid delivery of this Agreement.

O.    Each of the parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of this Agreement and the intentions of the parties as reflected thereby.

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement as of April 18, 2017.

CORPORATION:                          BUDBO, INC.

                                      _____
                                      By: Rick Burnett, CEO

SHAREHOLDERS:                         _____
                                      Luke Patterson

                                      _____
                                      Jacob Patterson

                                      _____
                                      Nick Heldreth

                                      _____
                                      Gary Heitz

                                      LaneAxis GPSCT, Inc.

                                      _____
                                      By: Rick Burnett, CEO

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement as of April 18, 2017.

**CORPORATION:**                     **BUDBO, INC.**

_____

By: Rick Burnett, CEO

**SHAREHOLDERS:**

_____

Luke Patterson

_____

Jacob Patterson

_____

Nick Heldreth

_____

Gary Heitz

LaneAxis GPSCT, Inc.

_____

By: Rick Burnett, CEO

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement as of April 18, 2017.

**CORPORATION:**        **BUDBO, INC.**

_____

By: Rick Burnett, CEO

**SHAREHOLDERS:**        _____

Luke Patterson

_____

Jacob Patterson

_____

Nick Heldreth

_____

Gary Heitz

LaneAxis GPSCT, Inc.

_____

By: Rick Burnett, CEO

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement as of April 18, 2017.

**CORPORATION:**                        **BUDBO, INC.**

_____
By: Rick Burnett, CEO

**SHAREHOLDERS:**               _____
Luke Patterson

_____
Jacob Patterson

DocuSigned by:

*Nick Heldreth*

ACA2E2BADCE040C...

_____
Nick Heldreth

_____
Gary Heitz

LaneAxis GPSCT, Inc.

_____
By: Rick Burnett, CEO

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement as of April 18, 2017.

**CORPORATION:**                    **BUDBO, INC.**

By: Rick Burnett, CEO

**SHAREHOLDERS:**

Luke Patterson

Jacob Patterson

Nick Heldreth

Gary Heitz

LaneAxis GPSCT, Inc.

By: Rick Burnett, CEO

**SHAREHOLDERS**

| Shareholder | Common Stock, $.0001 Par Value Owned | Percentage of Common Stock, $.0001 Par Value Owned | Series A Preferred Stock Owned |
|---|---|---|---|
| Luke Patterson | 1,096,500 | 21.93% | |
| Jacob Patterson | 1,071,000 | 21.42% | |
| Nick Heldreth | 255,000 | 5.10% | |
| Gary Heitz | 127,500 | 2.55% | |
| LaneAxis Shareholder | 2,450,000 | 49.00% | 1 Share* |
| **Total** | **5,000,000** | **100.00%** | **100.00%** |

* Such Share of Series A Preferred Stock entitles LaneAxis Shareholder to cast up to 15,000,001 votes together with the holders of Common Stock, voting together as a single class, with respect to any and all matters presented to the holders of Common Stock for their action, consideration or consent, whether at any special or annual meeting of stockholders, by written action of stockholders in lieu of a meeting, or otherwise, as further set forth in the Certificate of Designation filed with the Secretary of State of Delaware on or about April 18, 2017.

# EXHIBIT B

## FORM OF JOINDER TO SHAREHOLDERS AGREEMENT

THIS JOINDER (this "Joinder") to the Shareholders Agreement, dated as of April ___, 2017 (as amended or restated from time to time, the "Agreement"), by and among Budbo, Inc., a Delaware corporation (the "Company"), and the shareholders of the Company party thereto, is made and entered into as of _____ by and between the Company and _____ ( "Joining Shareholder"). Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Agreement.

WHEREAS, on the date hereof, Joining Shareholder has [acquired / been issued] _____ [Common/Preferred] Shares [from _____] and the Agreement and the Company require Joining Shareholder, as a holder of such Shares, to become a party to the Agreement, and Joining Shareholder agrees to do so in accordance with the terms hereof.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Joinder hereby agree as follows:

1.    Agreement to be Bound. Joining Shareholder hereby (i) acknowledges that it has received and reviewed a complete copy of the Agreement and (ii) agrees that upon execution of this Joinder, it shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a "Shareholder" for all purposes thereof and entitled to all the rights incidental thereto.

2.    Notice. For purposes of providing notice pursuant to the Agreement, the address of Joining Shareholder is as follows:

       [Name]
       [Address]
       [Facsimile Number]

3.    Governing Law. This Agreement and the rights of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the Laws of the State of California without regard to its rules regarding conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

4.    Descriptive Headings. The descriptive headings of this Joinder are inserted for convenience only and do not constitute a part of this Joinder.

5.    Counterparts. This Joinder may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and all of which together will be considered one and the same Joinder and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party or parties. For purposes

of this Joinder, facsimile signatures or signatures by other electronic form of transfer shall be deemed originals, and the parties agree to exchange original signatures as promptly as possible.

IN WITNESS WHEREOF, the parties hereto have executed this Joinder as of                     .

BUDBO, INC.


By: _____
    Name:
    Title:


[HOLDER]


By: _____
    Name:
    Title:

# EXHIBIT D

# SOFTWARE LICENSE AND SERVICES AGREEMENT

This License and Services Agreement (this "Agreement"), dated as of April 18, 2017, is entered into by and between **Laneaxis, Inc.**, a Delaware corporation ("LA"), and GPS Cannabis Tracker, Inc. ("GPSCT"), a Delaware corporation and wholly owned subsidiary of **Budbo, Inc.** (GPSCT and LA shall be referred to collectively as the "Parties" and individually as a "Party").

## Recitals

**WHEREAS**, LA has acquired a 49% interest in Budbo, Inc., a Delaware corporation ("Budbo"), which in turn has acquired 100% of the membership interests of Bubo Technologies, L.L.C., a Delaware limited liability company ("Bubo"), pursuant to the Share-LLC Exchange Interest Agreement, entered into on the date hereof between Budbo and Bubo (the "Acquisition");

**WHEREAS**, LA has developed the Software System Technology and in connection with the Acquisition, desires to license to GPSCT the use of the Software System Technology in relation to the Business; and

**WHEREAS**, LA agrees to provide the corresponding technical support and other services in connection with GPSCT's use of the Software Systems.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements of the Parties, the performance by the Parties in good faith and other valid and valuable considerations, the Parties hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1. The capitalized terms used herein but not otherwise defined shall have the following meanings:

"Affiliate" means, with respect to any specified Person, any other Person who, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; provided, that for the purposes of this definition, "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Business" means Bubo Technologies, LLC's, a Delaware limited liability company ("Bubo"), current or future business plans or operations as presented to, and contemplated by, Bubo and Laneaxis, including without limitation in connection with the development of a mobile application (currently name Budbo) that allows a user to quickly discover new local marijuana strains, concentrates, and edibles and further modification of such mobile application with the use of the tracking Technology and Intellectual Property licensed pursuant to this Agreement.

"Intellectual Property Rights" means all rights of the following types, which may exist or be created under the Laws of any jurisdiction in the world: (i) rights associated with works of authorship, including exclusive exploitation rights, copyrights and moral rights, and all extensions, renewals, registrations and applications therefor; (ii) rights in trademarks, trade names, service marks, service names and similar rights,

and all registrations and applications therefor, as well as and all goodwill embodied therein; (iii) rights in domain names and uniform resource locators, and all registrations and applications therefor; (iv) trade secret rights; (v) patents and patent applications, including any continuations, divisions, reissues, and reexaminations, and other industrial property rights; and (vi) all other proprietary rights in Technology.

"Laws" means state and federal laws, regulations, ordinances, provisions, detailed rules, standards, orders or regulatory documents of the United States or other applicable jurisdictions.

"Person" means any individual, limited liability company, corporation, association, partnership, commercial trust, stock company, joint venture, trust, property with fiction personality or other entities or organizations of any nature.

"Technology" means any or all of the following: (i) works of authorship including computer programs, whether in Source Code or Object Code, and whether embodied in software, firmware or otherwise, documentation, designs, files, net lists, records and data; (ii) inventions (whether or not patentable), improvements and technology; (iii) proprietary and confidential information, including technical data and customer and supplier lists, trade secrets and know how; (iv) databases, data compilations and collections and technical data; and (v) all instantiations of the foregoing in any form and embodied in any media.

"Software System Technology" means LA's Virtual Freight Management software as a service tracking and logistics solution built to help brokers, 3PLs and shippers gain real-time visibility and proactive control over every shipment and related Technology and Intellectual Property Rights owned by LA.

## ARTICLE 2

## SOFTWARE SYSTEM LICENSE

2.1.    License. During the Term, LA hereby grants to GPSCT a worldwide, non-exclusive, non-transferable, non-assignable and non-sublicensable license to use the Software System Technology solely for the use in the Business (the "License").  The License shall be royalty free; provided, that the Parties may agree in the future for GPSCT and/or Budbo to pay LA a monthly or a quarterly royalty fee (the "License Fee") as mutually determined by the Parties and jointly approved by Luke Patterson and Rick Burnett.

2.2.    Ownership/No Other Grant. LA retains all right, title and interest in and to the Software System Technology licensed to GPSCT pursuant to this Agreement, including, without limitation, all developments, improvements and modifications thereto (if any) created by or for LA to such Software System Technology during the course of providing any services to GPSCT hereunder.  Except as expressly provided herein, nothing in this Agreement will constitute or be deemed to be any grant, directly or by implication, estoppel or otherwise, of any right, license or covenant from LA to GPSCT or any of its Affiliates.

2.3.    License Purchase Option. Beginning on the date that is twelve (12) months after the date of this Agreement, GPSCT shall have the option to purchase the License to be used solely in the Business for a purchase price of one ($1) dollar, provided that at the time of the exercise of the Option (i) this Agreement has not been terminated prior thereto, (ii) Luke Patterson and Jacob Patterson are full time employees of the Company, (iii) LA's ownership of Budbo's common stock and other equity securities of Budbo is at least 25% of Budbo's common stock then issued and outstanding on a fully diluted basis, and (iv) Bubo's business as then conducted and intended to be conducted thereafter is not directly or indirectly

competitive to LA's business as then conducted and intended to be conducted thereafter; provided, further, that if the Option is exercised, any License Fee and/or License Service Fee payable to LA as may be agreed to pursuant to the terms hereof shall continue to be paid on such terms.

## ARTICLE 3

## ADDITIONAL SERVICES

3.1.    License. During the Term, GPSCT shall not pay LA any (i) software service fees in connection with the use of the License pursuant to the terms of this Agreement or (ii) the Additional Services (as defined below) to be provided by LA to GPSCT pursuant to the terms of this Agreement; provided, that LA may charge GPSCT for the costs and expenses incurred by LA to deliver, maintain and service the Software System Technology for use in the Business.

3.2    Technical Support and Training. LA shall provide at no extra charge to GPSCT and Budbo and/or their relevant Affiliates, such initial training and technical support on the correct implementation and use of Software System Technology and related proprietary know how; provided that LA may charge GPSCT or Budbo a reasonable service fee in the future as mutually agreed by the Parties and jointly approved by Luke Patterson and Rick Burnett, for any continued technical support or training provided to GPSCT, Budbo and/or their relevant Affiliates (the "License Service Fee").  In addition, LA shall provide GPSCT personnel with reasonable access to consult with pertinent LA employees and consultants in relations to the implementation and maintenance of the Software System Technology in the Business.  Such consultations shall occur at the request of GPSCT, provided that it is at a mutually agreeable time and place. Each Party shall be responsible for its own expenses incurred in connection with any such consultations. The subject matter and scope of such consultations shall be defined jointly by the Parties and shall be intended to allow GPSCT to take hands-on advantage of such pertinent LA's employees' and consultants' expertise and resources for purposes of assisting GPSCT and Budbo in the development, use, marketing, promotion and other commercialization of the Budbo mobile application.

## ARTICLE 4

## CONFIDENTIALITY

4.1.    Confidential Information and Confidentiality Obligations. Irrespective of whether this Agreement has been terminated, each of the Parties shall maintain in strict confidence the business secrets, proprietary information, customer information, personal information and any other information of a confidential nature of the other Party coming into its knowledge during the entry into and performance of this Agreement (the "Confidential Information").  Except where prior written consent has been obtained from the Party disclosing the Confidential Information or where disclosure to a third party is mandated by relevant Laws, including Laws of the place of listing of an Affiliate of a Party, the Party receiving the Confidential Information shall not disclose any Confidential Information to any third party.  The following information shall not constitute the Confidential Information: (i) any information which, as shown by written evidence, has previously been known to the receiving party by way of legal means; (ii) any information which enters the public domain other than as a result of a fault of the receiving Party; or (iii) any information lawfully acquired by the receiving Party from another source subsequent to the receipt of relevant information.

4.2.    Disclosure of Confidential Information to Certain Persons. A receiving Party may disclose the Confidential Information of the disclosing Party to its relevant employees, directors, consultants, agents or its appointed professionals, provided that such receiving Party shall ensure that such persons shall

comply with relevant terms and conditions of this Agreement and that it shall assume any liability arising out of any breach by such persons of relevant terms and conditions of this Agreement.

4.3     Return of Confidential Information. Any materials or documents comprising Confidential Information that have been furnished to a Party in connection with this Agreement, and all copies of such documentation, shall be promptly, at the option of the receiving party, destroyed or returned by that party to the disclosing party, within ten (10) days after the termination of this Agreement, provided however, the receiving party may retain, to the extent required by law or its record keeping policies, all routinely prepared memos or similar internal analyses, computations, studies or reports, but any such retained information must be kept confidential and subject to the terms hereof.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

5.1.     Mutual Representations and Warranties. Each Party hereby represents and warrants to the other Party that: (i) it has requisite corporate capacity to execute this Agreement, grant the rights and licenses granted herein and perform this Agreement in the other aspects; (ii) upon execution and delivery, this Agreement shall constitute its legal, valid and binding obligations enforceable against it in accordance with its terms; and (iii) it shall perform its obligations hereunder in accordance with all the requirements of the Laws.

5.2.     Disclaimer. TO THE EXTENT PERMITTED BY APPLICABLE LAWS, OTHER THAN THE EXPRESS WARRANTIES SET FORTH IN SECTION 5.1, EACH PARTY HEREBY DISCLAIMS ALL WARRANTIES, REPRESENTATIONS OR CONDITIONS OF ANY KIND, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NONINFRINGEMENT.

## ARTICLE 6

## TERM AND TERMINATION

6.1     Term. The term of this Agreement shall continue in perpetuity unless terminated pursuant to the terms hereof.

6.2     Termination. (a) GPSCT shall have no right to terminate this Agreement based on any breach hereof or for any other reason, and GPSCT's sole and exclusive remedy with respect to any breach hereof by LA will be to seek monetary damages for the breach and, in the case of LA's material breach of Article 4, injunctive or other equitable remedies to cure, limit and restrain such breach or threatened breach.

(b)     LA shall have the right to terminate this Agreement on the occurrence of any of the following events if: (i) GPSCT files a petition for bankruptcy or is adjudicated as bankrupt; (ii) GPSCT becomes insolvent and makes an assignment for the benefit of its creditors or an arrangement for its creditors pursuant to any bankruptcy Law; (iii) GPSCT discontinues its Business or modifies its Business in a material way without LA's prior written consent; (iv) either Luke Patterson or Jacob Patterson ceases to be actively involved on a full-time basis with either Budbo or GPSCT; (v) LA's ownership of Budbo's common stock and other equity securities of Budbo decreases to less than 10% of Budbo's common stock then issued and outstanding on a fully diluted basis; (vi) if GPSCT or any Affiliate of GPSCT materially breaches this Agreement and fails to cure such material breach within fifteen (15) days of receiving notice thereof from LA; or (vii) an administrator is appointed for GPSCT or its business.

(c)     This Agreement may be terminated upon the mutual written agreement of the Parties.

(d)     Material Amendments. LA shall have the right to terminate this Agreement if (i) the Parties are required to amend any material term or condition of this Agreement as a result of applicable Laws, including those which could cause a material adverse effect on GPSCT, Budbo or the Business, and (ii) the Parties are unable to agree as to the substance of such amendment to LA's satisfaction. For the avoidance of doubt, any required amendment to Section 2 or Section 3 shall be deemed an amendment of a material term or condition for the purposes of this Section 6.2(d).

6.3     Effect of Termination. Upon any expiration or termination of this Agreement, all rights and licenses granted by LA to GPSCT hereunder shall immediately terminate, and each Party shall promptly return to the other Party or destroy (at the other Party's request) all Confidential Information (including software) of the other Party then in its possession.

6.4     Survival. The responsibilities and obligations of the Parties under Articles 4, 7 and 8 shall survive the expiration or termination of this Agreement.

## ARTICLE 7

## INDEMNIFICATION

7.1.    Indemnification by GPSCT. GPSCT and Budbo shall each indemnify and hold harmless LA, its Affiliates and their respective officers, directors, employees, shareholders, agents and representatives (each a "LA Indemnitee") from and against any and all claims, demands, liabilities, damages, losses and expenses, including reasonable attorneys' fees and costs (collectively, the "Damages"), actually incurred by any LA Indemnitee arising out of or in connection with any lawsuit, claim, action or demand (the "Claims") brought by a third party based upon (i) the gross negligence, intentional misconduct or fraud of GPSCT or its Affiliates; (ii) breach by GPSCT or its Affiliates of the representations and warranties made by it in this Agreement; (iii) the use, marketing, promotion, sale, advertising, transportation, handling, storage, or distribution of the Budbo mobile application or any other product or technology by or on behalf of Bubo or Budbo; except in each case for (x) Claims arising due to the gross negligence, intentional misconduct or fraud by LA, and (y) Claims for which LA is obligated to indemnify GPSCT Indemnitees pursuant to Section 7.2.

7.2.    Indemnification by LA. LA shall indemnify and hold harmless GPSCT, its Affiliates and their respective officers, directors, employees, shareholders, agents and representatives (each a "GPSCT Indemnitee") from and against any and all Damages actually incurred by any GPSCT Indemnitee arising out of or in connection with any Claims brought by a third party based upon (i) the gross negligence, intentional misconduct or fraud of LA or its Affiliates; and (ii) breach by LA or its Affiliates of the representations and warranties made by it in this Agreement; except in each case for (x) Claims arising due to the gross negligence, intentional misconduct or fraud of, or breach of this Agreement by GPSCT, Budbo or their Affiliates and (y) Claims for which GPSCT and Budbo are obligated to indemnify LA Indemnitees pursuant to Section 7.1.

7.3.    Procedure. The foregoing indemnifications are subject to the following procedural requirements: the LA Indemnitee or GPSCT Indemnitee shall give prompt written notice to the indemnifying party of any Claims by a third party which may give rise to any claim for which indemnification may be required under this Article 7, and the LA Indemnitee or GPSCT Indemnitee shall reasonably cooperate with the indemnifying party and its counsel in the course of the defense of any such suit, claim or demand, such cooperation to include without limitation using reasonable efforts to provide or make available documents, information and witnesses at the expense of the indemnifying party. The

indemnifying party shall be entitled to assume the defense and control of any such claim at its own cost and expense; provided, however, that the LA Indemnitee or GPSCT Indemnitee shall have the right to be represented by its own counsel at its own cost in such matters. Neither the indemnifying party nor the indemnified party shall settle or dispose of any such matter in any manner which would materially and adversely affect the rights or interests of the other party (including the obligation to indemnify hereunder) without the prior written consent of the other party, which shall not be unreasonably withheld or delayed or conditioned on further consideration.

## ARTICLE 8

## <u>MISCELLANEOUS</u>

8.1     <u>Press Releases and Announcements</u>. No party shall issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other parties.

8.2     <u>No Third Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any person other than the parties and their respective successors and permitted assigns; <u>provided</u>, <u>however</u>, that the provisions in Article 7 concerning indemnification are intended for the benefit of the benefit of the individuals specified therein and their successors and assigns.

8.3     <u>Entire Agreement</u>. This Agreement (including the documents referred to herein) constitutes the entire agreement among the parties and supersedes any prior or (other than as set forth herein) contemporaneous understandings, agreements or representations by or among the parties, written or oral, with respect to the subject matter hereof.

8.4     <u>Succession and Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns. No party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other parties; provided that LA may assign its rights, interests and obligations hereunder in the event it consummates a merger, acquisition and/or sale.

8.5     <u>Counterparts and Electronic Signature</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures delivered by fax and/or e-mail/.pdf transmission shall be sufficient and binding as if they were originals and such delivery shall constitute valid delivery of this Agreement.

8.6     <u>Headings</u>. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

8.7     <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered four business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent for next business day delivery via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

If to LA:                                          Copy to (which shall not constitute notice hereunder):

Laneaxis, Inc.                                     Foley Shechter LLP
1159 Campanile                                     211 East 43rd Street, 6th Floor

| | |
|---|---|
| Newport Beach, CA 92660 | New York, NY 10017 |
| Attn: Rick Burnett, CEO | Attn: Jonathan Shechter, Esq. |
| Facsimile: | Facsimile: +1-917-688-4092 |
| | |
| If to GPSCT: | Copy to (which shall not constitute notice hereunder): |
| | |
| GPS Cannabis Tracker, Inc. | Foley Shechter LLP |
| 1159 Campanile | 211 East 43rd Street, 6th Floor |
| Newport Beach, CA 92660 | New York, NY 10017 |
| Attn: Luke Patterson, President | Attn: Jonathan Shechter, Esq. |
| Facsimile: _____ | Facsimile: +1-917-688-4092 |

Any party may give any notice, request, demand, claim or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the party for whom it is intended. Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties notice in the manner herein set forth.

8.8     Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdictions other than those of the State of Delaware.

8.9     Submission to Jurisdiction. Each of the parties (a) submits to the jurisdiction of any state or federal court sitting in Orange County in the State of California in any action or proceeding arising out of or relating to this Agreement, (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, and (c) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto. Any party may make service on another party by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in Section 9.7. Nothing in this Section 9.9, however, shall affect the right of any party to serve legal process in any other manner permitted by law.

8.10     Amendments and Waivers. The parties may mutually amend any provision of this Agreement at any time prior to the Effective Time. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all of the parties. No waiver of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the Party giving such waiver. No waiver by any Party with respect to any default, misrepresentation or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

8.11     Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to limit the term or provision, to delete specific words

or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

8.12　WAIVER OF JURY TRIAL. EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

8.13　Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**GPS CANNABIS TRACKER, INC.**

By:
Name: Luke Patterson
Title: President

**LANEAXIS, INC.**

By:
Name: Rick Burnett
Title: Chief Executive Officer

Agreed and acknowledged for purposes
of Article 7 of this Agreement:

**BUDBO, INC.**

By:
Name: Rick Burnett
Title: Chief Executive Officer

# EXHIBIT E

**StreetInsider.com**
*if you're not inside...you're outside*

**Upgrade to StreetInsider Premium! - Free Trial**

Press Releases

Google Play     App Store

# Budbo Consumer Cannabis App Merges with LaneAxis Freight Tracking Platform to form Budbo Inc.

Article     Comments (0)

May 24, 2017 1:02 PM EDT               Tweet   Share   E-mail

*Get inside Wall Street with **StreetInsider Premium**. Claim your 2-week free trial here.*

Newport Beach, CA (PRWEB) May 24, 2017

Budbo, a mobile phone app that matches cannabis users with desired strains and products in their area, is merging with LaneAxis Virtual Freight Management to form Budbo, Inc. For the first time, the cannabis industry will have an enterprise level suite of products truly focused on delivering real-time analytics and insights into the cannabis sector.

Often referred to as "The Tinder of cannabis," Budbo is a consumer-facing smartphone app that allows users to "puff" or "pass" on a virtual stack of marijuana flower strains, oils, edibles, and more, all available at nearby dispensaries or for local delivery. The platform's unique strain match feature allows users to list desired effects or symptoms, such as anxiety or insomnia, and then be presented with a list of best strain matches. Every swipe right (a "puff") is recorded as a preferred strain or product, which represents just some of the data made available to partner-dispensaries. "Budbo Connect" is a backend web portal for cannabis dispensaries to track all key user data obtained from the app, as well as serve as the command center for real-time tracking of cannabis movements.

LaneAxis will serve as the engine behind "Budbo Trax," the real-time, GPS-based tracking of cannabis movements □ from seed to processing to dispensary to delivery. LaneAxis is an emerging player in the freight transportation industry, utilizing patent-pending design wrapped around GPS and internet technology to deliver real-time visibility over freight shipments. A driver mobile app serves as the backbone of the platform, which sends shipment status alerts around the clock, while providing immediate digital access to critical documents for auditing or compliance.

"Budbo now emerges as the dominant source of cannabis tracking and business intelligence," says Luke Patterson, Budbo President. "The Budbo app already gives consumers the most complete experience on the market when it comes to finding their favorite cannabis products. Dispensaries rely on our data to strategically stock their shelves. Our partnership with LaneAxis will launch our visibility and data offerings to the next level."

LaneAxis CEO and Founder Rick Burnett says the ability for dispensaries and other vested parties to have deep insights into both customer behavior and the real-time movement of their products is unprecedented and of immense value.

"We're thrilled to forge this partnership with Budbo," says Rick Burnett. "The movement of cannabis is fraught with dangers. Growers, dispensaries, processing centers □ all of them have a critical interest in knowing exactly where their products are at all times. LaneAxis technology delivers that crucial visibility."

The Budbo app will be tailored to help cannabis growers and other vested parties stay compliant with strict and often complex cannabis laws, which can vary widely by state. Currently, 29 states plus Washington, DC, allow cannabis legalization in some form, with further legalization widely anticipated.

LaneAxis Virtual Freight Management will continue to operate as a separate entity.

Download Budbo today:
Android: https://play.google.com/store/apps/details?id=com.budbo&hl=en
iPhone: https://itunes.apple.com/us/app/budbo/id1146901226
Budbo Website: http://www.budbo.com
LaneAxis Website: http://www.laneaxis.com

Read the full story at http://www.prweb.com/releases/2017/05/prweb14358641.htm


TOP TEN
Big Data
TRENDS
SEE THE TRENDS
+ableau
Close (X)

FREE Breaking News Alerts from StreetInsider.com!

E-mail Address

StreetInsider.com Top Tickers, 5/16/2019

1. SPY      6. AMZN
2. CSCO     7. DDS
3. PCG      8. CUI
4. JACK     9. TSLA
5. AGIO     10. ABR

**Serious News for Serious Traders! Try StreetInsider.com Premium Free!**

## You May Also Be Interested In

- Oregon State Bar Professional Liability Fund Completes Successful Implementation of One Inc Digital Payments Platform
- Terminus Selected as an Inc. Magazine Best Workplace for 2019
- Insight Named to 2019 Fortune 500 List, Marking Nine Consecutive Years


Ad



**Learn To Believe In Yourself**

Learn to be who you want to be in this free Mindvalley masterclass with healer Marisa Peer

Mindvalley          **LEARN MORE**

Top News     Most Read     Special Reports

- Wall St. gains on upbeat earnings, strong economic data
- European shares recover, but trade worries mount
- Walmart (WMT) Tops Q1 EPS by 11c, Comps Increase 3.4%
- Buffett's Berkshire Hathaway Confirms New Amazon (AMZN) Stake, Adds Delta (DAL), JPMorgan (JPM) (more...)
- Australia jobless rate jumps to eight-month highs, Australian dollar stumbles

**PARTNER CENTER**

Open an account.
E*TRADE
E*TRADE
Get 60 days of commission-free trades & up to $600.
Join E*TRADE today!

Charles Schwab
Rated #1 in Trade Reliability by Investor's Business Daily
Open an Account

Charles Schwab
Rated #1 in Trade Reliability by Investor's Business Daily
Open an Account

Sponsored Links by Taboola

You May Like

**3 Warning Signs Your Dog Is Crying For Help**

Dr. Marty

**Diabetes Discovery That is Leaving Doctors Speechless (Try It Tonight)**

Blood Sugar Stabilizer | Supplement

**This Is What Happens To Dark Spots (When You Do This Every Morning)**

Gundry MD Dark Spot Diminisher

**Are You On Medicare? If You Live In California, Read This**

Comparisons.org

**If Your Indoor Cat Vomits (Do This Every Day)**

Ultimate Pet Nutrition

**Play this for 1 minute and see why everyone is addicted!**

Throne: Free Online Games

**Subway Photos You Can't Unsee**

Graduatez

**2019 Top Small SUVs - Our Top Pick Will Surprise You**

Small SUV | Search Ads

**This Rule in Santa Ana, California Leaves Drivers Upset**

We Quote USA

**She Had No Idea Why The Crowd Was Staring Until It Was Too Late**

TieBreaker

**California May Pay Off Your Home If You Live Near Santa Ana**

Wired.today Mortgage Quotes

**Discrete Security Cameras That See Everything. Check Out Great Options**

Advanced Home Security | Search Ads

Related Categories                                                    Create E-mail Alert

Press Releases

**Add Your Comment**                            Login with Facebook    Sign in with Twitter

Name          [                    ]

Subject       [                    ]

Body          [                    ]

              [                    ]

**Sign up for StreetInsider Free!**

Receive full access to all new and archived articles, unlimited portfolio tracking, e-mail alerts, custom newswires and RSS feeds - and more!

[E-mail Address]  [    ]


Signup for
**StreetInsider
Premium Today!**
Free Trial!

Home    Member's Home    Premium Content                          Free News Feed
Links    Entities    About StreetInsider    Get Our Content        Get our RSS Feed!
Advertise with Us    Contact Us    Disclaimer    Privacy Policy

© Copyright 2019 StreetInsider.com

# EXHIBIT F

**Bitcoin Forum**

 simple machines forum

May 26, 2019, 10:16:56 PM

Welcome, **Guest**. Please login or register.

**News**: Latest Bitcoin Core release: 0.18.0 [Torrent] (**New!**)

[Search]

Bitcoin Forum > Alternate cryptocurrencies > Announcements (Altcoins) (Moderators: mprep, Welsh) > **[SALE-$20 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**

---

> **Warning**: One or more bitcointalk.org users have reported that they strongly believe that the creator of this topic is a scammer. (Login to see the detailed trust ratings.) While the bitcointalk.org administration does not verify such claims, you should **proceed with extreme caution**.

---

Pages: « 1 2 3 [4] 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41 42 43 44 45 46 47 48 49 50 51 52 53 54 ... 62 »

« previous topic
next topic »

print

 Author Topic: [SALE-$20 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS  (Read 13529 times)

This is a self-moderated topic. If you do not want to be moderated by the person who started this topic, create a new topic.

**termion**
Hero Member
⬤⬤⬤⬤⬤

Activity: 910
Merit: 533





**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**
January 08, 2018, 02:06:47 PM

#61

> Quote from: LoveCryptoAll on January 08, 2018, 10:06:58 AM
> I was reading the whitepaper and other resources and I see you briefly went in to detail above, but does budbo aim to act as a holdings or currency within the industry?  I know it is meant to be much more, but my question is if it is going to be one of budbos purposes to act as a currency in addition to your other goals?  I was also curious if there was an idea or plan on how these dispensaries would be able to transfer cash to budbo if that is one of it's goals?  Legally of course...

Answer from TELEGRAM from Jacob Patterson

"No, we are not touching the money side of this. Strictly data and storage of transactions in the financial sense receipts for purchases.
edited
Now we will be positioned in such a way that if it was to go federally legal we would be a turn key solution for this as we will be already used by the global cannabis community, but until its federally legal the short answer is no.
Budbo App will no longer accept USD for its services, only Bubos."

GET **25 FREE SPINS** AT REGISTRATION   **PLAY NOW**

Advertised sites are not endorsed by the Bitcoin Forum. They may be unsafe, untrustworthy, or illegal in your jurisdiction. Advertise here.

**termion**
Hero Member
⬤⬤⬤⬤⬤

Activity: 910
Merit: 533





**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**
January 09, 2018, 02:39:38 AM

#62

https://www.nbcnews.com/news/us-news/12-year-old-sues-u-s-attorney-general-jeff-sessions-n820466

Like most 12-year-olds, Alexis Bortell is energetic and loves to read, write and explore her family's 35-acre farm in Colorado.

But Alexis isn't like most 12-year-olds.

She's written a book, takes cannabis oil daily and is challenging the U.S. Controlled Substance Act by suing Attorney General Jeff Sessions.

Approximately three years ago Alexis had to leave her home in Texas in order to treat her severe form of epilepsy — known as intractable epilepsy — with cannabis.

Now she's suing Sessions so that others like her won't have to leave home in fear of retribution from the federal government if they, too, use medical marijuana.

**LoveCryptoAll**
Sr. Member
⬤⬤⬤⬤

Activity: 574
Merit: 253

**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**
January 09, 2018, 11:03:22 AM

#63

Attorney General Jeff Sessions' move to tighten federal laws around legal marijuana will backfire-
http://edition.cnn.com/2018/01/07/opinions/jeff-sessions-marijuana-move-bad-for-him-chernis-opinion/index.html





**termion**
Hero Member

Activity: 910
Merit: 533



### Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS
January 09, 2018, 11:11:32 AM       #64

FROM TELEGRAM

**Hi people, we are happy to share a new update with you. Budbo now accepts other currencies as well. You can now contribute to Budbo's campaign with following currencies: Bitcoin(BTC), Etherium (ETH), Ripple (XRP), Litecoin (LTC), Bitcoin Cash(BCH), Pot Coin (POT), USD (US Dollar).**

**termion**
Hero Member

Activity: 910
Merit: 533

### Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS
January 09, 2018, 11:54:10 AM       #65

> Quote from: HopeCrypto on January 09, 2018, 11:45:44 AM
> I was looking at you profile and found that you were at BUBO(?) tech. is the BUBO and Budho you are in now are different comp.?

Developers answered on your question:

Bubo Technologies was our original company that we built the Budbo app under. In March we merged with a company LaneAxis to add another suite of services, and formed Budbo, Inc. As we began implementing this technology within ours, we saw the need for blockchain within the cannabis industry as a whole, and formed another company Budbo Token International, LTD.





**DaMaNiAc**
Newbie

Activity: 39
Merit: 0

### Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS
January 09, 2018, 12:34:05 PM       #66

How are you planning to distribute the tokens? There is nowhere on the dashboard to enter an Eth address.



**budbo**
Newbie

Activity: 108
Merit: 0

### Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS
January 09, 2018, 02:06:41 PM       #67

Hi people, we are happy to share a new update with you. Budbo now accepts other currencies as well. You can now contribute to Budbo's campaign with following currencies:



# Bitcoin(BTC), Etherium (ETH), Ripple (XRP), Litecoin (LTC), Bitcoin Cash(BCH), Pot Coin (POT), USD (US Dollar).

**Sign UP @ https://portal.budbo.io/**

**tomuru**
Newbie

Activity: 34
Merit: 0

### Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS
January 10, 2018, 12:52:13 AM       #68

I wrote a Japanese article introduced about budbo.
Is it included in the subject of bounrty?



**tarolog**
Sr. Member

Activity: 630

### Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS
January 10, 2018, 03:27:12 AM       #69

I read the whitepaper. Everything is described in sufficient detail. It can be seen that the whitepaper was written by specialists who are well versed in their work.

Merit: 250





**Boing7898**
Sr. Member
🏅🏅🏅🏅

Activity: 686
Merit: 259



**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**     #70
January 10, 2018, 04:47:16 AM

> Quote from: DaMaNiAc on January 09, 2018, 12:34:05 PM
> How are you planning to distribute the tokens? There is nowhere on the dashboard to enter an Eth address.

I think information on the distribution of tokens will appear near the end of the ICO.  For two months, the address can become irrelevant.



**criptofuego**
Newbie
🥇

Activity: 48
Merit: 0

**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**     #71
January 10, 2018, 06:25:55 AM

I'm very interested in this project. Seems to have a great potential. Keep up with the good work!



**kusumadewi**
Hero Member
🏅🏅🏅🏅🏅

Activity: 826
Merit: 517

**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**     #72
January 10, 2018, 08:07:28 AM

whats the next step after getting the token? do we move it to myetherwallet? and then to exchange market from there?





**The Crypto Peasant**
Full Member
🏅🏅🏅

Activity: 264
Merit: 103

**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**     #73
January 10, 2018, 08:13:17 AM

tokens for canibis are actually doing well atm, very ineterested so follow a supply chain crypto the cannibis



**termion**
Hero Member
🏅🏅🏅🏅🏅

Activity: 910
Merit: 533

**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**     #74
January 10, 2018, 08:22:05 AM

> Quote from: kusumadewi on January 10, 2018, 08:07:28 AM
> whats the next step after getting the token? do we move it to myetherwallet? and then to exchange market from there?



Developers are in talks with 12 major exchanges..and they will share the update soon once things are finalized .
And - yes - you will see Bubo in Myetherwallet.



**KonstantinosM**

**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS**     #75

Hero Member

Activity: 1099
Merit: 605



Life is a taxable event



January 10, 2018, 08:53:57 AM

Why did you decide to build that on top of Ethereum rather than on its own?

What happens if Ethereum blows up?

---

**termion**
Hero Member

Activity: 910
Merit: 533



**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS** #76
January 11, 2018, 08:36:32 AM

A master of positive karma on Reddit? This is how you can earn Budbo tokens-
https://medium.com/budbo/budbo-bounty-program-is-now-live-f9464c49dfff



---

**kusumadewi**
Hero Member

Activity: 826
Merit: 517



**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS** #77
January 11, 2018, 01:10:49 PM

Are you guys going to expand to the Netherlands? Could mean widespread adoption . I think, Netherlands - this is good option for expansion.



---

**termion**
Hero Member

Activity: 910
Merit: 533



**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS** #78
January 11, 2018, 01:17:58 PM

> Quote from: kusumadewi on January 11, 2018, 01:10:49 PM
> Are you guys going to expand to the Netherlands? Could mean widespread adoption . I think, Netherlands - this is good option for expansion.

Developers will be attending the The Crypto Economy World Tour | Amsterdam | January 29-30.



---

**termion**
Hero Member

Activity: 910
Merit: 533



**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS** #79
January 11, 2018, 07:01:50 PM

> Quote from: HopeCrypto on January 11, 2018, 05:48:57 PM
> Do you plan to allow paypal again? As you know premium of Korea is too high..

No



---

**kusumadewi**
Hero Member

**Re: [TOKEN SALE-$3 mln] Budbo 2.0-supply chain management on a LEGAL global CANNABIS** #80
January 11, 2018, 09:23:03 PM

Activity: 826
Merit: 517



> **Quote from: termion on January 11, 2018, 01:17:58 PM**
>
> > **Quote from: kusumadewi on January 11, 2018, 01:10:49 PM**
> >
> > Are you guys going to expand to the Netherlands? Could mean widespread adoption . I think, Netherlands - this is good option for expansion.
>
> Developers will be attending the The Crypto Economy World Tour | Amsterdam | January 29-30.

Oh, very well . I hope this is will be great. You are moving in the right direction. I hope, soon your project will become widely known.

Pages: « 1 2 3 [4] 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41 42 43 44 45 46 47 48 49 50 51 52 53 54 ... 62 »     **print**

Bitcoin Forum > Alternate cryptocurrencies > Announcements (Altcoins) (Moderators: mprep, Welsh) > **[SALE-$20 mln]**
**Budbo 2.0-supply chain management on a LEGAL global CANNABIS**

« previous topic
next topic »

Jump to:  => Announcements (Altcoins)  ▼   go

Powered by SMF 1.1.19 | SMF © 2006-2009, Simple Machines






# EXHIBIT G


celsius network

Your Crypto Could Be Earning Up To 7% APR

No minimum deposit  |  No withdrawal fees  |  No lockups

Download Now

SHARE    TWEET    SEND    SHARE

NEXT
PREV



SPONSORED ARTICLE

# BUDBO – THE BLOCKCHAIN SOLUTION FOR THE CANNABIS INDUSTRY

MATTHEW TOMPKINS | JAN 27, 2018 | 15:30

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT          I DECLINE

 SHARE      TWEET    PRIVACY CENTER    SEND    COOKIE POLICY    SHARE

Rundown

- Budbo Meets Big Data
- Benefits of a Blockchain Based System
- The Budbo Token Crowdsale and BUBO Tokens
- About Budbo

**Budbo, the company whose immensely popular app has been dubbed "the Tinder of weed", is now focusing on leveraging the power of the blockchain to help document supply chains and aid research by providing extensive transparent data. Their token sale is now live.**

The current legalized marijuana industry is fragmented and marginalized, something that has led Budbo to identify a dire need for some form of systematic organization that also incorporates a transparency of operations. Enter the blockchain. Budbo aims to streamline the processes, supply chain, and logistics of the marijuana industry, bringing transparency to the ecosystem with the help of the Ethereum Blockchain.

By creating a data backbone for the cannabis industry, Budbo will be able to help stakeholders in the industry, government authorities, researchers, and all other interested parties gain useful industry insights.

## BUDBO MEETS BIG DATA

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT    I DECLINE

PRIVACY CENTER



SHARE    TWEET    SEND    SHARE    <    NEXT

PREV    >

Stakeholders in the **cannabis** industry, such as growers, manufacturers, and dispensaries, will all be able to contribute their data to the Budbo ecosystem stored on the blockchain. All data concerning the entire lifecycle of the product, from seed to smoke, will be recorded in an immutable ledger.

Among Budbo's revolutionary range of products is Budbo Trax, a powerful logistics tool which allows for real-time GPS-enabled tracking of marijuana products – from grower to end-user, supported with verified bill of lading, proof of pickup and proof of delivery, all facilitating the effective monitoring of the marijuana industry's supply chain.



We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT    I DECLINE

PRIVACY CENTER    COOKIE POLICY

# NEFITS OF A BLOCKCHAIN BASED SYSTEM

SHARE    TWEET    SEND    SHARE    NEXT

PREV



With access to a database of crucial information about the cannabis industry, businesses can maximize their sales while government authorities can observe and examine the operations of the industry conveniently. Researchers and scientists will have a credible source of extensive data to draw upon for future research on marijuana.

With the help of blockchain technology, Budbo will take steps to ensure that businesses which are on board will comply with all local and state laws.

Budbo's vision is one of a self-governing community of activists, patients, physicians, developers, artists, and enthusiasts all working towards the common goal of improving the cannabis industry through contributing votes,

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

ACCEPT    I DECLINE

PRIVACY CENTER    COOKIE POLICY

o's vision is one of a self-governing community of activists, patients, ...cians, developers, artists, and enthusiasts all working towards the common goal of improving the cannabis industry through contributing votes, time, engineering and knowledge to the decentralized applications and network of Budbo.

PREV    NEXT

## THE BUDBO TOKEN CROWDSALE AND BUBO TOKENS



Following Budbo's successful pre-sale, during which 20 million BUBO tokens were sold, Budbo has now begun their token sale. The sale is currently in its Tier 1 stage, with each tier running until a set amount of tokens are sold. There are 5 tiers, with token prices ranging from $0.25 in Tier 1, limited to 15 million tokens, all the way to Tier 5 where tokens are valued at $0.35. What this means is that the sooner you invest the cheaper you can buy tokens. You can sign up to buy tokens here: **https://portal.budbo.io/**.



We use cookies to ensure the best experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT

DECLINE

PRIVACY CENTER    COOKIE POLICY



## ABOUT BUDBO

Budbo was originally founded by Luke and Jacob Patterson, Budbo set out to better educate customers about the cannabis industry.  With very little marketing, they were able to grow their network to three thousand dispensaries and over 75,000 users.

As blockchain continued to revolutionize the way businesses operate, Budbo pivoted to bring it into their business model, merging with Rick Burnett's LaneAxis. LaneAxis, a virtual freight management network, allows shippers and carriers to more effectively and efficiently transact all the intricate business details in moving freight.

Budbo positioned itself to become an enterprise solution for the cannabis industry, enabling everything from supply-chain management to compliance and regulation. In deploying BUBO tokens that serve as API keys to aggregate valuable data, Budbo can now provide actionable insights to growers, dispensaries, and consumers.

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT    I DECLINE

PRIVACY CENTER    COOKIE POLICY



their pre-sale complete, Budbo is quickly gaining momentum, already causing a real stir in the legalized marijuana industry.

*Do you use Budbo's app? Have you invested in their Token Crowdsale? Let us know in the comments below.*



SHARE     TWEET     SEND     SHARE     NEXT
PREV

*Images courtesy of Budbo, AdobeStock*

## What is your reaction?



| happy | unmoved | amused | excited | angry | sad |

**Tags:** blockchain technology, Budbo, cannabis industry, ICOs, Tinder of weed

SHARE     TWEET     SEND     SHARE

SHOW COMMENTS

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT     I DECLINE

PRIVACY CENTER     COOKIE POLICY



$8679.38 **+0.28%**  $270.320 **+0.13%**  $0.05237 **+0.00%**

### LIKED THE ARTICLE?

0

Let us know!

f **SHARE**   🐦 **TWEET**   ✈ **SEND**   in **SHARE**   ‹   **NEXT**

**PREV** ›

Subscribe to our newsletter

**SUBSCRIBE**

☐ I consent to my submitted data being collected and stored



We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

**I ACCEPT**   **I DECLINE**

PRIVACY CENTER   COOKIE POLICY



SHARE   TWEET   SEND   SHARE   NEXT

NEWS

# POSSIBLE LITECOIN AND MONERO MERGER STEPS CLOSER TO REALITY

MATTHEW TOMPKINS | JAN 27, 2018 | 11:00

SHARE   TWEET   SEND   SHARE   ✖

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT   I DECLINE

PRIVACY CENTER   COOKIE POLICY



**ie Lee admits his ambition to work with Monero in a series of
ts he posted yesterday, claiming that Litecoin's liquidity would be a
fit for Monero's anonymity and fungibility.**

SHARE     TWEET     SEND     SHARE        NEXT
PREV

Monero (XMR) project lead Riccardo Spagni and Litecoin (LTC) creator Charlie Lee would appear to be taking tentative baby steps in potentially bringing their two coins closer. Spagni posted the [following tweet](#) yesterday, which first bandied the idea of a possible merger between the two cryptocurrencies:



## THE LITE SIDE

Lee, who has professed a desire for increased anonymity in the past with regard to Litecoin,  was quick to respond in his own indomitable manner with his own series of tweets:



**Charlie Lee [LTC⚡]**
@SatoshiLite

Although @fluffypony was kidding here, I think it would be good for Litecoin and Monero (2 of the top non-scam coins 😄) to work together. A while back, I proposed to him that we work on

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT          I DECLINE

The [above tweet](#) highlights what is quickly becoming the future direction for cryptocurrency: on-chain atomic swaps, where two different coins can theoretically be exchanged in a secure and instant manner. On-chain atomic

technology is set to revolutionize the current crypto industry, as it was enabled by the recently enacted SegWit changes that Litecoin first tested and then finally adopted late last year. Lee went on to elaborate on his ambition to see Monero's unique anonymity and fungibility complement Litecoin's liquidity:


> **Charlie Lee [LTC ⚡]**  @SatoshiLite · Jan 26, 2018
> Replying to @SatoshiLite
> I believe this to be a win-win as it makes LTC/XMR interoperable: it gives XMR users access to LTC's liquidity (LTC is on close to all exchanges) and gives LTC users easy access to anonymity and fungibility of Monero.

## CHARLIE LEE'S PAST MERGED MINING PARTNERSHIP WITH DOGECOIN



It would not be the first time that Charlie Lee has reached out to other coins for cooperative opportunities. He previously helped saved an ailing Dogecoin through allowing the two coins to be mined together. This was in the early

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT   DECLINE

PRIVACY CENTER   COOKIE POLICY





f **SHARE**    **TWEET**    **SEND**    in **SHARE**    ‹  **NEXT**

**PREV**  ›

Charlie Lee recently made headlines with his move to separate his own financial interests from the Litecoin community by selling his entire share of Litecoins. This was widely seen as him abandoning his own coin.

Selling his stash was a PR move that **turned very wrong** for Lee in the fickle world of crypto. Lee had previously been seen as providing a strong guiding hand for the crypto community as a whole by overseeing the implementation of SegWit on Litecoin and later Bitcoin. This was a feat that involved persuading the interests of large mining operations. Much of the goodwill he had built up was brought down by accusations of self-interest and of losing faith in his own coin.

If the Monero partnership goes ahead, it would save a lot of development time for Litecoin, which has its own foundation, to which Lee contributes. Yet in turn, the development burden mentioned in Lee's tweet would also fall to Monero as well.

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

✖

I ACCEPT     I DECLINE

PRIVACY CENTER    COOKIE POLICY



*you a Litecoin owner? Would a partnership with Monero be something you d like to see? Let us know in the comments below.*




SHARE    TWEET    SEND    SHARE    ‹    NEXT

*Images courtesy of Bitcoinist archives, Twitter/@SatoshiLite, Twitter/@fluffypony, and Pixabay.*

PREV    ›

## What is your reaction?

0% happy

0% unmoved

0% amused

0% excited

0% angry

0% sad

**Tags:** altcoins, Charlie Lee, litecoin, LTC, monero, Riccardo Spagni, XMR

SHARE    TWEET    SEND    SHARE

SHOW COMMENTS



**LIKED THE ARTICLE?**
Let us know!
0

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

Subscribe to our newsletter    SUBSCRIBE

☐ I consent to my submitted data being collected and stored

I ACCEPT    I DECLINE

PRIVACY CENTER    COOKIE POLICY



$8679.38 **+0.28%**    $270.320 **+0.13%**    $0.05237 **+0.00%**

SHARE    TWEET    SEND    SHARE    ‹    NEXT

PREV    ›



.COM

Follow Bitcoinist on social media to keep up-to-date with the latest news!

SEARCH    Enter keywords...    SEARCH

**BITCOIN**

News

Price

Interviews

Reviews

**ALTCOINS**

News

Price

Ethereum

Ripple

✖

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT    I DECLINE

PRIVACY CENTER    COOKIE POLICY

$8679.38 **+0.28%**    $270.320 **+0.13%**    $0.05237 **+0.00%**

SHARE    TWEET    SEND    SHARE    ‹    NEXT

PREV    ›

CATEGORIES

Blockchain

Security

FinTech

Press releases

Events

ICO

PAGES

About us

Contact us

Editorial Policy

Advertise

Jobs

Sitemap

© 2019 Bitcoinist.com. All Rights Reserved.

DMCA | PROTECTED

✖

We use cookies to give you the best online experience. By agreeing you accept the use of cookies in accordance with our cookie policy.

I ACCEPT    I DECLINE

PRIVACY CENTER    COOKIE POLICY

# EXHIBIT H

Telegram Crypto Groups

## ◤ TOP TELEGRAM GROUPS

FOR CRYPTOCURRENCY

About

We are the best directory of all Telegram cryptocurrency groups of 2018. This list includes blockchain, ICO, airdrops, bitcoin, ethereum, cryptocurrency, token sales, exchange, wallet, mining, dapps, smart contracts, price analysis. Channels in trading groups, crypto and Altcoins. Updated daily with the number of channel users.

We are tracking 2292 top crypto related Telegram groups with a total of 17683283 members.

Got a group suggestion? Use the Add a Group feature to let us know!

Last updated Sunday May 26, 2019

## Subscribe to get Top Telegram Cryptocurrency group updates

Get weekly and stats updates on the the latest Telegram Crypto groups, trends (hot & cold) and stats such as pinned messages for the groups. Subscribe now. We'll never spam you.

Email Address *

Subscribe



# Budbo - English

https://t.me/budbo

| 7 DAY CHANGE | 30 DAY CHANGE | MEMBERS |
|---|---|---|
| **-0.29% %** | **-2.84% %** | 2078 |

 *A comprehensive blockchain solution for the cannabis industry.*

Started tracking this group 10 months ago

## Follower History



## Actions

✈ View On Telegram

## Pinned Messages History

5 MONTHS AGO

2019-01-05 20:49:12

Update To The Community: We understand frustrations and greatly appreciate everyone patience. As many of you know, we set a goal to be done with tech and ready to execute on our marketing plan by end of the year. Unfortunately, we are still in development. Everything about the app is changing. User journey and it's simplification, content experience, design and color, and there are several features we are adding to the app that we believe will be "game-changers" and will set us apart from anything else on the market at this time. Ever since we answered several questions about a month ago, it was my decision and the decision of this team to have 100% of our focus on the completion of the project and not this chat room or any public sentiment during the development as each day the channel morale goes from positive to negative to positive to negative and until the dev is completed and you see our initial marketing strategy and hype we have around the release, anything we say will have it's critics anyways. Our updates in the past have caused more distractions internally due to this. In short — the reason we have not posted too many screenshots or updates is due to the competitive nature of our industry. Keep in mind that we are an existing company and application that this is not our first rodeo. We have a strategy in place and it is in the best interest of our company as well as our token holders. As for some of the personal attacks on this channel, unfortunately, are part of the media landscape of today where anyone can post anything online without any factual information to back up their claims. Negative claims about a company can have several different motives behind them. I would be lying if I said our team can't wait to prove any nah-sayers wrong. However, OUR motivation is not to prove any nah-sayers wrong. OUR motivation is to deliver a great application and product. Rest assured that we are progressing forward and very excited on what we have built thus far and what our plan is for a media and marketing strategy when we release the app.

2018-11-26 21:08:40

The Budbo Token International - Utility Token Sale ended in March 2018 with the first distribution of Bubo tokens going out on March 17, 2018. We are still diligently working on distributing tokens to those contributors who have not received their tokens. Parts of the website are currently under maintenance with updates and will go live once QA has approved it. The project is still in development. Our absence in the channel is due to our priority being the successful completion of the project and not catering to FUD and the repetitive negativity circulating the telegram channel. We fully understand the importance of marketing/PR. Building goodwill in the community will be a priority focus once the tech is completed. We have continued to answer the questions asked (even had a hour schedule weekly to answer any and all questions that many did not take

advantage of). When there is an update to be shared with the community or any non-internal entity, we will do so. I will continue to answer questions as they come to me personally, Thank You

---

2018-10-20 14:07:31

Without advertising, there won't be new money coming into the crypto/Budbo space. That's the only way the coin will rise in value. Budbo won't advertise until it's time. Which is good because any movement in coins right now would be short lived. We want steady consistent growth. Also, there are incredibly few other icos that are doing any kind of movement even with advertising and constant development updates. Chances are, 90% of people have their money and coins exactly where they want them and no one will trade because, ummm, we've suffered a bear market for the last 9 months. Right now, a large portion of the crypto space is owned by people like you and me. Institutional money is about to start flowing in and real world use is about to be utilized. Once that happens and accessibility is much easier, there will be a bull run like never before nor ever again. Sit tight. Let the bills pile up. And wait for it. We're all in this together.

---

2018-10-11 16:54:36

https://thetechnologyheadlines.com/magazine/subscription/web/shared/08dba13 bafc84fa09221150032c36186/

---

2018-09-30 12:25:42

Hey everyone! Be sure to go check out Budbo.io as the website has changed a bit :) We would love your feedback on how it looks and any suggestions you may have! - In regards to the site lol Thank you all for everything we've been through, it's been a journey but will be all worth it once the business & blockchain really get going!

---

2018-09-18 15:47:39

COO Gary Heitz is prepping for an onsite interview with CNBC who will be doing a feature on Budbo to air nationally in early 2019 regarding Budbo's blockchain solution and mobile app.

---

2018-09-05 20:08:11

I only have a minute before my next meeting, but I saw these messages coming through and wanted to take a quick second to clarify things. Budbo and LaneAxis are two completely separate companies. When LaneAxis was looking to potentially track cannabis shipments, they reached out to us at Budbo. Since LaneAxis is in the logistics industry it was not in their best interest to engage in the cannabis industry directly. In a deal struck in between the two companies, Budbo would be able to use their tracking technology and have an indefinite license to use such technology under their patent without any costs. These are two completely separate companies and in no way is LaneAxis the parent company. We do not have any affiliation with their on-going token sale nor do we have any affiliation with their day-to-day operations or vice versa. All the being said, the technology behind Budbo and what is being built IMHO is far superior to anything else out there in the market.

2018-08-23 17:22:31

If yall have any pressing questions, please email Marketing@budbo.com

2018-08-13 13:26:48

Portal Closing ATTN - Due to a major influx of inquiries regarding the portal closing and Wednesday's distribution. I will be closing the portal down on Wednesday directly following the token distribution. I am scheduling the token distribution for 3pm CST.

2018-08-12 14:49:18

Portal closes tomorrow folks!

2018-08-08 13:58:42

1 Week to collect your tokens!

2018-07-27 15:02:02

https://www.newsweek.com/legal-marijuana-uk-approves-cannabis-medical-use-1044343

2018-07-26 14:10:51

The Portal is closing in 3 weeks!

# EXHIBIT I

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**
**BVI BUSINESS COMPANIES ACT, 2004**



F53FDEA4AB

**CERTIFICATE OF INCORPORATION**
**(SECTION 7)**

The REGISTRAR of CORPORATE AFFAIRS, of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of incorporation having been complied with,

**Budbo Token International LTD.**

BVI COMPANY NUMBER: **1960893**

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this 13th day of November, 2017.

*for* **REGISTRAR OF CORPORATE AFFAIRS**
13th day of November, 2017

# EXHIBIT J

# WRITTEN CONSENT

## OF

## THE BOARD OF DIRECTORS OF

## BUDBO TOKEN INTERNATIONAL LTD.

### November 15, 2017

**THE UNDERSIGNED**, being all of the members of the Board of Directors (the "Board") of Budbo Token International LTD., a corporation organized under the laws of British Virgin Islands (the "Corporation"), acting by written consent in lieu of a meeting in accordance with the BVI Business Companies Act, 2004, and the Corporation's Memorandum of Association and Articles of Association, do hereby consent to the adoption of, and hereby approve and adopt, the following resolutions.

**WHEREAS,** in connection with the Corporation's incorporation under the laws of British Virgin Islands and the Corporation's contemplated Token Sale (as defined below), the Board deems it to be advisable and in the best interests of the Corporation and its shareholders that the Corporation take the following actions.

**NOW, THEREFORE, BE IT:**

**Ratification of Initial Matters**

**RESOLVED,** that the initial organizational actions of Shirley Trust Company Limited as the incorporator of the Corporation taken prior to the date hereof are hereby approved, ratified and confirmed;

**RESOLVED,** that the appointment of Shirley Trust Company Limited as the registered agent of the Corporation in the British Virgin Islands is hereby approved, ratified and confirmed;

**RESOLVED,** that the Corporation's Certificate of Incorporation, attached hereto as Exhibit A, is hereby approved, ratified and confirmed;

**RESOLVED,** that the Memorandum of Association and Articles of Association relating to the business of the Corporation and the conduct of its affairs, attached hereto as Exhibit B, are hereby adopted as the Memorandum of Association and Articles of Association of the Corporation; and it is further

**Ratification of Appointment of Initial Directors**

**RESOLVED**, that effective as of the date of incorporation of the Corporation, the Board hereby approves, ratifies and confirms for the number of directors which shall constitute the initial Board to be set at three (3);

DocuSign Envelope ID: AEC42544-4395-4463-A7A6-51EE7B28052A

**RESOLVED**, that in connection with the incorporation of the Corporation, the Board hereby approves, ratifies and confirms for each of the following individuals to serve as an initial director of the Board:

| Name | Position |
|------|----------|
| Luke Patterson | Director |
| Rick Burnett | Director |
| Charles Sellers | Director |

to serve until the earlier of such person's resignation, death, removal from office, or such person is otherwise disqualified from serving as a member of the Board; provided that any member of the Board may be removed as set forth in the Corporation's governing documents; and it is further

## Appointment of the Initial Officers

**RESOLVED,** that the Board hereby approves and appoints Rick Burnett as the Chief Executive Officer, Secretary and Treasurer of the Corporation to serve in such offices until his successor is elected and qualified or until his earlier resignation or removal;

**RESOLVED,** that the Board hereby approves and appoints Luke Patterson as the President of the Corporation to serve in such office until his successor is elected and qualified or until his earlier resignation or removal; and be it further

## Share Issuance to Initial Shareholders

**RESOLVED**, that the Board ratifies, approves and authorizes the Corporation to issue twenty five thousand (25,000) ordinary shares, $1.00 par value per share (the "Shares"), of the Corporation to each of Luke Patterson and Rick Burnett, in consideration of the services provided by such persons to the Corporation prior to the date hereof and services to be provided by such persons to the Corporation after the date hereof, which Shares shall be fully paid and non-assessable ordinary shares of the Corporation; and be it further

## Bank Account

**RESOLVED,** that each of Rick Burnett, the Corporation's CEO, Secretary and Treasurer, and Luke Patterson, the Corporation's President, is hereby authorized to open a bank account for the Corporation in the jurisdiction of and with an institution of his choosing, and that he shall be a signatory on such account;

**RESOLVED**, that the Board hereby approves and authorizes for Rick Burnett, the Corporation's CEO, Secretary and Treasurer, and Luke Patterson, the Corporation's President, to be initially the only two authorized signatories on all checks issued by the Corporation from its corporate bank account and he shall otherwise be authorized to sign any and all related corporate bank account documents; and it is further

## Utility Token Sale

**RESOLVED,** that the Board has concluded, in its good faith business judgment, that it would be in the best interests of the Corporation and its shareholders that the Corporation proceed with the token sale (the "<u>Token Sale</u>") of the Corporation's digital crypto-tokens called Budbo Tokens (the "<u>Tokens</u>"), substantially on the terms set forth in <u>Exhibit C</u> attached hereto;

**RESOLVED**, that the Tokens do not constitute a share, stock or security of or an ownership in the Corporation or otherwise entitle the holder thereof to any voting, rights or other interests in the business, affairs, assets, properties or share ownership of the Corporation;

**RESOLVED**, that the Corporation is hereby authorized to proceed with the Token Sale;

**RESOLVED**, that the form, terms, and provisions of any documents and forms necessary and ancillary to the Token Sale be, and they hereby are, authorized and approved, and any Authorized Officer of the Corporation hereby is authorized to execute and deliver such documents and forms, all with such changes as the Authorized Officers, upon consultation with counsel (if necessary), shall deem desirable, necessary or advisable, and any further or additional agreements related thereto, in the name and on behalf of the Corporation, with such changes therein as may be approved by the officer executing the same, such approval to be conclusively evidenced by such execution and delivery;

**RESOLVED,** that upon receipt by the Corporation of payment in full of the purchase price for the Tokens which are being sold to the purchasers in the Token Sale, the Authorized Officers be, and they hereby are, authorized, empowered and directed to issue and deliver the Tokens to such purchasers;

**RESOLVED,** that the Corporation prepare, execute and file all such applications, documents, forms, consents to service of process, papers and instruments which may be required by any state, federal or foreign laws, or by any state, federal, or foreign regulatory body, in connection with the sale of the Tokens in the Token Sale and pay all fees as may be required in connection therewith; and it is further

## General

**RESOLVED,** that each of Rick Burnett, the Corporation's CEO, Secretary and Treasurer, and Luke Patterson, the Corporation's President (collectively, the "<u>Authorized Persons</u>") be, and each acting alone hereby is, authorized and directed to do and perform or cause to be done and performed all such acts, deeds and things, and to make, execute and deliver, or cause to be made, executed and delivered, all such agreements, undertakings, documents, instruments or certificates in the name of the Corporation and to retain such counsel, agents and advisors and to incur and pay such expenses, fees and taxes as shall, in the opinion of such Authorized Person(s) executing the same, be deemed necessary or advisable (such necessity or advisability to be conclusively evidenced by the execution thereof) to effectuate or carry out fully the purpose and interest of all of the foregoing resolutions; and, that any and all such actions heretofore or hereafter taken by the Authorized Person(s) relating to and within the terms

DocuSign Envelope ID: AEC42544-4395-4463-A7A6-51EE7B28052A

of these resolutions be, and they hereby are, adopted, affirmed and approved in all respects as the act and deed of the Corporation;

**RESOLVED,** that the omission from the foregoing resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirements of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions;

**RESOLVED,** that any and all actions taken by the Authorized Persons, or any of them, prior to the date of the foregoing resolutions adopted hereby, that are within the authority conferred thereby, are hereby ratified, confirmed and approved as the acts and deeds of the Corporation;

**RESOLVED,** that this Unanimous Written Consent may be executed in counterparts which, taken together, shall constitute one and the same document; that this Unanimous Written Consent may be executed by facsimile or pdf or other electronic copies of the signatures of the undersigned, in which case any third party is entitled to rely on such signature as conclusive evidence that this Unanimous Written Consent has been executed by such director; and it is further

**RESOLVED,** that this Unanimous Written Consent shall be filed in the minute book of the Corporation and become part of the records of the Corporation.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned, being all of the Board members of the Corporation, consent hereto in writing as of the date first set forth above.

_____
Luke Patterson

DocuSigned by:

Rick Burnett
—400D45FD44534B3...

Rick Burnett

_____
Charles Sellers

**IN WITNESS WHEREOF**, the undersigned, being all of the Board members of the Corporation, consent hereto in writing as of the date first set forth above.

Luke Patterson

Rick Burnett

Charles Sellers

# EXHIBIT A

## **Certificate of Incorporation**

[*see attached*]

DocuSign Envelope ID: AEC42544-4395-4463-A7A6-51EE7B28052A

# EXHIBIT B

## **Memorandum of Association and Articles of Association**

[*see attached*]

**EXHIBIT C**

## <u>Token Sale Executive Summary</u>

[*see attached*]

# EXHIBIT K

**LANEAXIS, INC.**

**STOCK ISSUANCE AGREEMENT**

**THIS STOCK ISSUANCE AGREEMENT** (the "Agreement") is made as of April  18 , 2017 by and between **LANEAXIS, INC.**, a Delaware corporation (the "Company"), and **LUKE PATTERSON** (the "Recipient").

**WHEREAS,** in consideration as herein provided, the Company desires to issue shares of the Company's common stock, $0.0001 par value per share (the "Common Stock"), as herein described, on the terms and conditions hereinafter set forth.

**NOW, THEREFORE, IT IS AGREED** between the parties as follows:

**1.** **ISSUANCE OF SHARES.** The Company hereby agrees to issue to Recipient an aggregate of Seven Hundred Thousand (700,000) fully-paid, non-assessable shares of Common Stock (the "Shares") in consideration of (i) Recipient selling all of his membership interests of Bubo Technologies, L.L.C., a Delaware limited liability company ("Bubo"), and causing other members of Bubo to sell all of their membership interests of Bubo, to Budbo, Inc., a Delaware corporation ("Budbo"), as a result of which Budbo shall acquire 100% of the membership interests of Bubo pursuant to the Share-LLC Exchange Interest Agreement, to be entered into on the date hereof among Budbo, Bubo and the members of Bubo. As of the date hereof, the Company holds a 49% interest in Budbo.

The Shares shall be issued and delivered to Recipient promptly after the date hereof

**2.** **LIMITATIONS ON TRANSFER; VESTING.** In addition to any other limitation on transfer created by applicable securities laws, Recipient shall not assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Shares except with the Company's prior written consent, which may be withheld, condition or delayed for any reason, and in compliance with the provisions herein and applicable securities laws. **Recipient hereby further acknowledges that Recipient may be required to hold the Shares issued hereunder indefinitely. During the period of time during which the Recipient holds the Shares, the value of the Shares may increase or decrease, and any risk associated with such Shares and such fluctuation in value shall be borne by the Recipient.** The Shares will vest on the eighteenth (18th) month anniversary date of the date of this Agreement, if the Recipient continues to serve as a full-time employee of Budbo on such vesting date.

**3.** **RESTRICTIVE LEGENDS.** All certificates representing the Shares shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties hereto):

(a) "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

(b) "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S)

AND VESTING REQUIREMENTS AS PROVIDED IN THE STOCK ISSUANCE AGREEMENT DATED APRIL ___, 2017."

(c)      Any legend required by appropriate blue sky officials.

**4.**     **INVESTMENT REPRESENTATIONS.**  In connection with the acquisition of the Shares, Recipient represents to the Company the following:

(a)      Recipient has full power and authority to enter into this Agreement, and such agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(b)      This Agreement is made with Recipient in reliance upon Recipient's representation to the Company, which by Recipient's execution of this Agreement, Recipient hereby confirms, that the Shares to be received by Recipient will be acquired for investment for Recipient's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Recipient has no present intention of selling, granting any participation in or otherwise distributing the same. By executing this Agreement, Recipient further represents that Recipient does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Shares.

(c)      Recipient understands the risk of acquiring securities of companies in the development stage and acknowledges that he is able to fend for himself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares.

(d)      Recipient understands that the Shares has not been registered under the Securities Act of 1933, as amended (the "Act"), by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Recipient's investment intent as expressed herein.

(e)      **Recipient further acknowledges and understands that the Shares must be held indefinitely unless the Shares is subsequently registered under the Act or an exemption from such registration is available.**  Recipient further acknowledges and understands that the Company is under no obligation to register the Shares. Recipient understands that the certificate evidencing the Shares will be imprinted with a legend that prohibits the transfer of the Shares unless the Shares is registered or such registration is not required in the opinion of counsel for the Company.

(f)      Recipient is familiar with the provisions of Rule 144 under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.

(g)      The Shares may be resold by Recipient in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after the Recipient has purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

(h)     Recipient further understands that at the time Recipient wishes to sell the Shares there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, Recipient would be precluded from selling the Shares under Rule 144 even if the minimum holding period requirement had been satisfied.

(i)     Without in any way limiting the representations set forth above, Recipient further agrees not to make any disposition of all or any portion of the Shares unless and until the transferee has agreed in writing for the benefit of the Company to be bound by the terms of this Agreement, and:

(i)     There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(ii)     (x) Recipient shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (y) if requested by the Company, Recipient shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company that such disposition will not require registration of such shares under the Act.

(iii)     Notwithstanding the provisions of subsections (i)(i) and (i)(ii) above, no such registration statement or opinion of counsel shall be necessary for a transfer by Recipient to the estate of any Recipient or the transfer by gift, will or intestate succession of Recipient to his/her spouse or to the siblings, lineal descendants or ancestors of Recipient or his/her spouse, if the transferee agrees in writing to be subject to the terms hereof to the same extent as if he or she were an original Recipient hereunder.

**5.     MARKET STAND-OFF AGREEMENT.**  Recipient shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any Common Stock or other securities of the Company held by Recipient, including the Shares (the "Restricted Securities"), for a period of time specified by the managing underwriters (not to exceed one hundred eighty (180) days) following the effective date of a registration statement of the Company filed under the Act (the "Lock Up Period").  Recipient agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to Recipient's Restricted Securities until the end of such period.  The underwriters of the Company's stock are intended third party beneficiaries of this Section 5 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

**6.     RIGHT OF FIRST REFUSAL.**  Subject to the terms and conditions in this Agreement, any transfer of the Shares by Recipient must be pursuant to the following steps:

(a)     **Sale Notice**.  Recipient shall give written notice (the "Sale Notice") to the Company of his intention to transfer his Shares.  The Sale Notice shall (i) identify the proposed transferee and the number of shares of the Shares to be transferred to such transferee, (ii) the price per share, and (iii) the terms of payment.

(b)     **Company's Election to Purchase the Shares**.  The Company shall have the option to purchase at the price and on the same terms and conditions specified in the Sale Notice all or less than all of the Shares referred to in the Sale Notice.  Within thirty (30) days after delivery of the Sale Notice to the Company, the Company must give written notice to Recipient regarding the number of Shares to be purchased by the Company (the "Company Notice").

(c)     **Price and Terms of Purchase.**  If the Company elects to purchase any or all of the Shares set forth in the Sale Notice, the Company shall purchase such Shares at the price and on the same terms and conditions specified in the Sale Notice.

(d)     **Waiver of Right of First Refusal**.  If the Company does not elect to purchase all of the Shares set forth in the Sale Notice, the number of Shares that the Company elected not to purchase (the "Non-Purchased Shares") may be transferred to the transferee identified in the Sale Notice on the terms and conditions specified in the Sale Notice.  The transfer of the Non-Purchased Shares shall not be made after the (90th) day following the day on which the Sale Notice was given, nor shall any change in the terms and conditions of transfer be permitted without Recipient first giving to the Company a new Sale Notice in compliance with the requirements of this Section 6.

(e)     **Exempt Transfers**.  Notwithstanding the foregoing, the right of first refusal in this Section 6 shall not apply to any transfer of Shares to the ancestors, descendants or spouse or to trusts for the benefit of such persons or the Recipient.  Such transferred Shares shall remain "Shares" hereunder, and such pledgee, transferee or donee shall be subject to the terms and conditions of this Agreement.

(f)     **Termination**.  The right of first refusal in this Section 6 shall terminate upon the earlier of (i) the first sale of Common Stock of the Company to the public effected pursuant to a registration statement under the Act filed with, and declared effective by, the Securities and Exchange Commission, and (ii) the closing of the Company's sale of all or substantially all of its assets or the acquisition of the Company by another entity by means of merger or consolidation resulting in the exchange of the outstanding shares of the Company's capital stock for securities or consideration issued, or caused to be issued, by the acquiring entity or its subsidiary.

**7.     REFUSAL TO TRANSFER.**  The Company shall not be required (a) to transfer on its books any Shares which shall have been transferred in violation of any of the provisions set forth in this Agreement or (b) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

**8.     MISCELLANEOUS.**

(a)     **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, and if not during normal business hours of the recipient, then on the next business day, (c) five (5) calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the other party hereto at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may designate by ten (10) days advance written notice to the other party hereto.

(b)     **Successors and Assigns.**  This Agreement shall inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Recipient, Recipient's successors, and assigns.

(c)     **Attorneys' Fees; Specific Performance.**  Recipient shall reimburse the Company for all costs incurred by the Company in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees.

(d)     **Governing Law; Venue.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California.  The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement shall be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

(e)     **Further Execution.**  The parties agree to take all such further action(s) as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.

(f)     **Independent Counsel.**  Recipient acknowledges that this Agreement has been prepared on behalf of the Company by Foley Shechter LLP ("FS"), counsel to the Company and that FS does not represent, and is not acting on behalf of, Recipient.  Recipient has been provided with an opportunity to consult with Recipient's own counsel with respect to this Agreement.

(g)     **Entire Agreement; Release; Amendment.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral.  Notwithstanding any prior agreements, whether written or oral, between the Recipient and the Company, Recipient hereby agrees that the Shares being issued to Recipient pursuant to this Agreement is the only capital stock of the Company, or any predecessor or any other related entity of the Company, to which the Recipient is entitled.  Recipient hereby releases the Company, its officers, directors and shareholders from any claims, both known and unknown, that Recipient may have to additional shares of capital stock of the Company, or its predecessors or any other related entity, arising on or prior to the date of this Agreement.  Recipient further agrees with such entities not to pursue any action or lawsuit seeking additional shares of capital stock of the Company, or its predecessors or any other related entity, related to such claims.  This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

(h)     **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded, and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(i)     **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LANEAXIS, INC.

By: _____

Name: Rick Burnett

Title: Chief Executive Officer

Address: 1159 Campanile
Newport Beach, CA 92660

**RECIPIENT ACKNOWLEDGES AND AGREES THAT RECIPIENT MUST HOLD THE SHARES ISSUED HEREUNDER INDEFINITELY, AND THAT THE COMPANY HAS NO OBLIGATION TO REPURCHASE SUCH SHARES. RECIPIENT FURTHER ACKNOWLEDGES THAT ANY RISK RELATED TO THE FLUCTUATION IN THE VALUE OF THE SHARES FROM AND AFTER THE DATE HEREOF SHALL BE BORNE BY RECIPIENT.**

**RECIPIENT ACKNOWLEDGES THAT RECIPIENT HAS READ ALL TAX RELATED SECTIONS AND FURTHER ACKNOWLEDGES RECIPIENT HAS HAD AN OPPORTUNITY TO CONSULT RECIPIENT'S OWN TAX, LEGAL AND FINANCIAL ADVISORS REGARDING THE ACQUISITION OF THE SHARES UNDER THIS AGREEMENT.**

**RECIPIENT ACKNOWLEDGES AND AGREES THAT WITH RESPECT TO THE ACQUISITION OF THE SHARES HEREUNDER RECIPIENT HAS NOT RELIED ON ANY STATEMENT, WHETHER WRITTEN OR ORAL, REGARDING THE SUBJECT MATTER HEREOF, EXCEPT AS EXPRESSLY PROVIDED HEREIN AND IN THE ATTACHMENTS AND EXHIBITS HERETO.**

RECIPIENT:

By: _____

Name: Luke Patterson

Address: 15400 Sonoma Drive #208
Fort Myers, FL 33908

# EXHIBIT L

**LANEAXIS, INC.**

**STOCK ISSUANCE AGREEMENT**

**THIS STOCK ISSUANCE AGREEMENT** (the "Agreement") is made as of April ⎯18⎯, 2017 by and between **LANEAXIS, INC.**, a Delaware corporation (the "Company"), and **JACOB PATTERSON** (the "Recipient").

**WHEREAS,** in consideration as herein provided, the Company desires to issue shares of the Company's common stock, $0.0001 par value per share (the "Common Stock"), as herein described, on the terms and conditions hereinafter set forth.

**NOW, THEREFORE, IT IS AGREED** between the parties as follows:

1. **ISSUANCE OF SHARES.** The Company hereby agrees to issue to Recipient an aggregate of Seven Hundred Thousand (700,000) fully-paid, non-assessable shares of Common Stock (the "Shares") in consideration of (i) Recipient selling all of his membership interests of Bubo Technologies, L.L.C., a Delaware limited liability company ("Bubo"), and causing other members of Bubo to sell all of their membership interests of Bubo, to Budbo, Inc., a Delaware corporation ("Budbo"), as a result of which Budbo shall acquire 100% of the membership interests of Bubo pursuant to the Share-LLC Exchange Interest Agreement, to be entered into on the date hereof among Budbo, Bubo and the members of Bubo. As of the date hereof, the Company holds a 49% interest in Budbo.

The Shares shall be issued and delivered to Recipient promptly after the date hereof

2. **LIMITATIONS ON TRANSFER; VESTING.** In addition to any other limitation on transfer created by applicable securities laws, Recipient shall not assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Shares except with the Company's prior written consent, which may be withheld, condition or delayed for any reason, and in compliance with the provisions herein and applicable securities laws. **Recipient hereby further acknowledges that Recipient may be required to hold the Shares issued hereunder indefinitely. During the period of time during which the Recipient holds the Shares, the value of the Shares may increase or decrease, and any risk associated with such Shares and such fluctuation in value shall be borne by the Recipient.** The Shares will vest on the eighteenth (18th) month anniversary date of the date of this Agreement, if the Recipient continues to serve as a full-time employee of Budbo on such vesting date.

3. **RESTRICTIVE LEGENDS.** All certificates representing the Shares shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties hereto):

(a) "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

(b) "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S)

AND VESTING REQUIREMENTS AS PROVIDED IN THE STOCK ISSUANCE AGREEMENT DATED APRIL ___, 2017."

        (c)       Any legend required by appropriate blue sky officials.

        **4.**       **INVESTMENT REPRESENTATIONS.**  In connection with the acquisition of the Shares, Recipient represents to the Company the following:

        (a)       Recipient has full power and authority to enter into this Agreement, and such agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

        (b)       This Agreement is made with Recipient in reliance upon Recipient's representation to the Company, which by Recipient's execution of this Agreement, Recipient hereby confirms, that the Shares to be received by Recipient will be acquired for investment for Recipient's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Recipient has no present intention of selling, granting any participation in or otherwise distributing the same.  By executing this Agreement, Recipient further represents that Recipient does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Shares.

        (c)       Recipient understands the risk of acquiring securities of companies in the development stage and acknowledges that he is able to fend for himself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares.

        (d)       Recipient understands that the Shares has not been registered under the Securities Act of 1933, as amended (the "Act"), by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Recipient's investment intent as expressed herein.

        (e)       **Recipient further acknowledges and understands that the Shares must be held indefinitely unless the Shares is subsequently registered under the Act or an exemption from such registration is available.**  Recipient further acknowledges and understands that the Company is under no obligation to register the Shares.  Recipient understands that the certificate evidencing the Shares will be imprinted with a legend that prohibits the transfer of the Shares unless the Shares is registered or such registration is not required in the opinion of counsel for the Company.

        (f)       Recipient is familiar with the provisions of Rule 144 under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.

        (g)       The Shares may be resold by Recipient in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after the Recipient has purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

(h)     Recipient further understands that at the time Recipient wishes to sell the Shares there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, Recipient would be precluded from selling the Shares under Rule 144 even if the minimum holding period requirement had been satisfied.

(i)     Without in any way limiting the representations set forth above, Recipient further agrees not to make any disposition of all or any portion of the Shares unless and until the transferee has agreed in writing for the benefit of the Company to be bound by the terms of this Agreement, and:

(i)     There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(ii)     (x) Recipient shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (y) if requested by the Company, Recipient shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company that such disposition will not require registration of such shares under the Act.

(iii)     Notwithstanding the provisions of subsections (i)(i) and (i)(ii) above, no such registration statement or opinion of counsel shall be necessary for a transfer by Recipient to the estate of any Recipient or the transfer by gift, will or intestate succession of Recipient to his/her spouse or to the siblings, lineal descendants or ancestors of Recipient or his/her spouse, if the transferee agrees in writing to be subject to the terms hereof to the same extent as if he or she were an original Recipient hereunder.

5.     **MARKET STAND-OFF AGREEMENT.**  Recipient shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any Common Stock or other securities of the Company held by Recipient, including the Shares (the "Restricted Securities"), for a period of time specified by the managing underwriters (not to exceed one hundred eighty (180) days) following the effective date of a registration statement of the Company filed under the Act (the "Lock Up Period").  Recipient agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to Recipient's Restricted Securities until the end of such period.  The underwriters of the Company's stock are intended third party beneficiaries of this Section 5 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

6.     **RIGHT OF FIRST REFUSAL.**  Subject to the terms and conditions in this Agreement, any transfer of the Shares by Recipient must be pursuant to the following steps:

(a)     **Sale Notice**.  Recipient shall give written notice (the "Sale Notice") to the Company of his intention to transfer his Shares.  The Sale Notice shall (i) identify the proposed transferee and the number of shares of the Shares to be transferred to such transferee, (ii) the price per share, and (iii) the terms of payment.

(b)     **Company's Election to Purchase the Shares**.  The Company shall have the option to purchase at the price and on the same terms and conditions specified in the Sale Notice all or less than all of the Shares referred to in the Sale Notice.  Within thirty (30) days after delivery of the Sale Notice to the Company, the Company must give written notice to Recipient regarding the number of Shares to be purchased by the Company (the "Company Notice").

(c)     **Price and Terms of Purchase.**  If the Company elects to purchase any or all of the Shares set forth in the Sale Notice, the Company shall purchase such Shares at the price and on the same terms and conditions specified in the Sale Notice.

(d)     **Waiver of Right of First Refusal**.  If the Company does not elect to purchase all of the Shares set forth in the Sale Notice, the number of Shares that the Company elected not to purchase (the "Non-Purchased Shares") may be transferred to the transferee identified in the Sale Notice on the terms and conditions specified in the Sale Notice.  The transfer of the Non-Purchased Shares shall not be made after the (90th) day following the day on which the Sale Notice was given, nor shall any change in the terms and conditions of transfer be permitted without Recipient first giving to the Company a new Sale Notice in compliance with the requirements of this Section 6.

(e)     **Exempt Transfers**.  Notwithstanding the foregoing, the right of first refusal in this Section 6 shall not apply to any transfer of Shares to the ancestors, descendants or spouse or to trusts for the benefit of such persons or the Recipient.  Such transferred Shares shall remain "Shares" hereunder, and such pledgee, transferee or donee shall be subject to the terms and conditions of this Agreement.

(f)     **Termination**.  The right of first refusal in this Section 6 shall terminate upon the earlier of (i) the first sale of Common Stock of the Company to the public effected pursuant to a registration statement under the Act filed with, and declared effective by, the Securities and Exchange Commission, and (ii) the closing of the Company's sale of all or substantially all of its assets or the acquisition of the Company by another entity by means of merger or consolidation resulting in the exchange of the outstanding shares of the Company's capital stock for securities or consideration issued, or caused to be issued, by the acquiring entity or its subsidiary.

**7.     REFUSAL TO TRANSFER.**  The Company shall not be required (a) to transfer on its books any Shares which shall have been transferred in violation of any of the provisions set forth in this Agreement or (b) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

**8.     MISCELLANEOUS.**

(a)     **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, and if not during normal business hours of the recipient, then on the next business day, (c) five (5) calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the other party hereto at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may designate by ten (10) days advance written notice to the other party hereto.

(b)     **Successors and Assigns.**  This Agreement shall inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Recipient, Recipient's successors, and assigns.

(c)     **Attorneys' Fees; Specific Performance.**  Recipient shall reimburse the Company for all costs incurred by the Company in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees.

(d)     **Governing Law; Venue.**   This Agreement shall be governed by and construed in accordance with the laws of the State of California.   The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement shall be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

(e)     **Further Execution.**   The parties agree to take all such further action(s) as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.

(f)     **Independent Counsel.**   Recipient acknowledges that this Agreement has been prepared on behalf of the Company by Foley Shechter LLP ("FS"), counsel to the Company and that FS does not represent, and is not acting on behalf of, Recipient.   Recipient has been provided with an opportunity to consult with Recipient's own counsel with respect to this Agreement.

(g)     **Entire Agreement; Release; Amendment.**   This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral.   Notwithstanding any prior agreements, whether written or oral, between the Recipient and the Company, Recipient hereby agrees that the Shares being issued to Recipient pursuant to this Agreement is the only capital stock of the Company, or any predecessor or any other related entity of the Company, to which the Recipient is entitled.   Recipient hereby releases the Company, its officers, directors and shareholders from any claims, both known and unknown, that Recipient may have to additional shares of capital stock of the Company, or its predecessors or any other related entity, arising on or prior to the date of this Agreement.   Recipient further agrees with such entities not to pursue any action or lawsuit seeking additional shares of capital stock of the Company, or its predecessors or any other related entity, related to such claims.   This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

(h)     **Severability.**   If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.   In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded, and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(i)     **Counterparts.**   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LANEAXIS, INC.

By: _____

Name: Rick Burnett

Title: Chief Executive Officer

Address:    1159 Campanile
            Newport Beach, CA 92660

RECIPIENT ACKNOWLEDGES AND AGREES THAT RECIPIENT MUST HOLD THE SHARES ISSUED HEREUNDER INDEFINITELY, AND THAT THE COMPANY HAS NO OBLIGATION TO REPURCHASE SUCH SHARES. RECIPIENT FURTHER ACKNOWLEDGES THAT ANY RISK RELATED TO THE FLUCTUATION IN THE VALUE OF THE SHARES FROM AND AFTER THE DATE HEREOF SHALL BE BORNE BY RECIPIENT.

RECIPIENT ACKNOWLEDGES THAT RECIPIENT HAS READ ALL TAX RELATED SECTIONS AND FURTHER ACKNOWLEDGES RECIPIENT HAS HAD AN OPPORTUNITY TO CONSULT RECIPIENT'S OWN TAX, LEGAL AND FINANCIAL ADVISORS REGARDING THE ACQUISITION OF THE SHARES UNDER THIS AGREEMENT.

RECIPIENT ACKNOWLEDGES AND AGREES THAT WITH RESPECT TO THE ACQUISITION OF THE SHARES HEREUNDER RECIPIENT HAS NOT RELIED ON ANY STATEMENT, WHETHER WRITTEN OR ORAL, REGARDING THE SUBJECT MATTER HEREOF, EXCEPT AS EXPRESSLY PROVIDED HEREIN AND IN THE ATTACHMENTS AND EXHIBITS HERETO.

RECIPIENT:

By: _____

Name: Jacob Patterson

Address: _____

# EXHIBIT M



**WHITEPAPER:** VERSION 1.2

LAST UPDATED: DECEMBER 30, 2017

# BUDBO

**A COMPREHENSIVE BLOCKCHAIN
SOLUTION FOR THE CANNABIS INDUSTRY**



**WEB:** WWW.BUDBO.IO

# Contents

Forward Looking Statements ........................................................................... 3

Securities Laws Disclaimer ............................................................................. 3

Founders' Letter ............................................................................................. 6

Key Definitions ............................................................................................... 7

Abstract ......................................................................................................... 8

Budbo Platform Ecosystem ........................................................................... 9

Project Background ...................................................................................... 10

Mission ......................................................................................................... 11

Unique Model ............................................................................................... 12

Use Case ....................................................................................................... 13

Budbo Business Model ................................................................................. 15

Token Sale..................................................................................................... 17

Budbo Token Description.............................................................................. 18

Token Diagram.............................................................................................. 19

Transparency & Community Control............................................................. 20

How to Get Budbo Tokens ........................................................................... 21

Budbo Platform and Mobile App.................................................................. 23

Market Context  ............................................................................................ 27

Government Regulations............................................................................... 29

Project Roadmap...........................................................................................30

Team ............................................................................................................. 32

Advisors.........................................................................................................34

Partners ........................................................................................................ 44

Risk Factors...................................................................................................45

# **Forward** Looking Statements

This White Paper contains forward-looking statements within the meaning of the U.S. federal securities laws, which involve substantial risks and uncertainties. The forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performances or achievements expressed or implied by the forward-looking statements, many of which are beyond the control of Budbo Token International, LTD. and Budbo, Inc. These risks and uncertainties include, but are not limited to, the factors described in the section captioned "Risk Factors." In some cases, you can identify forward-looking statements by terms such as "anticipates," "believes," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "projects," "should," "would" and similar expressions intended to identify forward-looking statements.

These risks and uncertainties include, but are not limited to: (i) the timing to consummate the proposed Token Sale; (ii) the risk that the proposed sale of Budbo Tokens might otherwise not occur, whether as a result of the current token sale regulatory limitations or otherwise; (iii) the risk of criminalization of cannabis sales and/or cannabis related products by an applicable governmental jurisdiction (including the U.S.); (iv) the risk that a regulatory approval that may be required for the proposed sale is not obtained or is obtained subject to conditions that are not anticipated; (v) the diversion of management time on transaction-related or issues; (vi) the ability of Budbo, Inc.'s management to successfully implement its business plan; or (vii) general market factors and federal and state regulations and legislation. Forward-looking statements reflect our current views with respect to future events and are based on assumptions and are subject to risks and uncertainties.

# **Forward** Looking Statements **Cont.**

Given these uncertainties, you should not place undue reliance on these forward-looking statements. Also, forward-looking statements represent our estimates and assumptions only as of the date of this White Paper. You should read this White Paper completely and with the understanding that our actual future results may be materially different from what we expect. We qualify all of the forward-looking statements by these cautionary statements. We assume no obligation to update any forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in any forward-looking statements, even if new information becomes available in the future."

# **Securities** Laws Disclaimer

Section 2 of the Securities Act of 1933, as amended, defines "security" as: "any note, stock, treasury stock, security feature, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate of subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing

Budbo Tokens do not represent or confer any ownership right, stake, share or security or equivalent rights, or any right to receive future revenue share or profits, intellectual property rights or any other form of participation in or relating to Budbo Token International, LTD., Budbo, Inc. and their respective corporate affiliates, including the governance of Budbo Token International, LTD. and Budbo, Inc. Budbo Tokens are not intended to be a digital currency, security, commodity, expectation of profit or any other kind of financial instrument.

In recognition of the fact that the United States government has provided limited guidance and has not passed any laws with respect to the sale of digital tokens, we believe it best that no United States-based individuals participate in the purchase of the Budbo Tokens.

In addition, foreign investors should be aware of laws prohibiting its residents from participating in initial coin offerings (ICOs) or token sales, particularly in Canada, South Korea, China and Singapore.

# Founders' **Letter**

Budbo's journey has taken many paths, touched many lives, and connected a great number of people. Since you are reading this, you are now a part of that journey. Thank you for your time and consideration.

Budbo began as a simple idea; we wished to connect patients and users with the highest quality, locally available cannabis products. Yet within this simple mission, we realized we had created something much more extraordinary: a platform on which dispensaries, manufacturers, and growers can get the most accurate data possible on patient and user preferences.

A synergy was born. We quickly noticed a direct correlation between the number of patients using the application and the diversity of the local product offering around them. In short, the more patients exploring products and finding flower through the application, the better and more targeted information our network of growers, manufacturers, and dispensaries would receive through the Budbo dashboard. Allowing them to make spot-on forecasting decisions when it comes to product trends, whether that be which products to buy and stock their shelves with, which strains to grow and cultivate, or which concentrates or edibles to manufacture and distribute - Budbo bridged the gaps between patient, dispensary, manufacturer, and grower.

Business was good, and to accommodate our growing cannabis network we expanded our product offering to include real-time GPS tracking of cannabis shipments.

Our current network consists of roughly 75,000 users and patients, 2,000+ dispensaries, 500+ product manufacturers, and 50+ grow operations.

Growing into a worldwide network has been a challenging but steady climb. Now we elevate our offering even further by utilizing the immutable ledger of blockchain and the tokenization of our platform.

Imagine, if you will, the entire cannabis industry as a decentralized autonomous organization. Where a patient's identification and medication regimen are encrypted and safely stored within the ledger of a blockchain. Where a smart contract enables the safe transfer of goods through verifiable proof of pick up, bill of lading, and proof of delivery. Medical testing of cannabis potency is verified and immutable as the product is moved from lab to dispensary. The community at large is a self-governing group of activists, patients, physicians, developers, artists and enthusiasts all working towards the common goal of improving the cannabis industry through contributing votes, time, engineering and knowledge to the decentralized applications and network of Budbo.

This can be our future. We can make it a reality. Thank you for your contribution of time, treasure, and effort.

> **"Before everything else, getting ready is the secret to success." - Henry Ford**
>
> *Anyone can come stumble onto a big idea. But not everyone is willing to invest the time, energy and sweat equity to bring it to life.*

*Sincerely,*
*Jacob and Luke Patterson*
*Founders, Budbo.*



# **Key** Definitions

### Dispensaries/Retailers

A dispensary refers to any retail store where cannabis, or cannabis-related products are sold.

### Customers

A Customer is a recreational user or medical patient of cannabis.

### Manufacturers

A manufacturer refers to a company that makes cannabis-related goods and products. This is a diverse group that could include a bakery that produces cannabis-infused brownies, known as edibles, or a company that produces highly potent THC concentrates such as wax.

### Growers/Cultivators

A company or person who grows cannabis.

### Courier/Transport

A person who ships or delivers cannabis.

### Labs - Testing

Cannabis flower and products are tested for their THC and CBD content percentages.

### Suppliers - Bottling Services, Labels, Nutrients

Suppliers are auxiliary cannabis companies that do not deal directly with the cannabis plant but still make products for the industry, such as nutrients or lights for growers, or bottles for dispensaries.

### Seed to Sale

Seed to Sale refers to the compliance side of tracking a cannabis plant throughout its lifecycle. From a seed, to its vegetation state, to its weight at harvest, and finally to the sale of the product.

# Abstract

Even though the legalization of cannabis is gaining traction, the cannabis industry is still largely fragmented due to the economic ecosystem that remains shrouded in black market practices. Budbo will be the first-of-its-kind, fully integrated blockchain-based solution for the transparent, standardized, and regulated interaction between cannabis users, dispensaries and couriers.

Budbo is a best-in-class platform already actively being used by more than 75,000 mobile users and over 2000 suppliers (dispensaries). Budbo consists of a mobile phone app and a cloud-based backend business intelligence platform. The platform is designed to match cannabis users' top picks or close matches of cannabis strains and products and direct them to nearby dispensaries which are carrying these products. The platform also provides a delivery tracking service aimed at ensuring full visibility and compliance into the cannabis delivery process. Budbo has over 150 vehicles currently being tracked every day.

The blockchain technology offers a way to gloablize all these channels simultaneously as it holds an immutable ledger that leverages crypto-tokens built on smart contracts. Budbo Token transactions will be instant, and average transaction confirmation time will be within minutes. All transactions will be secured with state-of- the-art cryptography, and blockchain integrity will be protected by CPU efficient ASIC resistant proof of work. This unique model allows us to fill numerous operational and process gaps for cannabis businesses.

To round out the product offering and provide a secure payment method and rewards program, we are now combining this cannabis product pursuit and tracking platform with the crypto blockchain model. The blockchain model will easily accommodate several stages of the cannabis pursuit, sales and logistics processes, addressing the following:

- **Recording and Storing Product Life Cycle Events**

- **Verifying Patient Identification**

- **Transaction Assurance**

- **Equipment Ordering**

- **Inventory Management**

- **Seed to Sale Tracking**

- **Client Management**

- **Delivery Tracking and Verification**

- **Platform Analytics**

The adoption of blockchain cryptocurrency technology is the next logical step in the development and growth of Budbo's platform. It enables us to create a structure that solves many of the issues surrounding the supply chain management of the cannabis industry.

# **Budbo** Platform
# Ecosystem



Budbo's Blockchain becomes the backbone of immutable, verifiable data security, upon which all layers of API and activity utilize the Budbo Token(BUBO) as the API access key.

# **Project** Background

The growth of the cannabis industry has been unparalleled in recent years with the uses and applications of marijuana being further explored and instituted. This has brought the industry into the legal light, creating a need for the different components to act together in order to strengthen the burgeoning business. However, as it stands, there is significant separation between cannabis producers, growers, labs, craftsmen, and dispensaries.

Budbo, Inc. is propelling the cannabis industry forward by building a global blockchain-based immutable ledger and implementing a utility token for consumers, retailers, growers, manufacturers and the entire global cannabis network.

Budbo's best-in-class mobile app stores industry data in the blockchain to provide retailers with real-time analytics on consumer preferences. Deliveries are tracked in real-time via GPS, with all true data and compliant documentation instantly stored in the blockchain's immutable ledger. This provides an unprecedented solution for the secure storage of all historical records.

Budbo International's utility tokens enable integration of the Budbo blockchain to all third-parties via API, allowing for a single point, data-driven cannabis environment to quickly flourish.

Budbo functions as a cloud-based platform that brings together all relevant parties in the cannabis industry in order to increase standardization, transparency and efficiency across channels. Budbo offers a unified solution for cannabis businesses and users to transact safely, securely and in compliance with federal and state regulations.

# Mission

The unique challenges faced by the cannabis industry call for a new solution. Despite the fact that there is an enormous and long-established market, it remains historically illegal and difficult to access for businesses. The rapid growth and expansion of the sector makes it especially lucrative for dispensaries and transporters, particularly through the increasingly legalized channels. Consumers in the US spent over $53 billion on cannabis in 2016 alone, that number more then quadruples when looked at on a global scale. Through medical research and progression the industry is transitioning into a large legal economy, and Budbo can be a major factor in facilitating this historical change.

Budbo aims to address the fragmentation and marginalization in the cannabis industry through the creation of a unified platform that enables a unified cannabis seed to sale and supply chain management process on a global platform. We will base our efforts around a new Budbo blockchain and token. The Budbo Token ($BUBO) will fund our efforts through a Token Sale, in a strategic effort to remain as decentralized from traditional forms as possible. Our goal is to be the first cannabis-focused platform that meets the needs of users, suppliers (dispensaries) and couriers built on the blockchain crypto-technology. We aim to be the one-stop platform that will integrate, accelerate and facilitate a new generation of transparency and social interaction in the rapidly growing and increasingly legalized cannabis industry.

# **Unique** Model

Budbo's unique 'tinder model' has proven to be highly effective in driving alignment between our business and operating models. The combination of a best-in-class mobile app and business intelligence tool empowers users to connect and interact in ways that have never been possible. By adopting the social component of popular networks like Tinder, Budbo facilitates communication with people and streamlines the shopping process through robust algorithms to aid users in the matching process of best "strain matches". The incorporation of the blockchain cryptocurrency model will enable us to take the Budbo platform to the next level of development by properly fulfilling our value proposition and capturing a portion of the value created through:

- Driving user adoption and engagement

- Maintaining a stable, functioning, and accessible mobile application

- Evolving the business tool's functionality to meet changing user and supplier demands

The Budbo blockchain ecosystem will store transactional records in the blockchain throughout the life cycle of a product, including all relevant data about the end to end process. Moreover, the end user can discover new strains in ways never before possible. Dispensaries gain invaluable data on local user preferences, and benefit from key analytics to know which strains to grow and which products to stock in order to increase sales and grow revenue. The data exchange happens through APIs which are accessed by the Budbo Token.

The global cannabis data exchange environment that Budbo, Inc provides is built on blockchain & smart contracts, with data stored in immutable ledgers. This establishes Budbo Inc. as the single source of true unmanipulated data for the global cannabis network.

With an already established (and growing) base of more than 75,000 recurring users, Budbo delivers critical business intelligence to dispensaries, leading to proactive decision-making. Integrating the blockchain cryptocurrency model into Budbo's existing structure will solve many issues surrounding the supply chain management of the cannabis industry. The Budbo Token sale will create the first and only cannabis blockchain network that utilizes a utility token as the monetary exchange creating enormous long term value in the token.

# <span style="color:cyan">Use</span> **Case**

## Why Budbo Is Needed

Budbo is the first platform for the global cannabis industry built on Blockchain technology and Smart Contracts. We combine retailers, labs, manufacturers, cultivators, and logistics into a decentralized, open and honest network, making the cannabis industry transparent, and accountable, especially on a global scale.

Budbo's core functionality is to provide a distributed ledger to the cannabis industry, creating a true industry backbone of storage and APIs on which all levels of ancillary services can harness the power and security of the blockchain.

From a technology perspective, the rapidly evolving marijuana industry presents a unique opportunity: legalized sales of cannabis on a massive scale. This fast-growing sector of the economy presents challenges that have not been dealt with before, partly because even in states that have legalized the sale of marijuana, cannabis-related businesses still face many business restrictions and inefficiencies. This is particularly true when it comes to legal protection, consumer outreach, and supply chain management.

We are now seeing a strong and effective push for the federal government to establish, regulate, and encourage an open and fair market for the use and sale of cannabis and cannabis-related products. Legal cannabis sales in the United States are up 17 percent since 2015, to $5.4 billion, and are expected to grow 25 percent in the next year to $6.7 billion, according to Arcview Market Research. By 2020 legal cannabis sales in the United States are projected to hit $21.8 billion. However the industry is still struggling with a patchwork of laws and regulations, as well as a lack of standardization to allow for the legal trade of cannabis. The same is true on a the global scale as several countries have moved to legalize and standarzie cannabis to consumers.

Blockchain technology presents a solution to most of these problems. Smart contracts built on blockchain transcend borders and unite interested parties throughout the cannabis industry. Budbo's application and back-end platform can help make the industry safe, responsible, and organized via standardization and tokenization.

Now is the ideal time to take advantage of the growth potential of the cannabis industry. Budbo creates a structure and technology that solves many issues surrounding management of the cannabis supply chain, and provides governments with a compliance solution.

# Budbo's **Blockchain**

**Growers**
Buy Supplies/Equipment
Water Use
Harvesting
Post Harvest

**Dispensaries**
Delivery Verification
Storage
Inventory Control
Sales

**Lab Testing**
Non-GMO
Organic
THC
THCA

**Manufacturers**
Product Ordering
Supplies
Production Cycle

**Logistics**
Bill of Lading
Proof of Pick up
Proof of Delivery

**Ancillary Services**
Cyber Security
Storage
Verifications



Budbo's Blockchain becomes the backbone of immutable, verifiable data security, upon which all layers of API and activity utilize the Budbo Token(BUBO) as the API access key. .

# Budbo **Business** Model

Front-end — Budbo App: Budbo app is a one-of-a-kind mobile application that allows users to quickly discover, explore, and locate new strains, concentrates, and edibles like never before. The Budbo app will have the capacity to connect dispensaries, growers and other entities in the cannabis network in one blockchain-crypto ecosystem.

Back-end — Budbo Platform: Budbo operates as a one-stop service for marijuana dispensaries and end-users, giving the cannabis industry a new level of consumer convenience and business intelligence.

The Budbo mobile app is built to maintain a rapidly growing base of users, products and dispensaries. Budbo's structure and culture is designed to be fast-moving and responsive to consumer demands. We continue to maintain the highest standards for our current platform, while also planning for future growth. This planning includes building out our internal system, migrating from cloud services to a blockchain infrastructure, and automating certain processes. This is all critical to continuing Budbo's rapid growth.

Budbo's unique 'tinder model' also captures value by offering advertisement potential for suppliers (dispensaries). The Budbo "strain match" feature requires users to input desired effects. Dispensaries can then use that information to suggest new products. The user can immediately swipe left or right or click on links for more information.

The adoption of the Blockchain model will allow the Budbo application to deliver working modular code and a sandbox environment to minimize development time, infrastructure and investment. The application will use an agile design approach and industry-leading Ethereum blockchain technology. Budbo's blockchain application will be available via the cloud and compatible with today's hybrid cloud environment. This will allow dispensaries to experiment without additional infrastructure expenses and get to market faster to a global community of marijuana users.

Blockchain technology is an emerging way for businesses, industries, and governments to almost instantaneously make and verify transactions—streamlining business processes, saving money, and reducing the potential for fraud.  At its core, a blockchain is a data structure that is used to create a digital transaction ledger that, instead of resting with a single provider, is shared among a distributed network of computers.

The result is a more open, transparent, and publicly verifiable platform that will fundamentally change the way users, dispensaries and couriers interact and exchange value and assets, enforce

contracts, and share data across channels. The Budbo application using blockchain creates almost limitless possibilities for growth and social interaction, ranging from product matches and direct organic advertising to instant payments and more efficient supply chain and inventory management.

Because the Budbo application and business tool is by design a "community-based" platform, where tasks, functions, goals and priorities are defined and re-defined in real-time by the community, it allows for greater freedom and flexibility for users, suppliers (dispensaries) and couriers. The backbone of the Budbo platform is the mechanism by which users can select and match their preferred choice of products with the dispensaries that sell them. One of the incentives that will drive consumers and suppliers to use the Budbo platform is the fact that it will encourage interactions between all parties and create value across channels. We achieve this by removing the burdensome signup process of existing platforms, as well as putting the match making power in the user's control with a simple and streamlined interface.

Budbo's major advantage over other platforms is that it does much more than simply utilize blockchain technology. Our platform is completely user-centric, which means users are and will remain at the heart of what we do.

Our support for the cannabis community will be shown through transaction transparency and information sharing. We have created a complete technology solution that benefits dispensaries, growers, merchants, couriers and consumers in the blockchain.

The Budbo Token Sale will allow the user base to grow globally and create a global cannabis data exchange network.  The Budbo Token will be the API token that allows acess to the information grid and data flow within the Budbo ecosystem.

# Token **Sale**

## Total Issued Tokens

200,000,000 Tokens Issued

## Tokens

150,000,000 for Token Sale

## Contribution Tiers

$0.25 USD (Tier 1) Jan, 29 - Feb, 05 UTC

$0.28 USD (Tier 2) Feb, 05 - Feb, 12 UTC

$0.30 USD (Tier 3) Feb, 12 - Feb, 19 UTC

$0.33 USD (Tier 4) Feb, 19 - Feb, 26 UTC

$0.35 USD (Tier 5) Feb, 26 - Mar, 05 UTC



## Reserves

20,000,000 BUBO for Pre Sale @$0.20 USD Nov, 27 2017 - Jan, 29 2018 UTC

10,000,000 BUBO for Employees, Founders, PR, Marketing, Partnerships & Contractors

10,000,000 BUBO for Community Reserve

7,000,000 BUBO for Dispensary Reserve

3,000,000 BUBO for Bounty

## Hard Cap

Hard Cap is 150,000,000 tokens (not including Pre-sale)

# **Budbo** Token Description

## Definition

Budbo Tokens will be the digital utilities that power and incentivize the Budbo ecosystem and platform. The Budbo Token provides access to the platform.

## Transaction Time

Budbo Token transactions will be instant, and average transaction confirmation time will be within minutes. All transactions will be secured with the state-of- the-art cryptography, and blockchain integrity will be protected by CPU efficient ASIC resistant proof of work. This unique model allows us to fill in many gaps for cannabis businesses within the entire global cannabis market.

## Token Details

Name: Budbo Token

Ticker: BUBO (if permitted under applicable laws)

Based on: Ethereum

# Token Diagram



# Transparency &
# Community Control

Budbo will engage a nationally recognized accounting firm for annual third-party reviews.

Here are other ways we will work for transparency and community control:

- Founders and team members who own Budbo Tokens will be prohibited from liquidating those tokens at a rate of more than 20% of their position within the first calendar year. This is to prevent dumping and to keep a stable token price.

- A minimal threshold amount will be required for a completed token crowdsale. The token offering will have a series of cap levels. If the token crowdsale does not reach its minimum cap of 1 million tokens, any funds received during the token crowdsale will be returned to the original initiating wallets automatically. Assuming the minimum threshold is exceeded, but the maximum cap of 150 million tokens (not including Pre-sale)

is not met, any unsold tokens will be placed into reserve. Any funds received after having reached the maximum cap of 150 million tokens will be automatically returned to the senders' wallet.

- Third-party recognized escrow agents will ensure tokens deposited for a token crowdsale are kept secure until the token crowdsale is finalized and the tokens generated.

- The token crowdsale will be designed to reduce the number of large buyers (whales) who may want to dump tokens. Instead, the token crowdsale will favor smaller investors who are committed to the cannabis cause and plan on participating in the community.

# How to Get Budbo Tokens

## Date

The initial token crowdsale will take place between January 15th, 2018 and February 15th, 2018. and can be accessed via our website: https://www.budbo.io. We will conduct a Pre-sale for eligible purchasers beggining on or about November 27, 2017.

## Registration

Please register for the token crowdsale so you are notified of the opening of the event. Be sure to take advantage of notification and prior registration so you do not miss out.

## Whitelist

There will be no whitelist event for this crowdsale.

## Accepted Currencies

The crowdsale will accept Bitcoin and Ethereum only.

## Opening a Budbo Token Account

After the initial token crowdsale , opening a coin account with Budbo will be easy and free. Because Budbo is a truly unified platform, it uses peer-to-peer technology to operate with no central authority. The network collectively carries out the issuing of Budbo Tokens. It works anywhere, anytime, so business can be transacted 24/7 in any part of the world.

## Distribution

Tokens will be distributed automatically by the Budbo Smart Contract throughout the Token Sale on Ethereum. Bitcoin contributions will be distributed separately.

# Exchange Trading

Budbo Tokens may be available for trading in the future if and when applicable laws permit for such trading, but no assurances can be given that such trading will ever take place.

# Security

Budbo will be built on Ethereum – a decentralized platform for applications that run exactly as programmed without any chance of fraud, censorship or third-party interference.

All transactions will be secured with state-of-the art cryptography, and the blockchain integrity will be protected by CPU-efficient, ASIC-resistant proof of stake. This unique model will allow us to speed transactions for cannabis-related businesses.

# Popularity

Budbo already has a vast user base in place and is listing over 2,000 dispensaries, and over 250,000 products. Concurrently, cryptocurrencies have become the meeting point between innovative technologies and traditional retail, so the introduction of our own Budbo Tokens will accelerate the process of adoption and data exchange.

# Awareness

Budbo is better known than newer platforms that have not yet established the same profile. Similarly, blockchain technology has maintained its reputation as an asset, which retains its value even in the face of economic uncertainty and has exhibited multiple benefits for the growth of businesses that adopt it.

# Budbo Platform and Mobile App

## Summary

Budbo takes advantage of the digital and verifiable nature of blockchain to solve the fragmentation of the cannabis market and the marginalization of businesses and consumers. Blockchain smart contracts are ideal for recording and facilitating the exchange of value, goods, services, and private data. Putting cannabis data and transactions on blockchain smart contracts will increase the speed of service, and save dispensaries and growers hundreds of thousands in reduced paperwork.

Globally the Budbo smart contracts can immediately serve a number of businesses within the cannabis industry. Blockchain smart contracts can instantly and accurately register and record the following events:

- Blockchain-based smart contracts provide accountability in a way no other technology can. The blockchain provides an immutable ledger that offers permanent verification of every past transaction, so it builds trust

- Stores all product lifecycle events forever in an easy-to-retrieve system

- Allows multiple apps to simultaneously interact with any piece of information

- Offers anonymous patient identification

- Facilitates peer-to-peer transactions on a national level

- Enables social interaction between users in a fun, immersive environment

The combination of decentralized encryption, anonymity, immutability, and scalability transforms Budbo into the ultimate online ecosystem for the facilitation of interactions between users, dispensaries, growers and couriers within the cannabis sector. Utlizing the Budbo Token as the API key for data exchange will put a demand on this value.

Budbo will use its own blockchain to focus on solving problems that are unique to the cannabis industry. It achieves this by building on the strength of a well-established system to offer applications, create a new cryptocurrency, and display valuable analytics. This allows it to run its functions exactly as programmed without

any chance of fraud, censorship or third-party interference.

As such, Budbo provides not only a groundbreaking blockchain-crypto based ecosystem but also a powerful, modular toolset to build interactions between all channels in the cannabis sector.

# Budbo Functionality

Budbo is a complete technology solution that benefits cannabis dispensaries, growers, couriers and users. Its functionality goes beyond seed-to-sale tracking by normalizing the cash-intensive marketplace, powering revenue for

merchants and enabling consumers to enjoy a speedy, convenient, safe and private way to pay.

Budbo has a unique working model that benefits all parties in the legal cannabis trade. The principal features of Budbo's business model are:

- Supplies/Equipment Ordering — Growers can use the Purchasing Management module to receive real-time updates regarding purchasing trends and inventory balance.

- Inventory Management — Budbo's Inventory Control module allows for efficient management of all stages of the product lifecycle. This module enables growers and dispensaries to manage inventory levels and maintain tight controls on inventory replenishment, minimizing excess stock and ensuring timely order fulfilment.

- Seed to Sale Tracking — The Seed to Sale Tracking Module enables businesses to track and manage inventory—from planting and growing all the way through processing,

  product shipping and, ultimately, to transactions at the PoS in dispensaries.

- Logistics — Budbo integrates with the logistics department to offer real-time insight into the status of the order delivery. Geo-fencing verification and GPS tracking provide peace of mind to both consumers and retailers.

- Point of Sale — Budbo's system consists of a mobile application, a PoS integration product, and a banking portal and online plug-in for businesses. Budbo facilitates mobile payments and PoS services including Android and iOS apps for consumers.

- Client Management — Store, access and manage one patient and Customer Database with information on user, strain preference,

time data, and geo-location of user, and proximity to dispensaries.

• Analytics — Dispensaries can access real-time updates on targeted user likes, preferences, and products most likely to be purchased to improve their product offering and increase sales. With the use of the smart feature Grow Forecasting, they can meet dispensary demand ahead of time.

• User Interactions — Users can interact in a fun, immersive environment on the Budbo platform. They can share reviews, play games, message and connect in one place.

• Retail Location Forecasting — Startups looking to open a dispensary can compare locations and access customer metrics to see which towns and neighborhoods hold the greatest potential.

• Business Modelling — Use our real time patient and consumer analytics to know which flower and products to stock your shelves with. Increase sales!

# Budbo Connect

Budbo Connect is built for business intelligence and proactive decision-making. Our goal is to help dispensaries sell more products. Budbo connect gives dispensaries user-generated data laid out in a simple, elegant interface.

We expect the increase in foot traffic, improved analytics, and exceptional customer service to cement strong, longstanding relationships with all of our dispensary partners.

Daily user interactions drive the core analytical engine of "Budbo Connect" — our backend dashboard for dispensaries. These key analytics ultimately provide the final solution for dispensary owners and prospectors, allowing them to know which strains to grow and exactly which products to stock in order to increase sales and grow revenue.

# BudboTrax

BudboTrax is built to establish order, peace of-mind, and real-time visibility in the transport of cannabis products throughout the cannabis ecosystem. Blockchain immutable ledgers provide historical record keeping for multiple uses, including government compliance.

- Real-time GPS tracking of high value cannabis products on all shipments.

- Shipment documents scanned and stored in the cloud.

- Adjustable geo-fences and automated alerts.

- Driver "SOS" button to immediately report emergencies to authorities.

- Real-time verifiable pickup and delivery confirmations.

- Confidence of knowing where your product is at all times.

Building strong relationships with dispensaries will provide an avenue to offer the "BudboTrax" GPS tracking service.

Analytical data reports are also available to growers and the broader cannabis network. BudboTrax is a mobile-powered GPS logistics tool built to monitor the entire cannabis supply chain — from grower to end-user.

Dispensaries and other vested parties will have full control over and insight into all cannabis movements via the Budbo Connect Dashboard.

From there, products will be tracked during transport by GPS via a free driver app that is part of the Budbo Tech Ecosystem.

# Market Context

Seed-to-Sale is an umbrella term used in the cannabis industry to refer to software and services that help businesses track and manage inventory—from planting and growing all the way through processing, product shipping and, finally, to transactions at the PoS in dispensaries. Seed-to-sale systems help cannabis businesses keep track of assets and sales as well as get in touch with consumers and manage the complex hurdles of state-by-state legal regulations and compliance.

As the recreational marijuana sector moves from the black market to the retail market, the demand for cannabis looks more and more lucrative with consumers who:

- Use cannabis, but less than once per month: 11.6 million occasional users

- Use between one and 20 times per month: 11.1 million regular users

- Use more than 20 times per month: 7.1 million heavy users

The 2017 National Survey on Drug Use and Health statistics from the federal Substance Abuse and Mental Health Services Administration estimates that 29.7 million Americans 12 or older had used cannabis within the past year. Of those, 18.1 million consumed cannabis within the past month. For our purposes, let's assume the people who smoked within the past month are regular users, and the rest are occasional users. This means that in 2017, about 11.6 million are smoking at least once a month, and 6.5 million people are using marijuana less than once a month. The report also estimates that 7.1 million people 12 or older are using marijuana more than 20 times per month.

It's important to draw these lines when it comes to usage, because it makes a difference when it comes to estimating how frequently people buy marijuana. Because we're estimating the number of full-time marijuana dealers, we only want to look at regular and heavy smokers.

Let's assume that people who use pot less than once per month probably get it from friends. For the next step, we use data from a study performed by RAND Corp, which focuses on the reasonable frequency of users who buy their products from a professional marijuana dealer, including dispensaries. This means that 11.1 million people are buying cannabis once a month, and 7.1 million people are buying twice a month. This comes out to 29.2 million professional marijuana transactions per month in the United States. If we assume that a standard marijuana dispensary is open eight hours a day, every day, and makes one transaction per hour; that comes out to about 240 sales per month per dispensary.

With 29.2 million marijuana transactions per month and 240 transactions per dealer, 121,600 dispensaries are needed to satisfy demand. This seems surprisingly reasonable. That's a little less than the number of family physicians in 2011.

There are already a couple of big players in the seed-to-sale space. Weed tech startups such as Flowhub are competing with pharmaceutical incumbents, including BioTrackTHC and MJ Freeway, for state-by-state government compliance contracts. Others such as KIND Financial have gotten tech giants involved, hosting their Agrisoft seed-to-sale platform on Microsoft Azure.

But while other blockchain startups focus predominantly on helping businesses work around regulatory restrictions, Budbo centers on the consumer-business relationship within the cannabis industry. Budbo gives users full control over their blockchain-based transaction history that's linked to local dispensaries and seed-to-sale systems, with Budbo as the middleman that facilitates the connection.

As an enterprise-level solution utilizing the blockchain-crypto ecosystem, Budbo integrates and accelerates a whole new generation of dispensaries and growers to thrive in the rapidly growing and increasingly legalized cannabis industry. Budbo Token transactions will be instant and secured with state-of- the-art cryptography.

# **Government** Regulations

Marijuana's status as a Schedule 1 drug means state marijuana operations are federally regulated as illegal enterprises. Despite the obstacles, legal marijuana has managed to go mainstream on a state-by-state basis, transforming the way Americans view and use cannabis.

Federal regulation on the legality of transport, sale and distribution of cannabis creates major obstacles for companies to establish, manage and grow their business. The lack of a fast, reliable and readily available payment method contributes to the multitude of issues businesses face, making it difficult to attract and retain customers.

The adoption of blockchain technology is the soundest solution to solving the fragmentation of the cannabis market and the marginalization of businesses and consumers. By integrating smart contracts and blockchain into its working model, Budbo targets the very basis of every digital transaction, exchange of value, goods and services, and private data. A host of economic, legal, regulatory, and technological hurdles must be scaled before we see widespread adoption of blockchain technology in the cannabis market - but first movers are making incredible strides.

The Budbo blockchain gives government agencies the solution for economic, legal, regulatory, and technological hurdles they have long faced.

# **Project** Roadmap

- Nov 2016 Launch of Budbo in Google Play and Apple App Store

  https://play.google.com/store/apps/details?id=com.budbo

  https://itunes.apple.com/us/app/budbo/id1146901226

- Dec 2016 Complex News publishes first article and video on Budbo

  http://www.complex.com/life/2016/12/tinder-for-weed-budbo

- Dec 2016 Total Frat Move publishes article on Budbo

  https://totalfratmove.com/budbo-tinder-for-weed/

- Feb 2017 Budbo takes part in Super Bowl Bash in Houston, TX



- March 2017 LaneAxis Combination

  https://theduber.club/weblog/2017/05/26/budbo-inc-whats-new/

- April 2017 Budbo is ranked the #1 4/20 App by Herb.co

  http://herb.co/2017/04/20/420-apps/

- April 2017 4/20 Party with WeedTV



- May 2017 First Cannabis Delivery tracked using Budbo Trax

- June 2017 Begin Token Sale Research

- September 2017 MJAC Conference in Los Angeles

  https://mjac2017.com/



- November 2017 Token Sale Presale

- January 2018 Token Sale

- February 2018 Begin Development on v2.0

- March 2018 Begin Blockchain Implementations

- May 2018 Launch Budbo App v2.0

# Team

Budbo owes its success in part to its diverse team of talent. Our founding members posses vision and depth of knowledge of the cannabis industry, blockchain cryptocurrency, finance, accounting, B2B and B2C marketing. Presently, our team consists of:



**Rick Burnett**
Chief Executive Officer



**Luke Patterson**
President, Co-Founder



**Jacob Patterson**
CTO, Co-Founder



**Gary Heitz**
CRO, Co-Founder



**Nick Heldreth**
CMO, Co-Founder



**Divyashish Jindal**
Blockchain Engineer



**Ihor Pidruchny**
Blockchain Engineer



**Prateek Dimri**
Business Analyst



**Blake Krohn**
VP of Engineering



**Mason Burnett**
Blockchain Information Systems



**Andrew Rivera**
Marketing/Communications



**David Levy**
Technology Advisor

# Team Cont.



**Tom Reid**
Sales Team



**Chase Cameron**
Account Executive



**Leland Price**
Account Executive



**Alex Williams**
Sales Team

# Advisory Board



**Amy Berliner**
Founder/CEO - Aegis Biotech




**Roy de Gouveia**
Strategic Advisor



**Ty Duffy**
CEO - Low Spark, Inc



**Benjamin Finch**
Strategic Advisor




**Larre Johnson**
Strategic Communications Advisor



**John David Carrasco**
CEO - CannLiv



**Michael Hodges**
Co-Founder - ADVFN



**Michael Noel**
CEO - Blockchain Consultants




**David Ashley**
CTO - ILF; LLC



**Willie Kennon**
President - Pineapple Enterprises



**Randal Crowder**
Co-Founder - TEXO Ventures



**Jack Finkelstein**
Senior Technology Advisor


# Advisory Board Cont.



**Richard Levy**
Senior Technology Advisor

**Rick Burnett - CEO**

Rick's extensive knowledge of mobile technology and logistics makes him a natural fit to lead the Budbo team. Rick spent 15 years researching and developing a mobile-based platform that provides real-time tracking over freight movements. This is the basis of the Budbo Trax feature.

https://www.linkedin.com/in/rick-burnett-102b9116/

**Luke Patterson – President, Co-Founder**

A data-driven entrepreneur and blockchain specialist, Luke's wealth of experience is replete with years as an information architect and mobile app developer.  Working with both start-ups and Fortune 500 companies alike, Luke's works have been featured in Wired, TechCrunch, Complex, and Business Insider.

https://www.linkedin.com/in/luke-patterson-979b82129/

**Jacob Patterson – CTO, Co-Founder**

Jacob relies on his vast experience as a developer to ensure Budbo remains the leader in cannabis technology innovation, including its evolution into the blockchain ecosystem. Jacob has held senior developer roles with Fortune 500 companies including U.S. Bancorp and media giant Comcast.

https://www.linkedin.com/in/pattersonjacob/

**Gary Heitz – CRO, Co-Founder**

A seasoned sales executive with deep experience in technology and digital media, Gary has generated tens of millions of dollars in revenue for Token Salenic companies such as Dell and Google. Quickly ascending to executive leadership positions at both companies, Gary structured complex sales initiatives, negotiated with Fortune 500 clients, and routinely exceeded sales goals by wide margins.  At Google, Gary was entrusted as lead Sales Executive for the company's DoubleClick demand side media platform, as well as Google's DoubleClick Bid Manager and Ad Network.

https://www.linkedin.com/in/gary-heitz-36317a3/

**Nick Heldreth – CMO, Co-Founder**

A born marketer and entrepreneur, Nick co-founded Budbo after recognizing the tremendous market opportunity that exists in the Cannabis space. Nick has over a decade of sales, marketing and customer service experience in financial services, entertainment, transportation, digital marketing, and real estate. His ventures have included acquisitions of a real estate company and a transportation company, both of which he transformed into highly profitable enterprises.

https://www.linkedin.com/in/nickheldreth/

**Divyashish Jindal – Blockchain Engineer**

I love to build innovative and sustainable solutions of the problems I come across to help build a better living world. Also, I believe in evolution to my core and I constantly thrive to create better version of me and the people around.

https://www.linkedin.com/in/divyashish/

**Ihor Pidruchny – Blockchain Engineer**

Designing decentralized blockchain based open source platform for logistics industry.

https://www.linkedin.com/in/ihorpidruchny/

**Prateek Dimri – Business Analyst**

With three years in the blockchain space, I assist with planning and monitoring, strategy, product conceptualization, market research, and predictive analysis.

https://www.linkedin.com/in/prateekdimri/

**Blake Krohn – VP of Engineering**

20 years of experience working as a software engineer for a diverse range of industries and companies worldwide. In addition to his past position at McAfee, Inc. and as team lead for various startups, Blake's most recent role as CTO for an industry-leading retailer has enabled him to understand and practice the comprehensive knowledge and leadership skills to be an effective, results-oriented VP of Engineering for Budbo.

https://www.linkedin.com/in/blake-krohn-7303691/

**Mason Burnett – Blockchain Information Systems**

Mason is a marketing visionary whose ideas have helped elevate private companies and institutions of higher education. Tenacious and focused on winning, Mason has immersed himself in the cannabis industry to help keep Budbo ahead of the competition.

https://www.linkedin.com/in/mason-burnett-a6a18896/

**Andrew Rivera – Director of Communications**

Andrew is an award-winning former TV news journalist with corporate experience in Public Relations and Marketing. Technically and editorially savvy, he thrives on every opportunity to create imaginative writing and visuals that slice through the clutter.

https://www.linkedin.com/in/andrewriveracommunications/

**David Levy – Canada Operations**

A seasoned developer, David's entrance into the technology universe with the design and development of AUTO INFO, the first online auto trader profiling site. David's expertise spans a number of industries, including his design of an advanced elevator control system..

https://www.linkedin.com/in/david-levy-a3a647112/

**Shaun Patterson – Brand Ambassador**

Innovative approach to executive consulting.

https://www.linkedin.com/in/shaun-patterson-1294b9b/

**Chase Cameron – Account Executive**

Building authority for brands in multiple industries across the globe.

https://www.linkedin.com/in/chase-cameron-aba791a4/

**Leland Price – Account Executive**

https://www.linkedin.com/in/leland-price-401b9b151/

**Alex Williams – Account Executive**

Alex Williams

Alex began his career in transportation and logistics by working for a forward-thinking global insurance brokerage. Alex specialized in risk management, helping clients minimize risk through data-backed insight and innovative solutions.

https://www.linkedin.com/in/alexwilliams23/

**Tom Reid – Account Executive**

Tom is an experienced transportation professional with over a decade of freight brokerage operations and sales experience. His previous role with one of the nation's largest logistics firms allowed him to focus on building relationships with top enterprise clients in the industry.  Tom's specialty is identifying and discovering opportunities for cost savings through strategic partnerships and processes.

https://www.linkedin.com/in/thomas-reid-83957b15/

# Advisors

**Amy Berliner – Founder/CEO - Aegis Biotech**

Amy Berliner

As Founder/CEO of Aegis Biotech, Amy applies more than two decades of Senior Executive experience to the benefit of her company and to her research, and development team.

https://www.linkedin.com/in/aegis-biotech-b57544a0/

**Dianne Burnett – Producer, Author, CEO**

Author, producer, philanthropist, and entrepreneur Dianne Burnett first made her name in sports entertainment. With her then-husband Mark Burnett, she developed sponsorship opportunities for a fledgling enterprise Eco-Challenge.

https://www.linkedin.com/in/dianne-j-burnett-93958917/

**Ty Duffy – CEO - Low Spark, Inc**

Ty Duffy is the owner and CEO of Low Spark Inc. LOW Spark is the largest distribution supply chain for cannabis and cannabis infused products in Colorado. LowSpark moves an average of 1 unit every 47 seconds with a vast network of contacts in the Cannabis Industry.

https://www.lowsparkinc.com/

**Benjamin Finch – Strategic Advisor**

In his time as a marketer, Ben has attracted over $75M in sales and now leads the first multidisciplinary agency to specialize in blockchain development. Ben's Ledger Agency specializes in technology-driven marketing, strategic project planning, social media, and community building, applying best practices to the Cryptocurrency space for a number of start-ups and ICOs.

https://www.ledgeragency.com/

**Larre Johnson – Strategic Communications Advisor**

Larre is a 30-year advertising, marketing and strategic communications veteran. His campaigns have helped brand and build two disruptive enterprises into multi-$B businesses. A former senior writer on Apple, Larre has won virtually every creative and effectiveness award the industry bestows.

https://www.linkedin.com/in/larre-johnson-b2898520/

**John David Carrasco – CEO - CannLiv**

John David Carrasco is President and CEO of Cannliv and John David Global. Cannliv has locations in Houston, TX, Denver CO and in South America (Colombia). Having chaired the Cannabis Caucus for the Texas Democratic Party during the last election cycle has resulted a leadership role amongst activists in the Cannabis space.

https://www.linkedin.com/in/johndavidcarrasco/

**Michael Hodges – Co-Founder - ADVFN**

Michael Hodges has over 30 years experience in computer software development and publishing, while working with multi-user and Internet projects for many years. He Co-founded On-line plc which in the process of changing its name to Online Blockchain PLC and ADVFN PLC both listed on the London Stock exchange AIM. He is currently Chairman of On-line PLC, and ADVFN PLC.

https://www.advfn.com/

**Michael Noel – CEO - Blockchain Consultants**

Blockchain technology is moving, morphing and changing so quickly that it's challenging to keep up with, even for those of us who work in within the area. Add to this the fact that this is a relatively new technology with origins going back just a few decades for the core technology, but the unique combination we now know as Blockchain dates from 2007/2008, barely a ten-year-old infant at this point.

https://www.linkedin.com/in/michaelnoel/

**David Ashley – CTO - ILF, LLC**

I have over 20 years of experience working on and developing business intelligence and eCommerce systems. Currently, I work as Interactive Life Form's (ILF) Senior Transition Contractor, improving internal systems and services used by various administrative departments world wide.
https://www.linkedin.com/in/david-ashley-885b074/

**Willie Kennon – President - Pineapple Enterprises**

Willie is the President of Pineapple Enterprises; a Cannabis based holdings company with 110 acres of premium farm land in Southern Oregon. Pineapple Enterprises is well on its way to producing over 10,000 lbs of flower per year.

https://www.linkedin.com/in/willie-kennon-363a5717/

**Randal Crowder – Co-Founder - TEXO Ventures**

Randall has deployed more than $40M over the past 10 years with a specific focus on tech-enabled health services and companies leveraging blockchain technology. Randall is a co-founder and Managing Partner at TEXO Ventures.

https://www.linkedin.com/in/randallcrowder/

**Jack Finkelstein – Senior Technology Advisor**

Qualified with over 25 years of broad sales and sales management, product design and merchandising experience. Jack has helped a number of companies bring existing and new products to new markets as well as building his own medical compliance packaging company.

https://www.linkedin.com/in/jackfinkelstein/

**Roy de Gouveia – Strategic Advisor**

An Entrepeneur turned Ecopreneur. Roy's background was in Restaurants before turning to renewable energy! He has businesses in South Africa in Biofuel, Fertilizer & Containerized Hydroponic farming.

https://www.linkedin.com/in/roydegouveia/

**Richard Levy – Senior Technology Advisor**

Richard provides expertise in all aspects of Product Management, Development, Hosting and Support. Richard has over 35 years experience in the software space, leading large and small teams to develop enterprise and Cloud based platforms to support applications in the banking, corporate legal, insurance, governance risk and compliance (GRC) industries.

https://www.linkedin.com/in/richard-levy-2812b6/

# Partners

We have formed an extensive network of partnerships and collaborations with large players in the cannabis industry. The Budbo app currently boasts over 75,000 unique users. We are also working with 2,000 suppliers in the cannabis sector who support our business model and goal of establishing a unified platform for secure, safe and fast transactions, as well as frictionless interaction between all parties in compliance with federal and state regulations.



# Risk Factors

## 1. Budbo Token Sale - Risk Factors

You should carefully consider and evaluate each of the following risk factors and all other information contained in the Terms before deciding to participate in the Budbo Token Generation Event (referred to herein as the "Token Sale" or "Budbo Token Generation Event"). To the best of Budbo's, and the entity creating and issuing the Budbo Tokens - Budbo Token International LTD.'s (the "Company") knowledge and belief, all risk factors which are material to you in making an informed judgment to participate in the Budbo Token Generation Event have been set out below. If any of the following considerations, uncertainties or material risks develops into actual events, the business, financial position and/or results of operations of the Company and the maintenance and level of usage of the Budbo app and platform and the Budbo Tokens could be materially and adversely affected. In such cases, the trading price of Budbo Tokens (in the case where they are listed on a cryptocurrency exchange) could decline due to any of these considerations, uncertainties or material risks, and you may lose all or part of your Budbo Tokens.

**There is no prior market for Budbo Tokens and the Budbo Token Generation Event may not result in an active or liquid market for the Budbo Tokens.** Prior to the Budbo Token Generation Event, there has been no public market for the Budbo Tokens. Budbo Tokens maybe available for trading in the future if and when appicable laws permit for such trading, but not assurances can be given that approval of such trading will ever be obtained. Furthermore, even if such approval is granted by a cryptocurrency exchange, there is no assurance that an active or liquid trading market for the Budbo Tokens will develop, or if developed, will be sustained after the Budbo Tokens have been made available for trading on such cryptocurrency exchange. There is also no assurance that the market price of the Budbo Tokens will not decline below the original purchase price (the "Purchase Price"). The Purchase Price may not be indicative of the market price of the Budbo Tokens after they have been approved for trading on a cryptocurrency exchange.

A Budbo Token is not a currency issued by any central bank or national, supra-national or quasi-national organization, nor is it backed by any

hard assets or other credit. The Company is not responsible for, nor does it pursue, the circulation and trading of Budbo Tokens on the market. Trading of Budbo Tokens will merely depend on the consensus on its value between the relevant market participants. No one is obliged to purchase any Budbo Token from any holder of the Budbo Token, including the purchasers, nor does anyone guarantee the liquidity or market price of Budbo Tokens to any extent at any time.

Furthermore, Budbo Tokens may not be resold to purchasers who are citizens or permanent residents of China or Singapore or any other jurisdiction where the purchase of Budbo Tokens may be in violation of applicable laws (including but not limited to laws regulating controlled substances, such as cannabis). Accordingly, the Company cannot ensure that there will be any demand or market for Budbo Tokens, or that the Purchase Price is indicative of the market price of Budbo Tokens after they have been made available for trading on a cryptocurrency exchange.

**Future sales or issuance of the Budbo Tokens could materially and adversely affect the market price of Budbo Tokens.**

Any future sale or issuance of the Budbo Tokens would increase the supply of Budbo Tokens in the market and this may result in a downward price pressure on the Budbo Token. The sale or distribution of a significant number of Budbo Tokens outside of the Budbo Token Generation Event (including but not limited to the sales of Budbo Tokens undertaken after the completion of the initial crowdsale, issuance of Budbo

Tokens to persons other than purchasers for purposes of community initiatives, business development, academic research, education and market expansion and issuance of Budbo Tokens as a reward to users of the Budbo platform), or the perception that such further sales or issuance may occur, could adversely affect the trading price of the Budbo Tokens.

**Negative publicity may materially and adversely affect the price of the Budbo Tokens**

Negative publicity involving the Company, Budbo, Inc. (the Budbo Token project's operating entity organized under the laws of the state of Delaware, USA), the Budbo platform, the Budbo Tokens or any of the key personnel of the Company or Budbo, Inc., regulation of cannabis in the US or worldwide, and/or regulation of cryptocurrencies in the US or worldwide, may materially and adversely affect the market perception or market price of the Budbo Tokens, whether or not it is justified.

**We may not be able to pay any anticipated rewards in the future.**

There is no assurance that there will be sufficient engagement in the Budbo platform such that you will receive any rewards anticipated to be distributed to active users of the Budbo platform. Further, even in the event there is substantial engagement and interactions among the users and the Budbo platform, there is no assurance you personally will receive any part of the rewards. This is because the ability of the Company to pay any reward to you will depend on the future results of operations and the future

business and financial condition of the Company and/or Budbo, Inc., and there is no assurance of the future results of operations and the future business and financial condition of the Company or Budbo, Inc.

**There is no assurance of any success of Budbo Platform or any Future Business Line.**

The value of, and demand for, the Budbo Tokens hinges heavily on the performance of the Budbo platform and the continuous active engagement of its users and success of its contemplated business lines. There is no assurance that the Budbo platform will gain traction after its launch and achieve any commercial success. Furthermore, there is no assurance that any of the business lines contemplated by Budbo, Inc. will be launched and generate sufficient customer traction. Such contemplated business lines currently include but are not limited to: (a) create an immutable ledger for all legal cannabis industry related data via the Budbo application and intelligence tool, (b) offer payment for legal cannabis industry related services and supplies through Budbo Tokens, (c) organize and unite global cannabis legalization efforts through the Budbo platform, and (d) bring standardization of licensing, transactions, supply chain, inventory management, delivery, tracking and ID verification through the Budbo application and business intelligence platform. Although Budbo, Inc. has performed several market studies testing the demand for the Budbo platform with relatively positive results, the Budbo platform has not been fully developed and finalized and is subject to

further changes, updates, and adjustments prior to its launch. Such changes may result in unexpected and unforeseen effects on its projected appeal to users, possibly due to the failure to meet users' preconceived expectations based on the beta version, and hence, impact its success. While the Company has made every effort to provide a realistic estimate, there is also no assurance that the cryptocurrencies raised in the Budbo Token Generation Event will be sufficient for the development of the Budbo platform and/or for the proper structuring and licensing of the anticipated Budbo Token future anticipated business lines. For the foregoing or any other reason, the development of the Budbo platform and launch of the anticipated Budbo Token future business lines may not be completed and there is no assurance that it will be launched at all. As such, distributed Budbo Tokens may hold little worth or value.

**The funds raised in the Token Generation Event are exposed to risks of theft.**

The Company will make every effort to ensure that the funds received from the Budbo Token Generation Event will be securely held in an escrow wallet, which is a multi-signature address with access thereto by private keys held by reputable and trusted parties. Further, upon receipt of the funds from the Company, Budbo, Inc. will make every effort to ensure that the funds received by it from the Company will be securely held through the implementation of security measures. Notwithstanding such security measures, there is no assurance that there will be no theft of the cryptocurrencies as a result of hacks, sophisticated

cyber-attacks, distributed denials of service or errors, vulnerabilities or defects on the Budbo Token Generation Event website, in the smart contract(s) on which the escrow wallet and the Budbo Token Generation Event relies, on the Ethereum or any other blockchain, or otherwise.

Such events may include, for example, flaws in programming or source code leading to exploitation or abuse thereof. In such event, even if the Budbo Token Generation Event is completed, the Company or Budbo, Inc. may not be able to receive the cryptocurrencies raised and Budbo, Inc. may not be able to use such funds for the development of the Budbo platform and/or for launching any future business line, including but not limited to the structuring and licensing of the Budbo Token future business lines. In such case, the launch of the Budbo platform and the structuring and licensing of the Budbo Token future business lines might be temporarily or permanently curtailed. As such, distributed Budbo Tokens may hold little worth or value.

# 2. RISKS RELATING TO THE ESCROW WALLET

**The private keys to the escrow wallet may be compromised and the cryptocurrencies may not be able to be disbursed.**

The escrow wallet is designed to be secure. Each of the holders of the three (3) private keys to the escrow wallet will use all reasonable efforts to safeguard their respective keys, but in the unlikely event that any two (2) of the three (3) keys to the escrow wallet are, for any reason whatsoever, lost, destroyed or otherwise compromised, the funds held by the escrow wallet may not be able to be retrieved and disbursed, and may be permanently unrecoverable. In such event, even if the Budbo Token Generation Event is successful, the Company will not be able to receive the funds raised and Budbo, Inc. will not be able to use such funds for the development of the Budbo platform and the structuring and licensing of the Budbo Token future business lines. As such, distributed Budbo Tokens may hold little worth or value.

# 3. RISKS RELATING TO BUDBO, INC.

The Budbo platform is developed, operated, and maintained by Budbo, Inc. Any events or circumstances which adversely affect Budbo, Inc. or any of its successor operating entities (collectively referred to herein as "Budbo, Inc.") may have a corresponding adverse effect on

the Budbo platform and any future business line, including but not limited to structuring and launch of the Budbo Token future business lines. Such adverse effects would correspondingly have an impact on the utility, liquidity, and the trading price of the Budbo Tokens.

**Budbo, Inc. may be materially and adversely affected if it fails to effectively manage its operations as its business develops and evolves, which would have a direct impact on its ability to maintain the Budbo platform and/or launch any future business lines**

The financial technology and cryptocurrency industries and the legal cannabis markets in which Budbo, Inc. competes have grown rapidly over the past four years and continue to evolve in response to new technological advances, changing business models, shifting regulations and other factors. As a result of this constantly changing environment, Budbo, Inc. may face operational difficulties in adjusting to the changes, and the sustainability of Budbo, Inc. will depend on its ability to manage its operations, ensure that it hires qualified and competent employees, and provides proper training for its personnel. As its business evolves, Budbo, Inc. must also expand and adapt its operational infrastructure. Budbo, Inc.'s business relies on its blockchain-based software systems, cryptocurrency wallets or other related token storage mechanisms, blockchain technology and smart contract technology, and efficient real estate management. All of these systems, tools, and skillsets represent complex, costly, and

rapidly changing technical infrastructure. In order to demonstrate continued ability to effectively manage technical support infrastructure for the Budbo platform, Budbo, Inc. will need to continue to upgrade and improve its data systems and other operational systems, procedures, and controls. These upgrades and improvements will require a dedication of resources and are likely to be complex and increasingly rely on hosted computer services from third parties that Budbo, Inc. does not control. If Budbo, Inc. is unable to adapt its systems and organization in a timely, efficient, and cost-effective manner to accommodate changing circumstances, its business, financial condition and results of operations may be adversely affected. If the third parties whom Budbo, Inc. relies on are subject to a security breach or otherwise suffer disruptions that impact the services Budbo, Inc. uses, the integrity and availability of its internal information could be compromised, which may consequently cause the loss of confidential or proprietary information and economic loss. The loss of financial, labor or other resources, and any other adverse effect on Budbo, Inc.'s business, financial condition and operations, would have a direct adverse effect on Budbo, Inc.'s ability to maintain the Budbo platform and/or to structure and license the anticipated Budbo Token future business lines. Any adverse effects affecting Budbo, Inc.'s business or technology are likely to also adversely impact the utility, liquidity, and trading price of the Budbo Tokens.

**We are an early stage company**. Budbo, Inc. has a limited operating history and has received

limited revenues to date. If you are purchasing a Budbo Token, it's because you think this is a good idea, that the founders can execute it better than their competition, and sell it to enough people such that the Budbo Token will succeed. You are taking all these things on faith, because it's impossible to know what will happen. We are dependent upon additional capital resources for the continuation of our planned principal operations and are subject to significant risks and uncertainties, including failing to secure funding to operationalize our planned operations or failing to profitably operate the business.

**Our insurance may not be sufficient. We carry insurance that we consider adequate in regard to the nature of the covered risks and the costs of coverage. We are not fully insured against all possible risks, nor are all such risks insurable.**

Limited intellectual property protection may cause us to lose our competitive advantage and adversely affect our business. Our proprietary intellectual property is not protected by any patent or patent application, and, despite our precautions, it may be possible for third parties to obtain and use such intellectual property without authorization. We have not conducted formal evaluations to confirm that our technology and products do not or will not infringe upon the intellectual property rights of third parties. As a result, we cannot be certain that our technology and products do not or will not infringe upon the intellectual property rights of third parties. If infringement were to occur, our development, manufacturing, sales and

distribution of such technology or products may be disrupted.

**There are several potential competitors who are better positioned than we are to take the majority of the market.** We compete with other companies in the cannabis industry. These companies may have more personnel talent, economic resources and manufacturing relationships needed to develop a competitive product. Many of these manufacturers also have well-recognized brand names and established distribution and retail relationships that could enable them to successfully market and sell a competitive product. The advantage they will have because of their scale and distribution network could be difficult for us to overcome. As a result, it is possible that our product could be forced out of the market by larger, more established players.

**Budbo, Inc. may experience system failures, unplanned interruptions in its network or services, hardware or software defects, security breaches or other causes that could adversely affect Budbo, Inc.'s infrastructure network, and/ or the Budbo platform.**

Budbo, Inc. is not able to anticipate any occurrences of hacks, cyber-attacks, distributed denials of service or errors, vulnerabilities or defects in the Budbo platform, the smart contracts on which the Company, Budbo, Inc., or the Budbo platform relies or on the Ethereum or any other blockchain. Such events may include, for example, flaws in programming or source

code leading to exploitation or abuse thereof. Budbo, Inc. may not be able to detect such hacks, cyber-attacks, distributed denials of service errors vulnerabilities or defects in a timely manner, and may not have sufficient resources to efficiently cope with multiple service incidents happening simultaneously or in rapid succession.

Budbo, Inc.'s network or services, which would include the Budbo platform and, if successfully structured, licensed, and launched, the Budbo Token future business lines, could be disrupted by numerous events, including natural disasters, equipment breakdown, network connectivity downtime, power losses, or even intentional disruptions of its services, such as disruptions caused by software viruses or attacks by unauthorized users, some of which are beyond Budbo, Inc.'s control. Although Budbo, Inc. has taken steps against malicious attacks on its appliances or its infrastructure, which are critical for the maintenance of the Budbo platform, there can be no assurance that cyber-attacks, such as distributed denials of service, will not be attempted in the future, that Budbo, Inc.'s enhanced security measures will be effective. Budbo, Inc. may be prone to attacks on its infrastructure intended to steal information about its technology, financial data or user information or take other actions that would be damaging to Budbo, Inc. and/or holders of the Budbo Tokens. Any significant breach of Budbo, Inc.'s security measures or other disruptions resulting in a compromise of the usability, stability, and security of the Budbo platform may adversely affect the utility, liquidity and/or trading price of the Budbo Tokens.

**We are dependent in part on the location and data center facilities of third parties.** Budbo, Inc.'s current infrastructure network is in part established through servers which it owns and houses at the location facilities of third parties, and servers that it rents at data center facilities of third parties. If Budbo, Inc. is unable to renew its data facility lease on commercially reasonable terms or at all, Budbo, Inc. may be required to transfer its servers to a new data center facility, and may incur significant costs and possible service interruption in connection with the relocation. These facilities are also vulnerable to damage or interruption from, among others, natural disasters, arson, terrorist attacks, power losses, and telecommunication failures. Additionally, the third-party providers of such facilities may suffer a breach of security as a result of third-party action, employee error, malfeasance or otherwise, and a third party may obtain unauthorized access to the data in such servers. Inc. and the providers of such facilities may be unable to anticipate these techniques or to implement adequate preventive measures.

**General global market and economic conditions may have an adverse impact on Budbo Token's operating performance, results of operations, and cash flows.** Budbo, Inc. has been and could continue to be affected by general global economic and market conditions. Challenging economic conditions worldwide have from time to time, contributed, and may continue to contribute, to slowdowns in the information technology industry at large. Weakness in the economy could have a negative effect on Budbo, Inc.'s business, operations and financial condition, including decreases in revenue

and operating cash flows, and inability to attract future equity and/or debt financing on commercially reasonable terms. Additionally, in a down-cycle economic environment, Budbo, Inc. may experience the negative effects of a slowdown in usage of the Budbo platform and may delay or cancel the structuring, licensing, and launch of the anticipated Budbo Token future business lines. Suppliers on which Budbo, Inc. relies for servers, bandwidth, location and other services could also be negatively impacted by economic conditions that, in turn, could have a negative impact on Budbo, Inc.'s operations or expenses. There can be no assurance, therefore, that current economic conditions or worsening economic conditions or a prolonged or recurring recession will not have a significant, adverse impact on Budbo, Inc.'s business, financial condition and results of operations, and hence, the Budbo platform and/or ability to structure, license, and launch the Budbo Token future business lines. Any such circumstances would then correspondingly negatively impact the utility, liquidity, and/or trading price of the Budbo Tokens.

**The Company, Budbo, Inc. or the Budbo Tokens may be affected by newly implemented regulations**

Cryptocurrency trading is generally unregulated worldwide, but numerous regulatory authorities across jurisdictions have been outspoken about considering the implementation of regulatory regimes which govern cryptocurrency or cryptocurrency markets. Furthermore, while the US experiences a liberalization of cannabis regulations at the state level, cannabis remains illegal at the federal level. The Company or the Budbo Tokens may be affected by newly implemented regulations relating to cryptocurrencies or cryptocurrency markets, and/or legal cannabis industry, including having to take measures to comply with such regulations, or having to deal with queries, notices, requests or enforcement actions by regulatory authorities, which may come at a substantial cost and may also require substantial modifications to the Budbo platform and/or the anticipated Budbo Token future business lines. This may impact the appeal of the Budbo platform and the anticipated Budbo Token future business lines for users and result in decreased usage of the Budbo platform and the Budbo Tokens. Further, should the costs (financial or otherwise) of complying with such newly implemented regulations exceed a certain threshold, maintaining the Budbo platform and structuring, licensing, and launching the Budbo Token future business lines may no longer be commercially viable, and the Company or Budbo, Inc. may opt to discontinue the Budbo platform, the anticipated Budbo Token future business lines, and/or the Budbo Tokens. Further, it is difficult to predict how or whether governments or regulatory authorities may implement any changes to laws and regulations affecting distributed ledger technology and its applications, including the Budbo platform, the anticipated Budbo Token future business lines and the Budbo Tokens.

The Company or Budbo, Inc. may also have to cease operations in a jurisdiction that makes it illegal to operate in such jurisdiction, or make it commercially unviable or undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction. In scenarios such as the foregoing, the utility, liquidity, and/or trading price of Budbo Tokens will be adversely affected or Budbo Tokens may cease to be traded.

**Cryptographic tokens such as the Budbo Tokens are a relatively new and dynamic technology.** In addition to the risks included in the above discussion of risk factors, there are other risks associated with your purchase, holding, and use of the Budbo Tokens, including those that the Company and Budbo, Inc. cannot anticipate. Such risks may further appear as unanticipated variations or combinations of the risks discussed above.

# 4. Risks relating to the U.S. federal laws affecting the legal cannabis industry.

Certain activities involving marijuana remain illegal under US federal laws. Such activities include but are not limited to: (i) distribution of marijuana to minors, (ii) transporting marijuana from states where it is legal to other states, (iii) drugged driving and other adverse public health consequences, (iv) growing marijuana on public lands, (v) marijuana possession or use on federal property, and (vi) other criminal activity or violence associated with the sale of marijuana.

To the extent the Company and/or Budbo, Inc. may not prevent certain of its users from using Budbo Tokens in violation of U.S. federal law, it may subject the Company and/or Budbo Token, Inc. to civil and/or criminal liability and the utility, liquidity, and/or trading price of Budbo Tokens will be adversely affected or Budbo Tokens may cease to be traded.

# EXHIBIT N



**Gary Heitz** admin                                                                                                                                                           1:14 PM

Sherwood14

| This is the fourth or fifth time I'm posting the same text below over the last 12 months. As you all know, I have been...

You have been respecul and we appreciate that.  However, you nor anyone in this chat room is a shareholder of Budbo, INC.  You are not entitled to answers to all of the questions you are asking.  That being said, I am happy to answer some of your questions to the best of my abilities.  I would suggest before you threaten "legal action" you completely read the purchase agreement that you signed before you purchased our utility token.  To your first point, NOBODY on the Budbo team has ever compared our token to BTC or ETH because we are not a security.  Nor have we ever claimed to be. The token is a utility token.  You are CORRECT with your statement of "IN A SHORT PERIOD OF TIME." BECAUSE THAT IS EXACTLY WHAT IT HAS BEEN! Only 7 months is a very short period of time to build a blockchain to integrate with the app, completely rebuild and rebrand V2 so the token can be integrated, add new custom features such as a wallet integration, voice integration, delivery service, etc etc etc.  Not to mention the day to day planning and execution of our sales and marketing strategies post launch of our updated tech stack.  The names and roles of the leadership team is on the site.  Budbo is a 3-4 year old company/start-up.  If you know anything about start-ups (this is very common) that Leadership positions and responsibilities have changed before Budbo ever went down the path of a token sale, during the token sale, post token sale and will continue to do so over the next 6-24 months.  There will changes in the near future that will have a positive impact on our company and when that happens we will let the community know and promote those changes.  Rick Burnett is the chairman of the board for Budbo, INC and Lane Axis is a shareholder of Budbo that we formed a partnership to use their IP within the app.  We decided to no l longer use the LaneAxis IP for the app and have decidded to go a different direction.  That being said, nobody on the Budbo Team is working on the LaneAxis token sale and if LaneAxis is using Budbo to promote then there is nothing I can do to stop that from happening.  All the coins have not been properly distributed to all token holders.  We have sent countless emails to all token holders to submit their MEW wallet address so we can distribute tokens.  If you look on our site there is not only directions how to do that but there is also a form to fill out if you have not received your tokens yet and we make distributions once a week to anyone that has reached out to us and has yet to get their tokens.  As far as the status of V2, once we are ready to give out updates I promise we will.  Again it's only been 7 months and if you look at the roadmap you will see that we hired 3 tier 1 design and dev firms to work on design, development, and audience data building for the app and another firm for the blockchain solution.  That is an update that we put on the site.  As far as a very specific timeline, again you are not a shareholder of our company.  We are keeping close to the vest for good reason and not going to put our tech or company at risk because certain members of the community "demand" answers or think they are entitled and privy to any and all information.  That being said, YES WE CAN IMPROVE our communication. That will and must happen once we are ready to go to market.  We will have to implement (very effectively) or PR and marketing campaigns.  But our audience is just not token holders.  We have a real company and solution with real competition.  I am not going to pre-deliver news (or make up fluff news) before we are ready to go to market just so certain individuals can have clarity that we are a real company.  Any executive of a company would tell you that is absurd.  So yes we are incredibly busy building our business and responding to attacks about our character in telegram is not a great use of my time.

**Gary Heitz** admin                                                                                                                                                                1:1 

I would read my replay to Sheerwood and this would answer a lot of your questions.  The Profile and Roadmap was temporarily taken down (which we explained last week) for updates and has been put back up already.  We are

Join

# EXHIBIT O



# Welcome Cultivator!

Supply Chain Management for the Global Cannabis Industry

## Create Your Account

Hello! Start your sign up process

* Indicates a required field

Email*
ThurgoodJ@mrniceguy.com

Password*
• • • • • • • •

Confirm Password*
• • • • • • • •

✓ One lowercase character
✓ One uppercase character
✓ One number
✓ One special character
✓ 8 characters minimum

**Next**

1/3



# Welcome Cultivator!

Supply Chain Management for the Global Cannabis Industry

## Register Your Company

Add your Company name and Address

* Indicates a required field

Company Name*
Mr Nice Guy

Address*
7128 Miramar R

7128 Miramar Rd #10, San Diego, CA

7130 Miramar Rd #15, San Diego, CA

7130 Miramar Rd, San Diego, CA 92121

7122 Miramar Rd, San Diego, CA 92121

Next

3/3

 Let's get your location set up

# Set Up Location Profile

Save

This gives users information on your storefront location

* Indicates a required field

☑ Prefill with my company information

Location Name*
Mr Nice Guy - On Miramar

Location Type*
Cultivator

Location Email*
ThurgoodJ@mrniceguy.com

Phone*
555-831-4400

Website
www.mrniceguy.com

Licence number
0123-45678

Location Category*

○ Medical

○ Recreational

● Med/Rec

○ Health and Wellness

Address*
7128 Miramar Rd #10, San Diego, CA 92121

Suite Number



Use the tool above to set your location

Location Short Description
Bacon ipsum dolor amet swine commodo quis, buffalo cupim t-bone pancetta aliqua jowl officia cow sint.

Location Long Description
Bacon ipsum dolor amet swine commodo quis, buffalo cupim t-bone pancetta aliqua jowl officia cow sint occaecat ad. Beef anim adipisicing shankle in tenderloin. Burgdoggen biltong beef ribs qui sint filet mignon tempor anim do. Flank bresaola landjaeger, sint ut non filet mignon ribeye pork.



## Logo




Drag files or Upload

**Mankind**

Photo Size requirement: Size: Max, 3 MB/photo. Supported formats:
JPEG, JPG or PNG. Suggested photo dimensions: max. 1000 x 1000 px.

## Hours

| Sunday | Closed | — | Closed | ☑ Closed |
| Monday | 9:00 am | — | 9:00 pm | ☐ Closed |
| Tuesday | 9:00 am | — | 9:00 pm | ☐ Closed |
| Wednesday | 9:00 am | — | 9:00 pm | ☐ Closed |
| Thursday | 9:00 am | — | 9:00 pm | ☐ Closed |
| Friday | 9:00 am | — | 9:00 pm | ☐ Closed |
| Saturday | 9:00 am | — | 10:00 pm | ☐ Closed |

## Photos








Drag files or Upload

Photo Size requirement: Size: Max, 3 MB/photo. Supported formats:
JPEG, JPG or PNG. Suggested photo dimensions: max. 1000 x 1000 px.

## Social Media

| Facebook | Instagram | Twitter |
| www.facebook.com/mrniceguy | MrNiceGuy | @MrNiceGuy |

| Yelp | YouTube | Pinterest |
| www.yelp.com/biz/mrniceguy | www.youtube.com/channel | |

# Add Product

Skip for now

**Add**

About the product

* Indicates a required field

☑ Did you create this product?

**Product Name***
Blue Dream

**Category***
Flower

Strain Information

**Parent Strain***
Blueberry

**Parent Strain***
Haze

⊕ Add Another

Sativa    Indica    ✓ Hybrid

Product Tags

🔍 Search Tags

✓ Sticky    ✓ Munchies    Couch Lock    ✓ Purple    CBD

## Effects & Attributes

| | | | | |
|---|---|---|---|---|
| Energetic | | Stress | | |
| Uplifted | | Depression | | |
| Relaxed | | Pain | | |
| Happy | | Appetite | | |
| Euphoric | | Inflammation | | |
| Hunger | | Dry Mouth | | |

## Product Information

**THC %***
26.31

**CBD %***
0.03

**Product Description***

OG Kush is cherished for its ability to crush stress under the weight of its heavy euphoria. It carries an earthy pine and sour lemon scent with woody undertones, an aroma that has become the signature of OG Kush varieties and descendants.

## Product Photos



Drag files or Upload

Photo Size requirement: Size: Max. 3 MB/photo. Supported formats: JPEG, JPG or PNG. Suggested photo dimensions: max. 1000 x 1000 px.

## Pricing

1 Gram — Price

1/8 oz — Price

# Products

Upload your CSV file

**Choose File**    No file chosen

⬇ Download Sample .csv

**Add New**

Location
**Mr Nice Guy - On Miramar** ▾

🔍 Search

| Product Name | Manufacturer | Category Type | Price | Product Image | Status |
|---|---|---|---|---|---|
| OG Kush | Mr Nice Guy | Flower | $10,$20,$50,$100 | | ● Active | ⋮ |
| GSC | Mr Nice Guy | Flower | $10,$20,$50,$100 | | ● Active | ⋮ |
| Green Crack | Mr Nice Guy | Flower | $10,$20,$50,$100 | | | |

✕ Deactivate

✎ Edit

🗑 Delete

Rows per page:    5 ▾    1-10 of 100    ‹  ›



 TOKENS  MC

# Employees

Upload your CSV file

**Choose File** No file chosen

⬇ Download Sample .csv

**Add New**



🔍 Search

| Name | Location | Status | Last Login | Role | |
|------|----------|--------|-----------|------|---|
| Thurgood Jenkins | All | ● Active | 5/19/2017 | Admin | ⋮ |
| Ted Jones | Mr Nice Guy - On Mir... | ● Inactive | 5/20/2017 | Employee | ⋮ |
| Bill Walsh | Mr Nice Guy - On Mir... | ● Inactive | 5/9/2017 | Employee | ⋮ |
| Saul Sliver | Mr Nice Guy - On Mir... | ● Inactive | 5/18/2017 | Employee | ⋮ |
| Bruce Banner | Mr Nice Guy - On Mir... | ● Inactive | 4/10/2017 | Employee | ⋮ |

Rows per page: 5 ▼　　1-10 of 100　　< >


 
# Wallet

Buy Tokens

**Send Tokens**

Current Tokens: 10.215

Next Payment Due: 12/25/18

Wallet Address: 00000000000000000000000

QR CODE



# Companies

Upload your CSV file

**Choose File**    No file chosen

⬇ Download Sample .csv

**Invite**

🔍 Search

| Company Name | Company Type | Contact Name | Locations | Revenue | Last Login | Status |
|---|---|---|---|---|---|---|
| Mr Nice Guy | Cultivator | Thurgood Jenkins | 1 | $4,450 | 5/19/2017 | ● Approved |
| Planet Express | Grower | Ted Jones | 2 | $5,650 | 5/20/2017 | ● Approved |
| Weed R Us | Grower | Bill Walsh | 1 | $0 | 5/9/2017 | ● Pending |
| Dr. Green Thumb | Retailer | Saul Sliver | 5 | $10,656 | 5/18/201 | |
| Mankind Cooperative | Retailer | Bruce Banner | 1 | $7,321 | 4/10/201 | |

✏ Edit

🗑 Delete

🏳 Report

👍 Approve

Rows per page:    5 ▾    1-10 of 10





 
# Strains

| Search | | | | |
|---|---|---|---|---|
| Product Name | Strain Type | Parent Strain | Child Strains | Date Added |
| Bubbah Kush | Indica | 1 Strain | 2 Strains | 3/22/2018 |
| GSC | Indica | 2 Strains | 2 Strains | 5/19/2018 |
| Green Crack | Sativa | 2 Strains | 2 Strains | 2/18/2017 |

Rows per page: 5    1-10 of 100

 
# Manage Deals

Add New



| | Name | Discount Type | Status | Applies To | Limitation |
|---|---|---|---|---|---|
| ☐ | 420 Sale | BOGO Free | ● Active | Storewide | Below ( dollar amount) |
| ☐ | 420 Pre-Sale | BOGO 25% Off | ● Inactive | Storewide | Below ( dollar amount) |
| ☐ | Memorial Day Sale | 5 Gram1/8ths | ● Inactive | Flower | Below (weight) |
| ☐ | Super Bowl Sale | % Off | ● Inactive | Prerolls | None |

Rows per page:    5 ▾    1-10 of 100    ‹    ›



Dashboard

Products

Orders

Deals

Employees

Locations

1Passwor
https://se

EXHIBIT P

: We understand frustrations and greatly appreciate everyone patience.  As many of you know, we set a goal to be done wi

05 January

munity:

rations and greatly appreciate everyone patience.  As many of you know, we set a goal to be done with tech and ready to ex
by end of the year.  Unfortunately, we are still in development.  Everything about the app is changing.  User journey and it's
nt experience, design and color, and there are several features we are adding to the app that we believe will be "game-char
n anything else on the market at this time.

ered several questions about a month ago, it was my decision and the decision of this team to have 100% of our focus on th
oject and not this chat room or any public sentiment during the development as each day the channel morale goes from po
to negative and until the dev is completed and you see our initial marketing strategy and hype we have around the release,
ics anyways.  Our updates in the past have caused more distractions internally due to this.

n we have not posted too many screenshots or updates is due to the competitive nature of our industry.  Keep in mind that
d application that this is not our first rodeo.  We have a strategy in place and it is in the best interest of our company as we

ersonal attacks on this channel, unfortunately, are part of the media landscape of today where anyone can post anything or
nformation to back up their claims.  Negative claims about a company can have several different motives behind them.  I wo
m can't wait to prove any nah-sayers wrong.  However, OUR motivation is not to prove any nah-sayers wrong.  OUR motivat
cation and product.

e are progressing forward and very excited on what we have built thus far and what our plan is for a media and marketing st
e app.

Gary Heitz pinned "Update To The Community:  We u..."

mmunity:  We understand frustrations and greatly appreciate everyone patience.  As many of you know, we set a goal to be
two times suffered release,tell us when the next deadline?

# EXHIBIT Q

# Former corporate officers allege CEO misappropriated $1.76M out of $4.75M token sale

by Nelson Rosario
1 week ago · 3 min read



**QUICK TAKE**

Patterson, v. Budbo, Inc.

CEO of Budbo, raised $4.5 million through a token sale and allocated $1.76 million to non-Budbo activities

These alleged activities led corporate officers to call out and try to get the CEO to stop misusing the funds

The CEO, Rick Burnett, allegedly fired all three corporate officers as a result

*Disclaimer: These summaries are provided for educational purposes only by* Nelson Rosario *and* Stephen Palley. *They are not legal advice. These are our opinions only, aren't authorized by any past, present or future client or employer. Also we might change our minds. We contain multitudes.*

As always, Rosario summaries are "NMR" and Palley summaries are "SDP".

**Patterson, v. Budbo, Inc., et al., 1:18-cv-00998 (W.D. Tex., 11/20/2018) [NMR]**

This week we have another shareholder derivative lawsuit, but one that is likely more personal than the Nvidia suit, because it involves partners in a business. A partnership is a lot like a marriage, and similarly, when things go south they usually go very south. This case involves former partners suing each other for a variety of alleged misconduct. What follows is a summary of the allegations in the lawsuit – obviously, allegations means that they are not yet proven true and the defendant will have a chance to respond.

Luke Patterson, Jacob Patterson and Gary Heitz were corporate officers in Budbo, Inc., a company that wanted "to develop software for phones and computers to locate vendors and dispensaries of marijuana, and other functions including tracking product shipments." Who doesn't want to do that these days? The CEO of Budbo is Rick Burnett who is also the CEO of two other companies that are defendants in this case; LaneAxis and LaneAxis GPSCT. The four individuals all owned stock in Budbo, with Burnett, through a series of transactions detailed in the complaint, being the effective majority shareholder of Budbo.

At some point, the Budbo people realized they needed better GPS functionality for their app, so people could more easily find their marijuana dispensaries. Burnett suggested using GPS software provided by his other company, LaneAxis. Turns out the GPS software didn't work. This is where things started to go south between the partners.

For some reason, it is not clear from the complaint, at some point Budbo decided to do a token sale. Specifically, they sold what they believe to be "utility tokens" for future use by consumers of their services. The sale raised $4.75 million. Allegedly, Burnett diverted $1.76 million from the sale to himself and his other ventures. Part of that money allegedly included $100,000 to send LaneAxis personnel to a conference in London. Look, I travel from time to time, but unless there were tons of people going to this conference, how did they spend $100,000?

The above is just one allegation among many related to the misappropriation of funds that were intended for Budbo consequently being spent on Burnett's other ventures. These alleged activities led Patterson, Patterson, and Heitz to call out Burnett to try and get him to stop the misuse of funds. Burnett allegedly responded by firing them.

Partnerships ending can be perilous for all parties involved. The reason being that your partners usually keep receipts, such as, for example, the eight-page fee schedule detailing 45 allegedly illegal transfers of crypto and fiat to Burnett and his companies. I'm not sure how Burnett is supposed to respond to all this.

**Update:** Of course, there are very often at least two sides to every story.  In that spirit, we heard from one of the defendants' lawyers after this summary was published. He tells that his client has not filed an answer because the lawsuit has never been served and that attempts to settle the case are outstanding. However, he also says that his client (Mr. Burnett) vigorously denies that any funds were misspent or misappropriated, and that the $100,000 was actually spent on multiple conferences and completely legitimate.  We asked for a copy of any responsive pleading (answer or motion to dismiss) when filed and if we receive them will provide summary.

---

*The Block is pleased to bring you expert cryptocurrency legal analysis courtesy of Stephen Palley (@stephendpalley) and Nelson M. Rosario (@nelsonmrosario). They summarize three cryptocurrency-related cases on a weekly basis and have given The Block permission to republish their commentary and analysis in full. Part I of this week's analysis, Crypto Caselaw Minute, is above.*

ICO   BUDBO   CRYPTO-CASELAW-MINUTE   MISAPPROPRIATION

© 2019 The Block. All Rights Reserved.

EXHIBIT R

**SERVICES AGREEMENT**

This Services Agreement, dated as of January 7, 2018, is entered into by and between, Budbo, Inc., a Delaware corporation ("**Budbo**"), and Budbo Token International LTD., a corporation formed under the laws of the British Virgin Islands ("**BTI**").

R E C I T A L S

WHEREAS, Budbo is a best-in-class platform consisting of a mobile phone app and a cloud-based backend business intelligence platform (the "**Platform**"). The Platform, among other things, (i) is designed to match cannabis users' top picks or close matches of cannabis strains and products and direct them to nearby dispensaries which are carrying these products, and (ii) provides a delivery tracking service aimed at ensuring full visibility and compliance into the cannabis delivery process;

WHEREAS, Budbo is currently working on combining the cannabis product aspect of its Platform and such tracking service with the crypto blockchain model. The blockchain model will easily accommodate several stages of the cannabis pursuit, sales and logistics processes, addressing the needs described in BTI's White Paper (the "**White Paper**") as published on BTI's website www.budbo.io (the "**BTI Website**");

WHEREAS, BTI has been formed to (i) issue ethereum based tokens (the "Budbo Tokens") that will be the digital utilities that power and incentivize the Budbo ecosystem and the Platform and will provide access to the Platform, (ii) oversee the process of implementation of the Budbo Tokens on the Platform and (iii) oversee the distribution of the proceeds of the Token Sale (as defined below) in the bests interests of the Platform and its users;

WHEREAS, BTI is in the process of conducting a sale of Budbo Tokens on the terms set forth in the White Paper and on the BTI Website (the "**Token Sale**");

WHEREAS, Budbo has (i) incurred and will continue to incur substantial costs and expenses to build the Platform, including the ability to utilize the Budbo Tokens on the Platform, and (ii) advanced and/or paid and will continue to advance and/or pay for the costs incurred and to be incurred by BTI in creating the Budbo Tokens and conducting the Token Sale (collectively, the "**Expenses**"); and

WHEREAS, the parties desire (i) that Budbo and its affiliates continue to provide certain services to BTI and its affiliates, (ii) that Budbo and certain management of Budbo provide certain corporate, administrative and other services to BTI and (iii) to compensate Budbo for the Expenses and providing such services.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants and undertakings contained herein and the transactions contemplated hereunder, the receipt and sufficiency of which are acknowledged, the parties hereby mutually agree as follows:

**ARTICLE I**

**DEFINITIONS.**

Section 1.1 Capitalized terms used in the Schedule attached hereto but not otherwise defined therein, will have the meaning ascribed to such word in this Agreement. For purposes of this Agreement, the following words and phrases will have the following meanings:

"**Agreement**" means this Services Agreement, together with the <u>Schedule</u> attached hereto, as the same may be amended from time to time in accordance with the provisions hereof.

"**Information**" means information in written, oral, electronic or other tangible or intangible forms, stored in any medium, including studies, reports, records, books, contracts, instruments, surveys, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, data, computer data, disks, diskettes, tapes, computer programs or other software, marketing plans, customer names, communications by or to attorneys (including attorney-client privileged communications), memoranda and other materials prepared by attorneys or under their direction (including attorney work product), and other technical, financial, employee or business information or data.

"**System**" means the software, hardware, data store or maintenance and support components or portions of such components of a set of information assets identified in a Schedule.

**ARTICLE II**

<u>**SERVICES.**</u>

Section 2.1      <u>Initial Services</u>. Except as otherwise provided herein, during the Term, Budbo agrees to provide, or with respect to any service to be provided by an affiliate of Budbo, to cause such affiliate to provide, to BTI and/or its affiliates the services set forth on the Schedule I (the "**Schedule**") annexed hereto (the "**Initial Services**").

Section 2.2      <u>Additional Services</u>. From time to time during the Term, the parties may identify additional services that Budbo will provide to BTI and/or its affiliates in accordance with terms of this Agreement (the "**Additional Services**" and, together with the Initial Services, the "**Services**"). If the parties agree to add any Additional Services, the parties will mutually create a Schedule or amend the existing Schedule for each such Additional Service setting forth a description of such Service, the term during which such Service will be provided, the cost, if any, for such Service and any other provisions applicable thereto. Notwithstanding anything to the contrary in the foregoing or anywhere else in this Agreement, any service actually performed by Budbo upon written or oral request by BTI in connection with this Agreement will be deemed to constitute a "Service" for the purposes of Article III, but such "Service" will only be incorporated into this Agreement by an amendment as set forth in this Section 2.2 and Section 5.10. Notwithstanding the foregoing, Budbo will not have any obligation to agree to provide the Additional Services.

Section 2.3      <u>Scope of Services</u>. Notwithstanding anything to the contrary herein, (i) neither Budbo nor any of its affiliates will be required to perform or to cause to be performed any of the Services for the benefit of any third party or any other person other than BTI or its affiliates, and (ii) Budbo makes no warranties, express or implied, with respect to the Services, except as provided in Section 2.5.

Section 2.4      <u>Limitation on Provision of Services</u>. (a) In case performance of any terms or provisions hereof will be delayed or prevented, in whole or in part, because of, or related to, compliance with any law, decree, request or order of any governmental authority, either local, state, federal or foreign, or because of riots, war, public disturbance, strike, labor dispute, fire explosion, storm, flood, acts of god, major breakdown or failure of transportation, manufacturing, distribution or storage facilities, or for any other reason which is not within the control of the party whose performance is interfered with and which by the exercise of reasonable diligence such party is unable to prevent (each, a "**Force Majeure Event**"), then upon prompt notice by the party so suffering to the other party, the party suffering will be excused from its obligations hereunder during the period such Force Majeure Event continues, and no liability will attach against either party on account thereof. No party will be excused from performance if such party

2

DocuSign Envelope ID: AB7B1A8E-D044-4592-9CDF-5E50BCE61638

fails to use reasonable diligence to remedy the situation and remove the cause and effect of the Force Majeure Event.

(b)     If Budbo is unable to provide a Service hereunder because it does not have the necessary assets, funds, personnel or expertise, the parties will determine a mutually acceptable arrangement to obtain such assets, funds, personnel or expertise and until such time as such assets, funds, personnel or expertise are obtained, Budbo's failure to provide such Service will not be a breach of this Agreement.

(c)     Notwithstanding anything to the contrary contained herein, this Agreement will not constitute an agreement for Budbo to provide Services to BTI to the extent that the provision of any such Services would not be in compliance with applicable laws.

Section 2.5     Standard of Performance; Standard of Care. (a) Budbo will use its commercially reasonable efforts to provide and cause its affiliates to provide the Services in a professional manner with reasonable degree of care and expertise necessary to provide the nature, quality and timeliness of the Services; provided, however, that nothing in this Agreement will require Budbo to prioritize or otherwise favor BTI over any third parties or any of Budbo's or Budbo's affiliates' business operations.  BTI acknowledges that Budbo's obligation to provide the Services is contingent upon BTI (i) providing in a timely manner all information, documentation, materials, resources and access requested by Budbo and (ii) making timely decisions, approvals and acceptances and taking in a timely manner such other actions requested by Budbo, in each case that Budbo (in its reasonable business judgment) believes is necessary or desirable to enable Budbo to provide the Services.  Notwithstanding anything to the contrary herein, Budbo shall not be responsible for any failure to provide any Service in the event that BTI has not fully complied with the immediately preceding sentence.  The parties acknowledge and agree that nothing contained in the Schedule will be deemed to (x) increase or decrease the standard of care imposed on Budbo, (y) expand the scope of the Services to be provided as set forth in Article 2, except to the extent that the Schedule references a Service that was not provided immediately prior to the date hereof, or (z) limit Sections 5.1 and 5.2.

(b)     In providing the Services, Budbo will not be obligated to: (i) hire or engage any additional employees or consultants or (ii) purchase, lease or license any additional equipment, software or other assets; and in no event will Budbo be obligated to (x) maintain the employment of any specific employee or (y) pay any costs related to the transfer or conversion of BTI's data to Budbo or any alternate supplier of Services.  Further, Budbo will have the right to designate which personnel it will assign to perform the Services, and it will have the right to remove and replace any such personnel at any time or designate any of its affiliates or a third party provider at any time to perform the Services.  At BTI's request, Budbo will consult in good faith with BTI regarding the specific personnel to provide any particular Services; provided, however, that Budbo's decision will control and be final and binding.

(c)     Budbo's sole responsibility to BTI for errors or omissions committed by Budbo in performing the Services will be to correct such errors or omissions in the Services at no additional cost to BTI; provided, however, that BTI must promptly advise Budbo of any such error or omission of which it becomes aware after having used commercially reasonable efforts to detect any such errors or omissions.

(d)     The parties and their respective affiliates will use good faith efforts to cooperate with each other in connection with the performance of the Services hereunder, including producing on a timely basis all information that is reasonably requested with respect to the performance of Services; provided, however, that such cooperation not unreasonably disrupt the normal operations of the parties and their respective affiliates; provided further, that the party requesting cooperation will pay all reasonable out-of-pocket costs and expenses incurred by the party furnishing cooperation, unless otherwise expressly provided in this Agreement.  Such cooperation will include exchanging information, providing electronic access to Systems used in connection with the Services and obtaining or granting all consents, licenses,

3

sublicenses or approvals necessary to permit each party to perform its obligations hereunder. Notwithstanding anything in this Agreement to the contrary, BTI will be solely responsible for paying for the costs of obtaining such consents, licenses, sublicenses or approvals, including reasonable legal fees and expenses. Either party providing electronic access to Systems used in connection with Services may limit the scope of access to the applicable requirements of the relevant matter through any reasonable means available, and any such access will be subject to the terms of Section 5.8. The exchange of information or records (in any format, electronic or otherwise) related to the provision of Services under this Agreement will be made to the extent that (i) such records/information exist and are created in the ordinary course, (ii) do not involve the incurrence of any material expense (unless BTI compensates Budbo for incurring such expense), and (iii) are reasonably necessary for any such party to comply with its obligations hereunder or under applicable law. Subject to the foregoing terms, the parties will cooperate with each other in making information available as needed in the event of a tax audit or in connection with statutory or governmental compliance issues, whether in the British Virgin Islands, United States or any other country; provided, however, that the provision of such information will be without representation or warranty as to the accuracy or completeness of such information. For the avoidance of doubt, and without limiting any privilege or protection that now or hereafter may be shared by the parties, neither party will be required to provide any document if the party who would provide such document reasonably believes that so doing would waive any privilege or protection (e.g., attorney-client privilege) applicable to such document.

(e)     If Budbo reasonably believes it is unable to provide any Service because of a failure to obtain necessary consents (e.g., third-party approvals or instructions or approvals from BTI required in the ordinary course of providing a Service), licenses, sublicenses or approvals contemplated by Section 2.5(d), such failure shall not constitute a breach hereof by Budbo and the parties will cooperate to determine the best alternative approach; provided, however, that in no event will Budbo be required to provide such Service until an alternative approach reasonably satisfactory to Budbo is found or the consents, licenses, sublicenses or approvals have been obtained.

Section 2.6     Changes in Services. The parties agree and acknowledge that Budbo, its affiliates and/or persons engaged by Budbo to provide the Services may make changes from time to time in the manner of performing the applicable Services if such persons are making similar changes in performing similar services for itself, its affiliates or other third parties, if any, and if such person furnishes to BTI substantially the same notice (in content and timing) as such person provides to its affiliates or other third parties, if any, respecting such changes. In addition, and without limiting the immediately preceding sentence in any way, and notwithstanding any provision of this Agreement to the contrary, Budbo, its affiliates and/or persons engaged by Budbo to provide the Services may make any of the following changes without obtaining the prior consent of BTI: (i) changes to the process of performing a particular Service that do not adversely affect the benefits to BTI of such Provider's provision or quality of such Service in any material respect or materially increase the charge for such Service; (ii) emergency changes on a temporary and short-term basis; and (iii) changes to a particular Service in order to comply with applicable law or regulatory requirements.

Section 2.7     Services Performed by Third Parties. Nothing in this Agreement will prevent Budbo from using its affiliates or third parties to perform all or any part of a Service hereunder. Budbo will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through its affiliates or third parties, and Budbo will be solely responsible for payments due any such affiliates or third parties.

Section 2.8     Responsibility for Budbo Personnel. All personnel employed, engaged or otherwise furnished by Budbo in connection with its rendering of the Services will be Budbo's employees, agents or subcontractors, as the case may be (collectively, "**Budbo Personnel**"). Budbo will

have the sole and exclusive responsibility for Budbo Personnel, will supervise Budbo Personnel and will cause Budbo Personnel to cooperate with BTI in performing the Services in accordance with the terms and conditions of Section 2.5. Budbo will pay and be responsible for the payment of any and all premiums, contributions and taxes for workers' compensation insurance, unemployment compensation, disability insurance, and all similar provisions now or hereafter imposed by any governmental authority with respect to, or measured by, wages, salaries or other compensation paid, or to be paid, by Budbo to Budbo Personnel.

Section 2.9 <u>Services Rendered as a Work-For-Hire; Return of Equipment; Internal Use; No Sale, Transfer, Assignment; Copies.</u> All materials, software, tools, data, inventions, works of authorship, documentation, and other innovations of any kind, including any improvements or modifications to Budbo's proprietary computer software programs or the Platform, collected and related materials, that Budbo, or personnel working for or through Budbo, may make, conceive, develop or reduce to practice, alone or jointly with others, (i) in the course of performing Services or as a result of such Services or (ii) derived directly or indirectly from the operation, usage or build-out of the Platform, whether or not eligible for patent, copyright, trademark, trade secret or other legal protection (collectively the "**Work Product**"), as between Budbo and BTI, will be solely owned by Budbo. The parties agree that Budbo will solely control and own all IP related to, directly or indirectly, to the Platform and the blockchain technology related to Platform or the Work Product (the "**Blockchain Technology**"), including, without limitation, and any all data derived in connection with the Platform or the Work Product. Upon the termination of this Agreement, (x) BTI will promptly return to Budbo any equipment or other property of Budbo relating to such terminated Services which is owned or leased by Budbo and is, or was, in BTI's possession or control; and (y) Budbo will transfer to BTI, as soon as practicable, any and all organizational data or information of BTI used in supplying the Service to BTI. All systems, procedures and related materials provided to BTI are for BTI's internal use only and only as related to the Services or any of the underlying systems used to provide the Services, and unless Budbo gives its prior written consent in each and every instance (in its sole discretion), BTI may not sell, transfer, assign, license or otherwise use the Services provided hereunder, in whole or in part, for the benefit of any person other than an affiliate of BTI. BTI will not copy, modify, reverse engineer, decompile or in any way alter the Platform or the Blockchain Technology without Budbo's express written consent, which may be withheld, condition or delayed for any reason or no reason). "**IP**" shall mean any of the following: patents and patent applications, registered and unregistered trademarks and service marks, trademark registrations, pending trademark and service mark registration applications, and similar reservations of marks, registered and unregistered copyrights, copyright registrations, and applications for copyright registrations, Internet domain names and trade secrets.

Section 2.10 <u>Cooperation.</u> Each party will designate in writing (email) to the other party one (1) representative to act as a contact person with respect to all issues relating to the provision of the Services pursuant to this Agreement. Such representatives will hold review meetings by telephone or in person, as mutually agreed upon, at such frequency as determined by the parties to discuss issues relating to the provision of the Services under this Agreement (the "**Review Meetings**"). In the Review Meetings such representatives will be responsible for discussing any problems identified relating to the provision of Services and, to the extent changes are agreed upon, implementing such changes.

Section 2.11 <u>No Further Obligations.</u> Budbo and its affiliates shall have no obligation during the Term to provide any services other than the Services, and no other obligation to provide any such services except as expressly set forth in this Article II, unless otherwise agreed by the Parties in writing.

## ARTICLE III

## <u>CHARGES AND PAYMENT.</u>

Section 3.1 <u>Fees</u>. In consideration of Budbo providing the Services, effective October 20, 2017 BTI will pay Budbo a monthly fee of $500,000, payable monthly in advance on the first business day of each month, *provided, however,* that the fee for the period from October 20, 2017 through December 31, 2017 in the amount of $1,177,419.35 is due within 10 days of the date of this Agreement or such other date as the parties may agree to in writing.

Section 3.2 <u>Late Payments</u>. Fees and charges not paid within ten (10) days after the date when payable will bear interest at the rate of 1% per month for the period commencing on the due date and ending on the date payment is received in full by Budbo.

## ARTICLE IV

## <u>TERM AND TERMINATION.</u>

Section 4.1 <u>Termination Date</u>. Unless otherwise terminated pursuant to this Article 4, this Agreement will terminate at the end of the Term, unless the parties have agreed in writing to an extension of the Term. "**Term**" means the period commencing on October 20, 2017 and ending on the earlier of (i) the date any party hereto terminates this Agreement pursuant to the terms hereof or (ii) April 20, 2018.

Section 4.2 <u>Early Termination</u>. Either may terminate this Agreement at any time and from time to time (except in the event such termination will constitute a breach by such party of this Agreement) by giving fifteen days' (15) prior written notice to the other party of such termination (the "**Termination Notice**"). Early termination by BTI will obligate BTI to pay to Budbo a termination fee equal to the direct costs incurred by Budbo and/or its Affiliates in connection with the buildout of the Platform and Budbo's provision of Services at the time of the early termination (the "**Termination Fee**"), which Termination Fee shall not be less than $1,177,419.35.

Section 4.3 <u>Termination by Budbo</u>. Budbo may terminate this Agreement by giving written notice of such termination to BTI, if BTI breaches any material provision of this Agreement (including a failure to timely pay the Fees); *provided*, *however*, that BTI will have ten (10) days after receiving such written notice to cure any breach which is curable before the termination becomes effective.

Section 4.4 <u>Effect of Termination of Services</u>. Upon the termination of this Agreement, Budbo will cease, or cause its applicable affiliates or third-party providers to cease, providing the terminated Services. Upon each such termination, BTI will promptly (i) pay to Budbo all fees accrued through the effective date of the Termination Notice, and (ii) reimburse Budbo for the termination costs actually incurred by Budbo resulting from BTI's early termination of such Services, if any, including those costs owed to third-party providers.

Section 4.5 <u>Data Transmission</u>. In connection with the termination of this Agreement, BTI will cooperate fully and will cause its affiliates to cooperate fully to support any transfer of data concerning the Services and the Platform to Budbo. If requested by Budbo in connection with the prior sentence, BTI will deliver and will cause its affiliates to deliver to Budbo, within such time periods as the parties may reasonably agree, all records, data, files and other information received or computed for the benefit of BTI during the Term, in electronic and/or hard copy form.

## ARTICLE 5

## <u>MISCELLANEOUS.</u>

Section 5.1 <u>DISCLAIMER OF WARRANTIES</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, BUDBO MAKES NO AND DISCLAIMS ALL

DocuSign Envelope ID: AB7B1A8E-D044-4592-9CDF-5E50BCE61638

WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT, WITH RESPECT TO THE SERVICES, TO THE EXTENT PERMITTED BY APPLICABLE LAW. BUDBO MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE QUALITY, SUITABILITY OR ADEQUACY OF THE SERVICES FOR ANY PURPOSE OR USE.

Section 5.2 <u>Limitation of Liability; Indemnification</u>. (a) Each party acknowledges and agrees that the obligations of the other party hereunder are exclusively the obligations of such other party and are not guaranteed directly or indirectly by such other party's shareholders, members, managers, officers, directors, agents, representatives or any other person. Subject to the terms of this Agreement, each party will look only to the other party and not to any manager, director, officer, employee or agent for satisfaction of any claims, demands or causes of action for damages, injuries or losses sustained by any party as a result of the other party's action or inaction.

(b) Notwithstanding (i) Budbo's agreement to perform the Services in accordance with the provisions hereof, or (ii) any term or provision of the Schedule to the contrary, BTI acknowledges that performance by Budbo of the Services pursuant to this Agreement will not subject Budbo, any of its affiliates or their respective members, shareholders, managers, directors, officers, employees, representatives or agents to any liability whatsoever, except as directly caused by the willful misconduct on the part of Budbo or any of its members, shareholders, managers, directors, officers, employees, representatives and agents; provided, however, that Budbo's liability as a result of such gross negligence or willful misconduct will be limited to an amount not to exceed the fees paid under this Agreement.

(c) NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT WILL EITHER PARTY OR ITS RESPECTIVE AFFILIATES BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, COLLATERAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OR LOST PROFITS SUFFERED BY THE OTHER PARTY OR ITS AFFILIATES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, IN CONNECTION WITH ANY DAMAGES ARISING HEREUNDER; PROVIDED, HOWEVER, THAT TO THE EXTENT BTI OR ITS AFFILIATES IS REQUIRED TO PAY (A) ANY AMOUNT ARISING OUT OF THE INDEMNITY SET FORTH IN SECTION 5.2(d) AND (B) ANY SPECIAL, INCIDENTAL, INDIRECT, COLLATERAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OR LOST PROFITS TO A THIRD PARTY WHO IS NOT AN AFFILIATE OF EITHER PARTY, IN EACH CASE IN CONNECTION WITH A THIRD-PARTY CLAIM, SUCH DAMAGES WILL CONSTITUTE DIRECT DAMAGES OF THE INDEMNIFIED PARTY AND WILL NOT BE SUBJECT TO THE LIMITATION SET FORTH IN THIS SECTION 5.2(c).

(d) BTI shall indemnify and hold harmless and defend Budbo, its affiliates and any of their respective officers, partners, directors, employees, shareholders, representatives and agents, from and against any and all losses, claims, damages, liabilities, obligations expenses (including without limitation, reasonable attorney's fees payable to counsel of Budbo's choice), judgments, fines, settlements and other amounts arising out of or relating to acts or omissions taken by Budbo in good faith while performing the Services for BTI. Budbo shall not be entitled to indemnification under this Section 5.2(d) with respect to any claim, issue or matter in respect of which it has committed fraud or willful or wanton misconduct.

Section 5.3 <u>Compliance with Law and Governmental Regulations</u>. BTI will be solely responsible for (i) compliance with all laws affecting its business and (ii) any use BTI may make of the Services to assist it in complying with such laws. Without limiting any other provisions of this Agreement, the parties agree and acknowledge that neither party has any responsibility or liability for advising the other party with respect to, or ensuring the other party's compliance with, any public

disclosure, compliance or reporting obligations of such other party, regardless of whether any failure to comply results from information provided hereunder.

Section 5.4    No Partnership or Joint Venture; Independent Contractor. Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between the parties or any of their respective affiliates, successors or assigns.  The parties understand and agree that this Agreement does not make either of them an agent or legal representative of the other for any purpose whatsoever.  No party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other party, or to bind any other party in any manner whatsoever.  The parties expressly acknowledge that Budbo is an independent contractor with respect to BTI in all respects, including with respect to the provision of the Services.

Section 5.5    Exclusivity; Non-Exclusivity. Budbo and its affiliates may provide services of a nature similar to the Services to any other person.  There is no obligation for Budbo to provide the Services to BTI on an exclusive basis.  Budbo shall be the exclusive provider of the Services to BTI, unless otherwise agreed to in writing by Budbo.

Section 5.6    Expenses. Except as otherwise provided herein, each party will pay its own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Section 5.7    Further Assurances. From time to time, each party will use its commercially reasonable efforts to take or cause to be taken, at the cost and expense of the requesting party, such further actions as may be reasonably necessary to consummate or implement the transactions contemplated hereby or to evidence such matters.

Section 5.8    Confidentiality. (a) Subject to Section 5.8(c), each party, on behalf of itself and its respective affiliates, agrees to hold, and to cause its respective directors, officers, employees, agents, accountants, counsel and other advisors and representatives to hold, in strict confidence, with at least the same degree of care that applies to such party's confidential and proprietary Information pursuant to policies in effect as of the date hereof, all Information concerning the other party and its affiliates that is either in its possession (including Information in its possession prior to the date hereof) or furnished by the other party, its affiliates or their respective directors, officers, managers, employees, agents, accountants, counsel and other advisors and representatives at any time pursuant to this Agreement or otherwise, and will not use any such Information other than for such purposes as will be expressly permitted hereunder or thereunder, except, in each case, to the extent that such Information has been (i) in the public domain through no fault of such party or its affiliates or any of their respective directors, officers, managers, employees, agents, accountants, counsel and other advisors and representatives, (ii) later lawfully acquired from other sources by such party (or its affiliates) which sources are not themselves bound by a confidentiality obligation, or (iii) independently generated without reference or prior access to any proprietary or confidential Information of the other party.

(b)    Each party agrees not to release or disclose, or permit to be released or disclosed, any Information of the other party or its affiliates to any other person, except its directors, officers, employees, agents, accountants, counsel and other advisors and representatives who need to know such Information (who will be advised of their obligations hereunder with respect to such Information), except in compliance with Section 5.8(c); provided, however, that any Information may be disclosed to third parties (who will be advised of their obligation hereunder with respect to such Information) retained by Budbo as Budbo reasonably deems necessary to perform the Services.

(c)     In the event that any party or any of its affiliates either determines on the advice of its counsel that it is required to disclose any Information pursuant to applicable law (including pursuant to any rule or regulation of any governmental authority) or receives any demand under lawful process or from any Governmental Authority to disclose or provide Information of any other party (or of the other party's affiliates) that is subject to the confidentiality provisions hereof, such party will notify the other party prior to disclosing or providing such Information and will cooperate at the expense of such other party in seeking any reasonable protective arrangements (including by seeking confidential treatment of such Information) requested or required by such other party.  Subject to the foregoing, the person that received such a request or determined that it is required to disclose Information may thereafter disclose or provide Information to the extent required by such law (as so advised by counsel) or by lawful process or such governmental authority; provided, however, that such person provides the other party upon request with a copy of the Information so disclosed.

Section 5.9     Headings. The Section and paragraph headings contained in this Agreement or in the Schedule hereto and in the table of contents to this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

Section 5.10     Amendments. This Agreement (including the Schedule) may not be amended except by an instrument in writing executed by a duly authorized representative of each party.  By an instrument in writing, Budbo, on the one hand, or BTI, on the other hand, may waive compliance by the other with any term or provision of this Agreement (including the Schedule) that such other party was or is obligated to comply with or perform.  Any such waiver will only be effective in the specific instance and for the specific and limited purpose for which it was given and will not be deemed a waiver of any other provision of this Agreement (including the Schedule) or of the same breach or default upon any recurrence thereof.  No failure on the part of any party to exercise and no delay in exercising any right hereunder will operate as a waiver thereof nor will any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

Section 5.11     Notices. Notices, offers, requests or other communications required or permitted to be given by a party pursuant to the terms of this Agreement shall be given in writing to the other party to the following addresses:

| | |
|---|---|
| if to Budbo: | 1159 Campanile |
| | Newport Beach, CA. 92660 |
| | Attention: Rick Burnett, CEO |
| | Email: rick@budbo.com |
| | |
| if to BTI: | 1159 Campanile |
| | Newport Beach, CA. 92660 |
| | Attention: Rick Burnett, CEO |
| | Email: rick@budbo.io |

or to such other address, facsimile number or email address as the party to whom notice is given may have previously furnished to the other in writing as provided herein.  Any notice notices may be sent by facsimile or email.  All notices shall be deemed to have been given when received, if hand delivered; when transmitted, if transmitted by facsimile or email; upon confirmation of delivery, if sent by recognized overnight courier; and upon receipt if mailed.

Section 5.12     Assignment; No Third-Party Beneficiaries. Neither this Agreement nor any of the rights and obligations of the parties may be assigned by any party without the prior written consent of the other party, except that (i) Budbo may assign any rights and obligations hereunder to any affiliate or

DocuSign Envelope ID: AB7B1A8E-D044-4592-9CDF-5E50BCE61638

affiliates of Budbo or third parties capable of providing such Services hereunder, without the prior written consent of BTI, and (ii) an assignment by operation of law in connection with a merger or consolidation will not require the consent of the other party. Notwithstanding the foregoing, each party will remain liable for all of its respective obligations under this Agreement. Subject to the first sentence of this Section 5.12, this Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns and no other person will have any right, obligation or benefit hereunder. Any attempted assignment or transfer in violation of this Section 5.12 will be void.

Section 5.13    <u>Entire Agreement</u>. This Agreement, the Schedule and appendices hereto and thereto contain the entire agreement between the parties with respect to the subject matter hereof, supersede all previous agreements, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter and there are no agreements or understandings between the parties with respect to such subject matter other than those set forth or referred to herein or therein. The Schedule is incorporated herein by reference and made a part of this Agreement as if set forth in full herein.

Section 5.14    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable Law or public policy, all other conditions and provisions of this Agreement will nonetheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the fullest extent possible.

Section 5.15    <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware. Each of the parties hereby submits unconditionally to the jurisdiction of, and agrees that venue shall lie exclusively in, the federal and state courts located in the City of Los Angeles, California for purposes of the resolution of any disputes arising under this Agreement.

Section 5.16    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile or .pdf copies of signed signature pages will be deemed binding originals.

*[Signature page follows]*

DocuSign Envelope ID: AB7B1A8E-D044-4592-9CDF-5E50BCE61638

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed as of the date first written above.

**Budbo, Inc.**

By: _Rick Burnett_
       9F493DFD57444E6...
Name: Rick Burnett
Title:   Chief Executive Officer

**Budbo Token International LTD.**

By: _Rick Burnett_
       9F493DFD57444E6...
Name: Rick Burnett
Title:   Chief Executive Officer

[*Signature page to Budbo – BTI Services Agreement*]

# SCHEDULE I

## Services

<u>Types of Services:</u>

1. Assist in creation of ethereum-based Budbo Token (as defined in the White paper).

2. Implement the structure of deployment and implementation of the Budbo Token and related development of the Platform and Budbo Token in order for such tokens to be used on the Platform.

3. Corporate support and formation services, including the formation of BTI, preparation of the White Paper and creation and build-out of the BTI Website.

4. Administrative support services, including but not limited to secretarial support, event management, conference management, and other day-to-day office support services.

5. Operational management support services, including but not limited to management, supervision and instruction of the operation of BTI and general administration; provided that BTI shall be solely responsible for the marketing and advertising of its services.

6. Legal support services, including but not limited to support services in respective of contract management, risk control, compliance and other corporate legal matters; provided that BTI shall be solely responsible for making its regulatory filings.

7. Technology support services related to the Platform and Budbo Tokens, including but not limited to network design, optimization and maintenance, system support and upgrade, technology and infrastructure support, management of information technology equipment, technical support and disaster recovery, and complementary product development.

8. Provision of office space and facilities.